# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JULIE A. SU, Acting Secretary of Labor, U.S. Department of Labor, *Plaintiff*, v. AMERICARE HEALTHCARE SERVICES, INC., and DILLI ADHIKARI, *Defendants*. | CA No. 2-21-cv-05076-EAS-KAJ Judge Edmund A. Sargus, Jr. |

## MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**COMBINED TABLE OF CONTENTS AND SUMMARY OF THE ARGUMENT**
........................................................................................................................... 1

**RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS** ......................................................................................................... 4

I.     Response to Plaintiff's Statement of Undisputed Material Facts.................... 4

     A.     Plaintiff's Contentions as to Defendant Americare's Operations........... 4

     B.     Plaintiff's Contentions as to Defendant Adhikari's Alleged Ownership and Control over Americare ..................................................................... 6

     C.     Plaintiff's Contentions that the Aides are Defendants' Employees ....... 7

     D.     Plaintiff's Contentions that Defendants Failed to Comply with the Overtime Provisions of the FLSA. ...................................................... 12

     E.     Plaintiff's Contentions that Defendants Owe Overtime Back Wages to 1,474 Employees ...................................................................................... 14

     F.     Plaintiffs' Allegations that Defendants Have No Viable Good Faith Defense to Avoid Liquidated Damages because They Knew They Were Required to Pay Overtime Before the Violations Occurred in this Case. ....................................................................................................... 15

     G.     Plaintiffs' Allegations that Defendants Willfully Violated the FLSA.. 17

     H.     Plaintiff's Allegations as to Defendants' Recordkeeping Violations .... 18

     I.     Plaintiff's Allegations as to Defendants' Continuing FLSA Violations 19

II.     Defendants' Statement of Additional Material Facts..................................... 19

     A.     Americare's Relationship with the Consumers and Aides .................. 19

     B.     Linkosky's statements during the DOL investigation.......................... 21

     C.     Investigator Alloway's comments. ....................................................... 22

**ARGUMENT**.............................................................................................................. 24

I.     The Court should rule on Defendants' Motion for Partial Summary Judgment first. ......................................................................................................... 24

II.     Standard of Review ........................................................................................ 25

i

III.    The government has not met its burden to demonstrate that no reasonable juror could find for Defendants on its claim for overtime violations. ............. 27

     A.    A reasonable fact-finder could conclude that an employer-employee relationship did not exist between the Aides and Defendants. ............ 29

     B.    Disputed issues of law and fact preclude finding violations, at summary judgment, for each and every Aide and for each and every pay period alleged by the government. .................................................................. 34

IV.    The government has not carried its burden of proving Defendants willfully violated the FLSA's overtime requirements. .................................................. 39

V.    Disputed facts preclude summary judgment on Defendants' good faith defense. .................................................................................................................... 41

VI.    Summary judgment on the alleged record keeping violations would be premature. ............................................................................................................ 43

VII.    Entry of an injunction would be premature at this stage. ............................. 45

**CONCLUSION** ........................................................................................................ **46**

4883-2204-5087 v3

**COMBINED TABLE OF CONTENTS AND SUMMARY OF THE ARGUMENT**

Pursuant to Local Rule 7.2(a)(3), Defendants provide the following combined table of contents and concise summary of the argument.

**I.** Defendants' Motion for Partial Summary Judgment presents a logically antecedent question of law, as it raises arguments challenging the validity of the government's removal, by regulatory fiat, of third-party employers' ability to claim the companionship and live-in exemptions under 29 U.S.C. §§ 213(a)(15) and (b)(21), respectively. Accordingly, Defendants' submit that the Court should resolve their Motion first.

**II.** The government fails, in its memorandum, to articulate the correct standard of review for a motion for summary judgment where the moving party will also bear the burden of persuasion at trial. This is important because such a movant bears a heavier burden at summary judgment: not only must they demonstrate an absence of genuine disputes of fact, they must also show that no reasonable juror could rule for the non-moving party.

**III.** The government has not met its burden to demonstrate that no reasonable juror could find for Defendants on its claims for overtime violations for a few reasons. First, the government has not conclusively demonstrated the existence of an employment relationship between Defendants and the workers at issue because the evidence, construed in Defendants' favor, arguably shows that the workers are not ultimately economically dependent on Americare. Next, even if an employment relationship exists, the government's claim for alleged violations from October 19, 2018, to

1

September 6, 2019, cannot be resolved at summary judgment if the Court either rules in Defendants' favor on their MPSJ or finds a triable issue of fact on willfulness. Finally, for the remaining alleged violations, Defendants submit that there is a genuine dispute of fact with respect to whether they intentionally manipulated the workers' rates of pay (as alleged by the government) or if they followed their stated practice of reaching agreement on a revised rate of pay with individual workers. Because a reasonable juror would not be required to find that Defendants intentionally manipulated the workers' rates of pay, summary judgment cannot be granted in the government's favor.

**IV.** Summary judgment on the issue of willfulness should not be granted in the government's favor. Adhidari's testimony regarding his efforts to obtain guidance regarding the FLSA's overtime requirements, and the mixed advice he received, could lead a reasonable juror to conclude that he did not act with knowledge or reckless disregard of the law's requirements. This interpretation of the evidence is buttressed by the actions and comments of Adhikari's former counsel, Linkosky, who represented to DOL investigators that he believed Americare was in compliance.

**V.** Similarly, summary judgment should not be granted at this juncture on the issue of Defendants' good faith defense. The evidence on this issue is much the same as on the issue of willfulness. Although Defendants bear the burden of persuasion on the issue, when viewed in the light most favorable to Defendants, a reasonable fact-finder could conclude that Defendants had both subjective good faith and an objectively reasonable basis for their conduct.

**VI.** Because there is a genuine dispute as to whether the workers were Defendants' employees, summary judgment in the government's favor on the alleged record-keeping violations would be premature.

**VII.** Because disputed issues of fact and law preclude an entry of summary judgment on the government's primary claims for overtime violations, the Court should decline the government's request for an injunction at this stage of the proceedings.

**RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS**

## I.     Response to Plaintiff's Statement of Undisputed Material Facts

### A.     Plaintiff's Contentions as to Defendant Americare's Operations

1.     Undisputed

2.     Undisputed

3.     Undisputed to the extent that Defendants have stipulated that "[i]n calendar years 2018, 2019, 2020, 2021, and 2022, Americare's employees handled or otherwise worked with goods or materials that traveled across state lines." Disputed to the extent that Plaintiff seeks to infer from this stipulation that the Home Health Aides ("Aides") at issue in this litigation are or were "employees" of Defendants, which is a legal conclusion based on disputed facts.

4.     Undisputed.

5.     Undisputed.

6.     Undisputed to the extent that the range of caregiving activities listed by Plaintiff is consistent with the range of caregiving duties an Aide might be called upon to perform. Disputed to the extent that Plaintiff's statement implies that Defendants "hire" Aides in the typical sense of that term or that Defendants are responsible for assigning the caregiving duties any given Aide performs on behalf of the consumer(s) to whom he or she provides services. To the contrary, because Aides and consumers are typically relatives or otherwise closely connected in the community, the majority of Aides come to Americare having been pre-selected by their consumer. As a result, and because the care recipients have the right to select their care giver,

4

Americare's role in the "hiring" process is mostly limited to ensuring compliance with applicable law as it relates to Aide qualifications, certifications, and background screening. (*See* ECF No. 64-1, PAGEID 440-441, 30(b)(6) Dep. 120:17-121:2; *id.*, PAGEID 430-432, 30(b)(6) Dep., 110:13-112:15; ECF No. 66-1, PAGEID 3720, Bharati Dep. 17:2-7)

      7.      Disputed. Plaintiff relies on the original Complaint in the declaratory judgment action, which was amended. The Amended Complaint instead pleads that Americare "process(es) service and payroll documents" and "register[s] and conduct[s] payroll services regarding Direct Care Workers." (Am. Compl., ECF No. 25 ¶¶ 1, 24). *See Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) ("Factual assertions in pleadings and pretrial orders, *unless amended*, are considered judicial admissions conclusively binding on the party who made them.") (cleaned up) (citation omitted) (emphasis added); *B & H Med., LLC v. ABP Admin, Inc.*, 526 F.3d 257, 267 (6th Cir. 2008) (citation omitted) (stating that a prior "complaint is a nullity, because an amended complaint supersedes all prior complaints").

      8.      Undisputed to the extent that Americare maintains offices in each of the cities listed by Plaintiff. Disputed to the extent that Plaintiff's statement attempts to imply that Aide report solely to Americare's Area Directors, or that the Area Directors exercise meaningful control over the work of the Aides beyond assuring compliance with applicable law, including quality control measures. *See* 29 C.F.R. § 795.105(d)(1)(i) ("Requiring the individual to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed-upon

5

deadlines or quality control standards, or satisfy other similar terms that are typical of contractual relationships between businesses (as opposed to employment relationships) does not constitute control that makes the individual more or less likely to be an employee under the Act.").

9. Undisputed to the extent that the Area Directors perform the duties listed. Disputed, however, to the extent that Plaintiff seeks to imply that the performance of these functions constitutes the kind of control indicative of an employment relationship, as each of these functions—ensuring Aides are qualified before authorizing them to provide services to Americare's consumers and ensuring that Aides are providing the amount and quality of care required—are required by applicable law. (*See, e.g.,* 42 C.F.R. 484.80 (relating to home health aide qualifications; Ohio Admin. Code 3701-60-06 (requiring criminal records check); Ohio Admin. Code 173-9-03 (specifying databases for background checks).

10. Undisputed.

11. Undisputed.

12. Undisputed.

**B.** **Plaintiff's Contentions as to Defendant Adhikari's Alleged Ownership and Control over Americare**

13. Undisputed.

14. Undisputed.

15. Undisputed.

6

16.     Undisputed to the extent that this paragraph accurately reflects the cited testimony. Disputed to the extent that the cited testimony is incomplete. Adhikari went on to explain that Americare simply implements policy (including as it relates to the Aides) as dictated by state and federal law. (ECF No. 69-1, PAGEID 3965-3966, Adhikari Dep. 23:2-24:12).

17.     Disputed. Dhital testified that Adhikari is called upon, from time to time, to make determinations regarding the rate of pay for Aides; however, in other cases Dhital approves the rate of pay. (ECF No. 71-1, PAGEID 4309-4311, Dhital Dep., 29:3-17, 30:9-31:31).

18.     Undisputed to the extent that Adhikari testified that he participated in making decisions regarding recordkeeping. Disputed, however, to the extent that Plaintiff implies Adhikari makes all recordkeeping decisions related to tracking and recording the hours worked by the Aides. For example, the cited evidence explains that "Ohio's Department of Medicaid and the private managed care organizations require the caregivers to log their services and time in an electronic visit verification ('EVV') system pursuant to Section 12006 of the 21st Century CARES Act." (ECF No. 69-3, PAGEID 4158, Adhikari Dep., Ex. 15 at RFA 30).

## C.     Plaintiff's Contentions that the Aides are Defendants' Employees

19.     Undisputed that prospective Aides complete an application. Disputed to the extent that this paragraph implies that Aides "apply" for a job with Americare in the typical sense of the term. To the contrary, the Aides who provide services to Americare's consumers are typically pre-selected by the consumer. Americare's role in the

7

onboarding process is largely limited to ensuring that the prospective Aides meet the legal requirements necessary to be authorized to provide services to the consumer, including, by way of example only, possessing mandatory certifications and passing required background checks. (*See* ECF No. 66-1, PAGEID 3719, Bharati Dep. 16:16-19; ECF No. 67-1, PAGEID 3834-3835, Acharya Dep. 10:20-11:5; ECF No. 71-1, PAGEID 4293, Dhital Dep. 13:2-7).

20. Disputed as stated in that, although minimum education requirements for Aides are not set by Americare, applicable regulations mandate minimum training and competency requirements to which Americare must adhere in its operations. (ECF No. 64-1, PAGEID 447-48, 30(b)(6) Dep. 127:5-128:6; ECF No. 66-1, PAGEID 3727, Bharati Dep. 24:10-25; ECF No. 67-1, PAGEID 3837, Acharya Dep. 13:7-19; *see also* 42 C.F.R. § 484.80).

21. Disputed as stated for the reasons set forth above in response to paragraph 20. Under applicable regulations, Americare cannot require prospective Aides to have prior home care work experience as its consumers have the right to receive care from any person they select who is qualified and willing to provide services. (*See* 42 C.F.R. § 431.51; Ohio Admin. Code 173-42-06(A)(3)(b)(ii)).

22. Undisputed that Americare conducts background checks of prospective Aides as required by applicable regulations. (*See* Ohio Admin. Code 3701-60-06 (requiring criminal records check); Ohio Admin. Code 173-9-03 (specifying databases for background checks). Undisputed that Americare, which services primarily immigrant

8

and refugee communities, confirms that prospective Aides are eligible to work in the United States and do not have tuberculosis.

23. Undisputed.

24. Undisputed that a prospective Aide whose background check discloses a disqualifying offense will not be permitted to serve as a consumer's caregiver. Disputed to the extent that Plaintiff's statement implies that Americare has discretion on the matter; to the contrary, applicable regulations prohibit Americare from enrolling a prospective Aide with a disqualifying offense. (ECF No. 66-1, PAGEID 3730-3731, Bharati Dep., 27:18-28:6; ECF No. 67-1, PAGEID 3841-3842, Acharya Dep. 17:19-18:18; *see also* Ohio Admin. Code 173-9-06).

25. Undisputed. Defendants note, however, that home-health-aide and first-aid certifications are required for prospective Aides by applicable regulation. (*See* Ohio Admin. Code 5160-46-04).

26. Undisputed. Defendants note, however, that a competency evaluation is required by applicable regulations. (*See* 42 C.F.R. § 484.80(c)).

27. Undisputed. Defendants note, however, that applicable regulations require retraining in areas where the competency evaluation is unsatisfactory. (*See* 42 C.F.R. § 484.80(c)).

28. Undisputed. Defendants note, however, that applicable regulations mandate periodic reassessment of Aide competency through in-home evaluation. (*See, e.g.,* 42 CFR 484.80(h)).

29.     Undisputed. Defendants note, however, that use of EVV is required under the 21st Century CARES Act and applicable state regulations. (*See* Ohio Admin. Code 5160-44-31(C); Ohio Admin. Code 5160-1-40).

30.     Undisputed that Defendants use paper time sheets to track and confirm delivery of the required amount and type of services.

31.     Undisputed. Incident reporting, however, is required by applicable regulations. (*See* Ohio Admin. Code 5160-44-31(B)(2)(c); Ohio Admin. Code 5160-44-05).

32.     Undisputed. Defendants are, however, obligated to ensure that Aides are delivering services of the amount and quality to which each consumer is entitled.

33.     Undisputed.

34.     Undisputed. Defendants incorporate by reference their response to paragraph 28.

35.     Undisputed. Americare, however, is required by applicable regulation to maintain such records. (*See, e.g.,* Ohio Admin. Code 173-39-02(B)(10)).

36.     Undisputed.

37.     Undisputed.

38.     Undisputed.

39.     Undisputed. A minimum of 12 hours of yearly continuing education training is, however, required by applicable regulations. (*See, e.g.,* 42 C.F.R. 484.80(d); Ohio Admin. Code 5160-46-04(A)(7)(b)).

4883-2204-5087 v3

40. Undisputed that Aides sign a document titled "Employment agreement." Disputed that the use of the words "employment" or "employee" are determinative of the existence of an employment relationship as the economic realities, not the label used, controls. *See Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015). Disputed to the extent that Plaintiff implies terms regarding "rules and procedures regarding confidential information, wound care, and medication policies" are relevant to whether the Aides are Defendants' employees. (*See* 29 C.F.R. § 795.105(d)(1)(i)).

41. Undisputed that the Aides are given a copy of Americare's employee handbook. Disputed that the use of the words "employment" or "employee" are determinative of the existence of an employment relationship as the economic realities, not the label used, controls. *See Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015). Disputed to the extent that Acharya gave conflicting testimony on whether the employee handbook applies to the Aides. (ECF No. 67-1, PAGEID 3863-3864, Acharya Dep. 39:11-40:6).

42. Undisputed. Americare is, however, required by applicable Ohio Department of Aging regulation to maintain a back-up plan for instances when an Aide is unavailable. (*See, e.g.,* Ohio Admin. Code 173-39-02.11(C)(2)(c)).

43. Undisputed. Defendants incorporate by reference their response to paragraph 42.

11

**D.      Plaintiff's Contentions that Defendants Failed to Comply with the Overtime Provisions of the FLSA.**

44.      Disputed. Paragraph 44 sets forth a conclusion of law based on disputed issues of fact and law, including, for example, the validity of the 2013 Home Care Rule, whether the Aides were/are Defendants' employees, whether Defendants pay practices violated the overtime requirement, and whether, assuming such practices were unlawful, the alleged violations were willful.

45.      Undisputed to the extent that for the period from October 19, 2018, to about September 6, 2019, Defendants paid Aides at their regular rate for all hours worked. Defendants dispute that this was in violation of the FLSA as the Aides were not employees as defined by the FLSA; and, even if they were, Defendants are entitled to claim the companionship and live-in exemptions. *See* 29 U.S.C. § 213(a)(15) and (b)(21). Defendants further dispute whether they can be held liable for alleged violations in this period as Defendants contend that any violations were not willful.

46.      Undisputed that beginning on or about September 6, 2019, Defendants adjusted their pay practices to begin paying Aides time and a half for hours worked in excess of 80 in a two-week pay period. Disputed that Defendants unilaterally adjusted Aide rates of pay based on hours worked; to the contrary, testimony from Adhikari establishes that changes to Aide rates of pay after September 6, 2019, were made in response to changes to a given Aide's consumer's care plan and after reaching agreement on the revised rate of pay with the affected Aide. Consequently, Defendants dispute that their pay practices after September 6, 2019, resulted in overtime

12

violations. (*See* ECF No. 64-1, PAGEID 389, 30(b)(6) Dep., 69:3-25; *id.*, PAGEID 532, 30(b)(6) Dep. 212:3-24; *id.*, PAGEID 551, 30(b)(6) Dep., 231:15-24).

47.     Undisputed to the extent that paragraph 47 accurately describes the payroll records for Aide Sujata Dahal for the three pay periods identified. It is further undisputed that Plaintiff's calculations produce an average hourly rate for the pay periods identified of $12.50 or $12.51. Otherwise disputed for the reasons set forth in response to paragraph 46.

48.     Disputed as the cited evidence lacks relevant context, namely, Americare's lack of control over the hours worked by the Aides (which are dictated by care plans issued by third-party service coordinators (also referred to as "case managers"), and Americare's practice of renegotiating and reaching agreement with Aides on revised rates of pay in response to changes to care plans made by the service coordinators. (*See* ECF No. 64-1, PAGEID 341, 30(b)(6) Dep., 21:7-10; *id.*, PAGEID 439, 30(b)(6) Dep., 119:3-21; ECF No. 66-1, PAGEID 3721, Bharati Dep. 18:9-21; ECF No. 71-1, PAGEID 4316-4317, Dhital Dep., 36:9-37:10; ECF No. 64-1, PAGEID 389, 30(b)(6) Dep., 231:13-24)

49.     Disputed. Pradhan, Americare's payroll coordinator, clarified that it was his understanding that changes to an Aide's rate of pay that he was instructed to make were related to changes in the applicable care plan. Furthermore, Pradhan testified that his duties were limited to entering data in the company's payroll software and checking the payroll for accuracy. (ECF No. 70-1, PAGEID 4242 and 4249, Pradhan Dep., 17:12-23, 24:9-25:9).

13

50.     Undisputed that paragraph 50 accurately quotes the cited testimony. That said, Defendants explained at length the financial constraints on home care agencies operating in Ohio, including low rates of reimbursement, variations (usually downward) in the reimbursement rate depending on a consumer's mix of approved services, and the fact that the reimbursement rates make no provision for overtime. (*See* ECF No. 64-1, PAGEID 341-345, 30(b)(6) Dep., 21:15-25:10).

51.     Undisputed that Adhikari so testified; however, in context and construed in the light most favorable to Defendants, his testimony reflects an attempt to express that Americare strives to pay the Aides as much as possible within the confines of the reimbursements it receives, even to the point of losing money. (ECF No. 64-1, PAGEID 537-538, 30(b)(6) Dep., 217:16-218:11 ("So we are – this is a blessing for these people if they are getting $12.50 *where we were getting only $14 from the State*.") (emphasis added)).

52.     Undisputed that the payroll records reflect some pay periods after September 6, 2019, in which Aides worked more than 80 hours and were not paid overtime.

53.     Undisputed that paragraph 53 accurately describes the identified payroll records.

### E.     Plaintiff's Contentions that Defendants Owe Overtime Back Wages to 1,474 Employees

54.     Undisputed.

55. Undisputed that the method of calculating back wages described in paragraph 55 is the method used by the government for all Aides at issue in this case. Disputed that this method was correct or appropriate.

56. Undisputed that the government employed the method described in paragraph 56 to determine overtime hours worked.

57. Undisputed as to the accuracy of the government's math. Disputed as to Defendants' alleged liability for the claimed back wages for the reasons set forth in Defendants' response to paragraph 45.

58. Disputed for the reasons set forth in paragraph 46. Defendants further dispute the government's calculation as, even assuming Defendants pay practices after September 6, 2019, resulted in violations as alleged, the computations include Aides for which no violation occurred, including, for example, Aides who always worked the same number of hours without downwards adjustments in pay.

59. Disputed for the reasons set forth in Defendants' responses to paragraphs 57 and 58.

**F.      Plaintiffs' Allegations that Defendants Have No Viable Good Faith Defense to Avoid Liquidated Damages because They Knew They Were Required to Pay Overtime Before the Violations Occurred in this Case.**

60. Disputed. Adhikari testified that, at the time, he had received mixed or inconclusive advice regarding overtime pay with respect to his PA business, and therefore elected to begin paying overtime as a prophylactic measure. (*See* ECF No. 64-1, PAGEID 371-372, 30(b)(6) Dep., 51:19-52:13; *id.*, PAGEID 375-376, 30(b)(6)

15

Dep., 55:13-56:22; *id.*, PAGEID 401 ECF No. 69-1, PAGEID 4024, Adhikari Dep., 82:19-22).

61.     Undisputed.

62.     Disputed. Adhikari's testimony, when read in context, demonstrates that he was unsure of the 2013 Home Care Rule's applicability to Americare. (*See* ECF No. 64-1, PAGEID 371, 30(b)(6) Dep. 51:12-52:13 (stating his understanding "home care agencies are not employer" and explaining advice he relied upon regarding exemptions).

63.     Undisputed that Adhikari testified to receiving advice from an attorney based in Westerville, Ohio, in 2016 or 2017 that "like the companion services, home-making services are exempted from overtime." Furthermore, although he did not recall the attorney's address, Adhikari recalled the approximate location where the attorney maintained his home office. (ECF No. 64-1, PAGEID 373, 30(b)(6) Dep., 53:17-24). Adhikari further explained that the attorney represented himself as having experience with the FLSA. (*Id.* PAGEID 374, 54:4-10).

64.     Undisputed.

65.     Undisputed that Intra-National was investigated by the Pennsylvania Department of Labor in 2018. Undisputed that Adhikari testified to there having been a collective action for unpaid overtime filed against Intra-National in 2017.

66.     Undisputed.

67.     Undisputed.

68.     Undisputed.

16

69. Undisputed.

70. Undisputed. That said, Adhikari also testified that, until recently, agreements with Aides on changes to pay rates were mostly made verbally.

71. Disputed. While Adhikari testified that Linkosky advised him to pay overtime, Linkosky also entered his appearance on behalf of Americare in its declaratory judgment action against the government, now on appeal to the Third Circuit, which seeks a ruling that the 2013 Home Care Rule is unlawful. (*See Intra-National et al. v. U.S. Dept. of Labor, et al.,* 2:20-cv-01545-WSH (W.D. Pa.) at ECF No. 3). A reasonable fact-finder could construe this action by Linkosky as an endorsement of the claim that Americare's Aides are exempt from the FLSA's overtime requirements based on the companionship and live-in exemptions, 29 U.S.C. §§ 213(a)(15) & (b)(21).

72. Undisputed.

73. Disputed. In the first portion of cited testimony, Adhikari indicates his understanding of the challenged rule; however, the lawfulness of that rule is directly at issue in the declaratory judgment action (and is also challenged here). Adhikari's understanding of what the 2013 Rule was intended to do is therefore not inconsistent with a reasonable belief that the 2013 Rule is invalid.

### G. Plaintiffs' Allegations that Defendants Willfully Violated the FLSA.

74. Disputed. Defendants' employees are exempt under the companionship and live-in exemptions, so they did not violate the FLSA, let alone do so willfully. 29 U.S.C. §§ 213(a)(15) & (b)(21). In addition, Adhikari's testimony is unclear on willfulness, as he also states that it was his understanding that home care agencies like his

17

are not employers of the Aides. Adhikari further clarified that around this time he was uncertain as to overtime rules applicable to his business. (ECF No. 64-1, 30(b)(6) Dep., PAGEID 371-372, 52:12-53:19).

75.    Disputed. Adhikari's testimony on the state of his knowledge of FLSA overtime requirements, when viewed in full, was vague and inconclusive. Accordingly, the most that can be inferred from Adhikari's testimony for purposes of summary judgment is that he was unsure of the Act's requirements.

76.    Disputed for the reasons set forth in Defendants' response to paragraph 65.

77.    Undisputed.

78.    Undisputed that Adhikari implemented similar payment practices as those at issue here in his Pennsylvania business in mid-2018. Disputed to the extent that paragraph 78 implies that these pay practices were unlawful, as that is a disputed legal issue.

79.    Undisputed that from October 19, 2018, until about September 6, 2019, Defendants paid Aides straight time for all hours worked. Otherwise, disputed.

80.    Disputed for the reasons set forth in Defendants' response to paragraph 46.

### H.    Plaintiff's Allegations as to Defendants' Recordkeeping Violations

81.    Disputed. Defendants have produced numerous paper time sheets in which the Aides record their weekly hours worked. (*See, e.g.,* ECF No. 66-1, PAGEID 3801-3803, Bharati Dep. Ex. 9)

18

82. Disputed. Paragraph 82 sets forth a conclusion of law based on disputed facts and legal issues.

83. Disputed. Paragraph 83 sets forth a conclusion of law based on disputed facts and legal issues.

### I. Plaintiff's Allegations as to Defendants' Continuing FLSA Violations

84. Disputed for the reasons set forth in Defendants' response to paragraph 46.

## II. Defendants' Statement of Additional Material Facts

### A. Americare's Relationship with the Consumers and Aides

85. Consumers are referred to Americare through a variety of avenues to receive care. (*See* ECF No. 71-1, PAGEID 4290-4292, Dhital Dep. 10:24-12:23).

86. The majority of Americare's clients come from the Nepali community. (ECF No. 64-1, PAGEID 600, 30(b)(6) Dep., 280:20-23; ECF No. 71-1, PAGEID 4293, Dhital Dep. 13:2-4).

87. Americare does not determine the type or amount of care any consumer referred to them for service will receive; rather the scope of services is determined by a care plan issued by a service coordinator/case manager. (*See* ECF No. 64-1, PAGEID 341, 30(b)(6) Dep. 21:7-10; *id.*, PAGEID 507, 30(b)(6) Dep. 187:5-14; ECF No. 66-1, PAGEID 3720, Bharati Dep., 17:8-20; ECF No. 66-1, PAGEID 3784-3795, Bharati Dep. Ex. 3).

88. These care plans are periodically revised, with the revisions often entailing changes to the mix of services, which can have different reimbursement rates.

19

(ECF No. 64-1, PAGEID 341-343, 30(b)(6) Dep., 21:15-23:10; *id.*, PAGEID 391, 30(b)(6) Dep., 71:6-24

89.     Many of Americare's consumers will decline to receive care from an Aide who is not a member of their religion or culture. (*See* ECF No. 71-1, PAGEID 4293-94, Dhital Dep. 13:20-14:5) ("And it's a big cultural cluster that even if we try to send from outside, the valid care, the customers don't want that because it's a religious thing, cultural thing. If somebody cook food for them, they don't eat. If somebody takes them water, they don't like it.").

90.     As a result, most of the Aides providing services to Americare's consumers are a family member or relative of the consumer for whom they care. Furthermore, many of the Aides reside in the same home as the consumer for whom they provide services. (ECF No 64-1, PAGEID 341 & 347, 30(b)(6) Dep. 21:7-14, 27:11-12; ECF No. 66-1, PAGEID 3720, Bharati Dep. 17:2-7 (noting that "almost every client caregivers are family members"), PAGEID 3726, 23:17-20 (same); ECF No. 71-1, PAGEID 4293, Dhital Dep. 13:20-23 (noting that "95 to 98 percent of home health aide belongs to their family members.").

91.     Consumers and their families (including the Aides), also frequently negotiate with Americare regarding pay and ancillary services, such as having Americare employees come to their homes to pick up timesheets or drop off prescriptions. (*See* ECF No. 64-1, PAGEID 453, 30(b)(6) Dep., 133:8-24).

92.     Because of these family relationships, and the ease with which consumers can—and do—switch between home care agencies, with the Aide changing agencies with them. (ECF No. 64-1, PAGEID 345, 25:11-16; *id.*, PAGEID 347-348, 30(b)(6) Dep. 27:11-28:6; ECF No. 64-1, PAGEID 409, 30(b)(6) Dep. 89:1-9; ECF No. 71-1, PAGEID 4311, Dhital Dep. 31:14-21).

**B.     Linkosky's statements during the DOL investigation.**

93.     The DOL's investigation of Americare was supervised by now-former Assistant District Director John Dudash. (Dudash Dep., 8:2-8 (retirement date) and 11:22-12:7).

94.     Dudash testified that he participated in several telephone conferences with Linkosky. (Dudash Dep., 10:5-7, 11:3-6).

95.     As to their first interaction, Dudash recalled Linkosky stating that he represented Americare and insisting on performing a self-audit, rather than submit records to the investigators. (Dudash Dep., 10:10-16).

96.     About subsequent conversations with Linkosky, Dudash recalled, "He [Linkosky] filed suit to say that the law did not apply…and at that point in time he quit doing the computations and was not going to provide us with any records, so I talked to him once or twice about getting the records and let's move forward, but I was not successful." (Dudash Dep., 11:6-12).

97.     In particular, with respect to these conversations, Dudash recalled that "He [Linkosky] said he believed his client was in compliance. He said that the first couple of years maybe not when they were paying straight time for the hourly rate,

21

but he said then they came into compliance and there was no need." (*Id.* 11:15-19, 14:23-15:8).

98.     In an e-mail to DOL investigator Stephen Alloway, Linkosky similarly stated his position that Adhiarki's Pennsylvania company, Intra-National was in compliance since August 2018. (*See* ECF No. 74-2, Linkosky E-Mail, PAGEID 4537).

99.     Dudash also recalled having discussions with Linkosky about whether the exemptions applied in this case. (Dudash Dep. 13:23-14:1).

**C.     Investigator Alloway's comments.**

100.     During his deposition, Alloway commented that "I mean, employers do have the right to reduce or increase an employee's pay," with the caveat that "you can't engage in like a bookkeeping method to avoid overtime." (ECF No. 74-1, Alloway Dep., 94:4-14).

101.     Alloway agreed that an employer could pay different rates of pay to different employees working roughly similar jobs. (*Id.*, 94:15-95:3).

102.     Alloway further agreed that nothing in the FLSA prevents employers and employees from renegotiating the employee's rate of pay, and that such renegotiations could take place at any time and for any reason. (*Id.*, 95:4-21).

103.     Wage transcription and computation sheets prepared in the course of Alloway's investigation include examples of Aides whose hours never varied and whose rate of pay reflected only raises, along with other examples of Aides whose rate of pay changed one time in connection with a change in hours but was otherwise consistent before and after the change, which is consistent with Defendants' testimony

22

regarding their practices. (*See* ECF No. 74-2, PAGEID 4538-4541, Allow Dep. Exs. 7-8).

104. The computations submitted by the government likewise contain similar examples of Aides whose hours never changed and whose earnings never decreased, although analysis is complicated by the fact that the computations for many of the Aides are not presented in date-sequence. (*See, e.g.,* ECF No. 79-4, PAGEID 25622-25633, Comps., "Damber Kumari Biswa"; *id.*, PAGEID 25634, Comps. "Rajun Biswa"; *id.*, PAGEID 25637, Comps., "Santa Bir Biswa"; *id.*, PAGEID 25651, Comps., "Bhumika Chauhan"; *id.*, PAGEID 25656, Comps., "Dilip Chhetri").

23

## ARGUMENT

### I. The Court should rule on Defendants' Motion for Partial Summary Judgment first.

In support of their Motion for Partial Summary Judgment, Defendants argue that, for a number of different reasons, the 2013 Home Care Rule, 29 C.F.R. 552.109, should be set aside, including a challenge to the validity of the government's demotion of "care" in the companionship services exemption. *See* ECF No. 77-2. Those arguments are fully developed and articulated in Defendants' briefing in support of its Motion for Partial Summary Judgment and need not be restated. That said, and before turning to addressing the government's Motion for Summary Judgment, Defendants highlight a few reasons why the Court should review and decide Defendants' Motion before addressing the government's and, furthermore, why the Court should refrain from deciding either Motion until the Supreme Court decides the *Loper Bright* and *Relentless* cases later this term.

First, the Court should decide Defendants' Motion because it presents a logically antecedent question of law—*i.e.*, whether, under the Administrative Procedure Act, the 2013 Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" such that it must be "set aside." 5 U.S.C. § 706(2). As Defendants' Motion shows, it is undisputed that at least some Aides at issue here would qualify under the companionship or live-in exemptions if the 2013 Rule is set aside, as it must be. *See* ECF No. 77-3, Concise Statement, ¶¶ 23-30, 35-41. But the 2013 Rule stands in the way. Therefore, the Court may not enter summary judgment for the government until it addresses the validity of the 2013 Rule.

24

Although Defendants asserted the companionship and live-in exemptions as affirmative defenses to the government's claims, *see* ECF No. 42, Answer, PAGEID 243, at 6, the government did not move for summary judgment on them. And, if either or both of those exemptions are available to Defendants, then the core claims the government asserts here—the alleged overtime violations—will hinge on the applicability of those exemptions to the Aides at issue in this litigation. The applicability of exemptions here would therefore at the very least depend on disputed facts, and so summary judgment for the government would be unwarranted. *See Chao v. Double JJ Resort Ranch*, 375 F.3d 393, 395-96 (6th Cir. 2004) ("Whether employees are within an exemption from the provisions of the [Fair Labor Standards] Act is primarily a question of fact.")

Next, as Defendants argue in their Motion, the validity of the 2013 Rule depends in large measure on the continuing viability of *Chevron* deference. As the Supreme Court appears poised to overturn—or at least significantly modify—*Chevron*, the Court should refrain from ruling on these motions until the rule of decision applicable to Defendants' challenge to the 2013 Rule is clarified.

## II.     Standard of Review

The government accurately states the general rule that "[s]ummary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." (ECF No. 78-1 at 20, PAGEID 25467 (citing Fed. R. Civ. P. 56(a) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). However, the government fails

25

to acknowledge that the moving party must meet a heightened burden on issues for which it also bears the ultimate burden of persuasion—which, for purposes of the present Motion, is every issue aside from Defendants' good faith defense to the claim for liquidated damages.

According to the Sixth Circuit, "'summary judgment in favor of the party with the burden of persuasion…is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)). That is, the government can only prevail here "if the evidence is such that every reasonable juror" would decide in the movant's favor. *Id.* (citing *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir. 2001)); *see also Timmer v. Mich. Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997)("In addition, if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.") (citation omitted).

As such, "[w]hen the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden." *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F.Supp.3d 842, 850 (E.D. Mich. 2015) (citation omitted). In other words, the government here must "satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it

26

would be entitled to a directed verdict at trial.'" *Id.* And, a motion for directed verdict "'may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and *reasonable minds could come to but one conclusion, in favor of the moving party.*'" *Hurt v. Commerce Energy, Inc.*, 973 F.3d 509, 517 (6th Cir. 2020) (quoting *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012) (emphasis added)).

Here, the government has not met its burden on the issues for which it bears the burden of persuasion or on Defendants' good faith defense, nor has it established an absence of disputed factual issues warranting judgment in its favor on Defendants' good faith defense.

## III. The government has not met its burden to demonstrate that no reasonable juror could find for Defendants on its claim for overtime violations.

To prevail on its claim that Defendants violated the FLSA's overtime requirement, the government is required to prove (a) that the Aides are covered "employees" under the FLSA, (b) that an employer-employee relationship exists/existed between Defendants and the Aides;[1] (c) that the Aides worked more than 40 hours in a given

---

[1] Just days ago, the Department of Labor published a new rule that purports—once again—to address "how to determine whether a worker is properly classified as an employee or independent contractor under the Fair Labor Standards Act." 89 Fed. Reg. 1638, 1638 (Jan. 10, 2024). The rule is not effective until March 11, 2024, and may not in any event be retroactively applied to the past conduct at issue here without violating due process. *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). Should the government take the extraordinary and unlawful step of relying upon this new rule in its reply, Defendants will request an opportunity for a surreply, and argue that the rule must be set aside.

workweek; and (d) that wages "at a rate not less than one and one-half times the regular rate" for each Aide were not paid for hours worked in excess of 40. *See* 29 U.S.C. § 207(a)(1).

Before turning to the disputed issues, some brief discussion of the undisputed facts. Leaving aside the Aides, Americare does not dispute that it employs area managers, office staff, and payroll staff. And, Defendants have stipulated that they are subject to "enterprise" coverage under 29 U.S.C. § 203(s)(1)(A),and must therefore comply with overtime requirements. Second, there is no dispute that, if the government prevails, Adhikari may be held individually liable as he is the sole beneficial owner of Americare and is actively involved in both overall policymaking and day-to-day operations of the company. Third, there is no dispute that the Aides at issue here worked more than 40 hours in at least some workweeks when they provided services to Americare's consumers. Finally, there is no dispute that from October 19, 2018, to about September 6, 2019, Defendants paid the Aides at their regular rates for all hours worked. But whether this pay practice violated the FLSA's overtime requirement depends on whether the companionship and live-in exemptions apply to the employees at issue, a question that Defendants vigorously dispute.

For the reasons discussed below, disputed facts (or undisputed facts that must be interpreted in Defendants' favor) preclude determining at summary judgment (1) whether an employer-employee relationship existed between Defendants and the Aides and (2) whether Defendants' payroll practices after September 6, 2019, violated the FLSA for every pay period in which any Aide worked more than 80 hours.

28

**A.** **A reasonable fact-finder could conclude that an employer-employee relationship did not exist between the Aides and Defendants.**

Whether an individual worker "is an employee is a mixed question of law and fact." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) ("'[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts…the question is to be resolved by the finder of fact in accordance with the appropriate rules of law.'"). To determine whether a particular worker is an "employee," courts in this Circuit apply an "economic-reality test" that, ultimately, looks to resolve whether the worker is "'as a matter of economic reality…dependent upon the business to which they render service.'" *Id.* at 807 (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)).

The Sixth Circuit applies a six-factor test to determine if an employment relationship exists. Those factors are: (1) the permanency of the relationship, (2) the degree of skill required for the job, (3) the worker's investment in equipment or materials, (4) the worker's opportunity for profit or loss, depending on his or her skill, (5) the degree of the alleged employer's right to control the work, and (6) whether the work or service is an integral part of the employer's business. *See Acosta v. Off Duty Police Servs.*, 915 F.3d 1050, 1055 (6th Cir. 2019) (citations omitted). "No one factor is determinative," as the "central question is the worker's economic dependence upon the business for which he is laboring." *Keller,* 781 F.3d at 807 (quoting *Brandel*, 736

29

F.2d at 1120). The Department of Labor's interpretive guidance, which likewise focuses on "economic dependence as the ultimate inquiry," sets forth a similar list of factors. 29 C.F.R. § 795.105(b).

Here, factors (1), (2) and (5)—the analysis of which turn on disputed facts or undisputed facts that must be construed in Defendants' favor—preclude summary judgment for the government on the employment relationship issue. Factor (1)—the permanency of the relationship—weighs against finding the existence of an employment relationship, as the relationship between Americare and the vast majority of its Aides is defined by the ongoing enrollment of the Aide's care recipient as a consumer of Americare. That is, when a consumer's service plan expires and is not renewed, or the consumer elects to move to another agency (as some do), the Aide providing services typically does not continue working for Americare. Indeed, in the case of a consumer switching agencies, the Aide will typically follow the consumer to the new agency. Construed in Defendants' favor, a reasonable fact-finder could view this evidence that the Aides are "on contract" with Americare to provide services to their care recipient.

Next, viewing the evidence in the light most favorable to Defendants, factor (2) tilts in favor of finding no employment relationship exists between Defendants and the Aides. Central to the analysis of this factor under both Sixth Circuit jurisprudence and the DOL's interpretive guidance is whether the worker's job requires specialized skill or training, the duration of any required training, and whether the training is provided by the worker's alleged employer. *See Keller*, 781 F.3d at 809 ("It is also

30

important to ask how the worker acquired his skill.") (citation omitted). According to DOL's interpretive guidance:

> The amount of skill required for the work. This factor weighs in favor of the individual being an independent contractor to the extent the work at issue requires specialized training or skill that the potential employer does not provide. This factor weighs in favor of the individual being an employee to the extent the work at issue requires no specialized training or skill and/or the individual is dependent upon the potential employer to equip him or her with any skills or training necessary to perform the job.

29 C.F.R. § 795.105(d)(2)(i). Here, there is evidence showing that Aides obtain required training and certifications before they can be authorized to deliver services to Americare's consumers. Americare does not provide this training; instead, the Aides obtain the training and certification from third-party providers. Construed in Defendants' favor, this evidence tends to show that the Aides do require some level of specialized skill and training and that Defendants do not provide them with that training.

Factor (5), the employer's right to control the work—which DOL's interpretive regulation identifies as a "core" factor, 29 C.F.R. 795.105(d)(1)(i)—also weighs against finding the existence of an employment relationship. Notably, in discussing this factor, DOL's regulation explains that

> Requiring the individual to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed-upon deadlines or quality control standards, or satisfy other similar terms that are typical of contractual relationships between businesses (as opposed to employment relationships) does not constitute control that makes the individual more or less likely to be an employee under the Act.

31

*Id.* Here, Defendant's purported right to control the Aides work effectively begins and ends with compliance requirements of the nature described by the Department. Otherwise, the Aides' work is controlled by the consumer, the service coordinator, and the Aides themselves. Americare does not authorize the services the Aides provide, nor does Americare determine the number of hours of service to be provided. Aides, in consultation with their consumer and the service coordinator, determine their own work schedules. When and how to provide the services is largely left up to the Aide and the consumer, so long as the consumer's documented needs are being met in accordance with the care plan.

Similarly, Americare's discretion in deciding to onboard a particular prospective Aides is low-touch and tightly constrained. Americare's functions—like ensuring prospective Aides possess required certifications and do not have any disqualifying criminal history—are ministerial tasks about whether the Aide is able to provide the relevant services; the primary "hiring" decision is left entirely to the consumers. In the vase majority of cases, Americare's consumers pre-select as their caregiver a family member or close relative. Because consumers have the right to select who will provide their care services, Americare does not make "hiring" decisions; rather, the company's role is mainly limited to ensuring that the selected caregiver meets the necessary prerequisites to provide services. Americare in many cases also lacks the ability to require that a consumer take on additional care givers to offset its overtime liability, short of declining to continue to provide services to a consumer. Many of Americare's consumers have strict religious and/or cultural sensitivities to receiving

32

personal care—which includes services like assistance with bathing, toileting, grooming, and meal preparation—from individuals who are not of their ethnic or religious community.

Finally, a reasonable factfinder could (and, indeed, should) conclude that the Aides ultimately, are not economically dependent on Americare in the relevant sense. The close family relationships typical of Americare's consumers and their Aides, and the high degree of mobility of consumers moving from one agency to another, put the consumers and the Aides in the driver's seat: *they* are the ones that hire Americare, rather than the other way around. That is, as Adhikari and others testified, Americare's consumers (some acting through family member representatives) effectively "shop around" for home care agencies, readily switching agencies to obtain the best package of ancillary services (i.e., services not provided for in the care plan or provided by an Aide, like prescription delivery) for their families and pay for their family member Aide. The Aides are economically dependent on their consumer and the particular government-sponsored program through which they are approved to receive services, not Americare, which merely facilitates these transactions.

This is dispositive here. The lack of permanency inherent to the relationship between many of the Aides and Americare; Americare's lack of meaningful control over the Aides (outside of ministerial tasks such as ensuring compliance with health, safety, and quality control requirements) and the reality that the Aides are not economically dependent on Americare, a reasonable factfinder should not, and at the

33

very least would not be *required* to, find that an employment relationship exists. Accordingly, the government's summary judgment motion should be denied.

> **B. Disputed issues of law and fact preclude finding violations, at summary judgment, for each and every Aide and for each and every pay period alleged by the government.**

The overtime violations alleged by the government divide into two distinct periods: (1) from October 19, 2018, to about September 6, 2019, when Defendants admittedly paid Aides at their regular rates for all hours worked; and (2) from about September 6, 2019, to present, where the government alleges that Defendants engaged in a scheme to manipulate their payroll records to give the appearance of paying overtime when, in reality (according to the government), Defendants continued to pay straight time for all hours worked.

> *1. October 19, 2018 to September 6, 2019*

Dealing with the first period is relatively straightforward. As noted above, Defendants do not dispute that they paid Aides at their regular rate for all hours worked from October 19, 2018, to about September 6, 2019. Assuming the Court (1) declines to set aside the 2013 Rule, (2) finds that the Aides were Defendants' employees, and (3) finds that the alleged violations were willful, then there is no dispute that the Defendants did not pay overtime as required under the FLSA during that period. However, if any of these assumptions does not hold, summary judgment for the government cannot be granted for the alleged violations during the 2018-2019 period.

34

First, whether the alleged violations were willful is dispositive of whether Defendants have any potential liability for the 2018-2019 period at all. That is, the government's Complaint was filed on October 19, 2021; accordingly, unless the three-year limitations period for willful violations applies, claims for alleged violations for the October 19, 2018, to September 6, 2019, period would be time-barred. And, as Defendants argue below, the government has not met its burden to warrant summary judgment in its favor on the willfulness issue. Next, if the Court determines either (a) that factual disputes preclude summary judgment on the employment relationship issue or (b) that the 2013 Rule must be set aside, then summary judgment cannot be granted and the claims for this period must proceed to trial on either the employment relationship issue or the applicability of the companionship and live-in exemptions, or both. To be sure, Defendants contest all three issues.

### 2. *September 6, 2019, to present*

The alleged violations for the 2019 to present period present a more difficult analysis. First, for the reasons noted above, summary judgment in favor of the government for these alleged violations would be inappropriate if the Court either finds the existence of genuine disputes of fact on the employment relationship issue or the Court concludes that the 2013 Rule must be set aside. Second, the government's claim that Defendants violated the overtime requirement for every pay period during the 2019 to present period in which an Aide worked more than 80 hours hinges on a reading of the record that fails to construe the evidence in the light most favorable to Defendants and resolves inferences in favor of the government.

35

Defendants do not dispute that the payroll records show changes to the regular rates paid to Aides and that, on the face of the records, many of these changes are inverse to changes in the number of hours worked by an Aide. Defendants do dispute, however, that these changes reflect an intentional manipulation of the payroll records to give the appearance of paying overtime despite paying only straight time for all hours worked.

The principal flaw in the government's analysis is that it begins and ends at the face of the payroll records without serious consideration of the underlying facts. As discussed above, Defendants do not control the hours worked by the Aides, nor do they determine the services the Aides provide to their consumers. Instead, the Aides' approved hours and assigned duties are dictated by care plans created by third-party service coordinators. Furthermore, these care plans are subject to change based on periodic reviews of consumer needs by the service coordinators. In light of these factors, Adhikari testified that Americare implemented a system—based on his understanding that an employer and employee are free to agree to a new rate of pay at any time—whereby the company and a given Aide renegotiate the Adie's regular rate of pay based on changes to the consumer's care plan.

Defendants' pay practice arguably complies with the FLSA. Under *Walling v. Youngerman-Reynolds Hardwood Co.*, "[a]s long as the minimum hourly rates established by § 6 are respected, the employer and employee are free to establish this regular rate at any point and in any manner they see fit." 325 U.S. 419, 424 (1945). Here, there is no question that the Aides always received at least the statutory minimum

36

wage and, furthermore, Defendants' evidence establishes that after September 6, 2019, Defendants instituted a practice of re-negotiating an Aide's hourly wage based on revisions to a third-party imposed care plan. And, while true that the regular rate cannot be computed "in a wholly unrealistic and artificial manner so as to negate the statutory purposes," *Youngerman*, 325 U.S. there is nothing necessarily "unrealistic" or "artificial" about an employer and employee agreeing on a revised hourly rate as Americare and the Aides did here in light of limitations imposed by the reimbursement rates and Americare's inability to control an Aide's hours.

*Walling v. Green Head Bit & Supply Co.*, on which Plaintiff relies, provides a useful counterpoint to Americare's situation and is furthermore distinguishable based on the specific pay practices at issue. 138 F.2d 453 (10th Cir. 1943). In that case, the employer developed a preemptive pay plan under which its employees' hourly rates would be automatically adjusted based on the number of hours worked. Importantly, there is nothing in *Green Head Bit* to suggest that the employer could not control the number of hours its employees worked in any given work week. In contrast, Americare's pay practices were largely reactive; that is, the hourly rate for an Aide was adjusted only in response to a change in the service plan and after reaching agreement with the Aide on the new rate. Notably, testimony establishes that some Aides have rejected a proposed revised rate and subsequently ceased providing services through Americare, presumably going with their consumer to a different agency. Notably, aside from a handful of Aide interviews—none of which appear to have ever addressed the issue of changes to the rate of pay—the government has not

37

presented any evidence beyond the payroll records themselves and some carefully edited soundbites (including from Pradhan, whose only roll was payroll data entry) to conclusively demonstrate that Defendants intentionally engaged in a scheme of manipulation.

That said, while Defendants maintain that making such agreements (whether verbal, as in most cases, or written) is their standard practice when faced with a revised service plan, it is also the case that their payroll records demonstrate instances in which an Aide's hourly rate changed in multiple, consecutive pay periods and instances after September 6, 2019, in which the payroll records reflect straight time wages having been paid for all hours worked, including overtime. Such instances, however, do not conclusively prove that Defendants unilaterally manipulated the Aides' hourly rates, given, for example, Adhikari's testimony that, although service plans are typically only reviewed and/or revised every three to six months, intervening events (such as a hospitalization) can result in short term changes. Furthermore, the records are also replete with other instances consistent with Defendants' stated practices—i.e., one-time changes in an Aide's rate and hours followed by long stretches worked at the new rate. Finally, the records also contain examples of Aides whose hours, including overtime, and regular rate of pay never changed the entire time they were on Americare's payroll.

In short, a reasonable factfinder would not be required to conclude that Defendants unlawfully manipulated the Aides' hourly rates to give the impression of

paying overtime while only paying straight time, or, even if they did, that these alleged violations extended to every pay period that the Aides worked overtime.

## IV. The government has not carried its burden of proving Defendants willfully violated the FLSA's overtime requirements.

The government claims that Defendants willfully violated the FLSA's overtime requirement. If that's the case, then the statute of limitations applicable to the government's claims extends from two years to three. To prevail on its claim for willful violations, the government must prove that Defendants "knew or showed reckless disregard for the matter of whether [their] conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Whether a defendant willfully violated the FLSA is a factual question." *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 416 (6th Cir. 2022) (citing *Sec'y of Labor v. Timberline South, LLC*, 925 F.3d 838, 842 (6th Cir. 2019)).

Here, viewed in the light most favorable to Defendants, a reasonable factfinder would not be required to conclude that the alleged violations, if proven, were willful. As an initial matter, the existence of a prior investigation by the Pennsylvania Department of Labor and a collective action lawsuit is not dispositive of the issue as the government has not pointed to any evidence that either resulted in a finding of non-compliance. Next, viewed in Defendants' favor, the evidence shows that Adhikari made efforts to apprise himself of whether Americare was obligated to pay overtime but received inconclusive or conflicting advice from an attorney in Westerville and Greg Castelli as to whether the Aides were exempt from the FLSA's overtime requirements. Next, although Adhikari testified that Linkosky advised him to pay the Aides

overtime, Adhikari also testified that John Linkosky told him that home care agencies like his lacked sufficient control over the Aides to be considered employers. Ultimately, as a prophylactic measure in the face of what he believed was potential overtime liability, Adhikari and Americare implemented an overtime plan they believed was compliant, based on advice they received from Linkosky that an employer could make adjustments to an employee's rate of pay so long as the employer and employee agreed on the new rate.

Next, a reasonable jury could also decline to credit statements made by Linkosky in his declaration. Linkosky states that his role was that of "consultant" and that he "did not do research or engage in any advice or counseling about any other matter involving Americare." However, Linkosky entered his appearance on behalf of Americare and Intra-National in their declaratory judgment action. And, in an e-mail to Adhikari, Linkosky describes conducting research aimed at establishing an exemption for the Aidess. Linkosky also incredibly claims that he merely "facilitated the conduct of Americare's response" to the government's investigation. Testimony and documentary evidence in the record belies this assertion, showing Linkosky holding himself out to the government as being Defendant's attorney. Indeed, Linkosky's representation of Americare went so far as participating in telephone conferences with DOL investigators, during which he represented to investigators that he believed Americare was in compliance with the FLSA. At a minimum, these inconsistencies significantly undermine his credibility and, furthermore, tend to support Adhikari's testimony that he reasonably believed Americare's pay practices were compliant.

Based on this record, a reasonable factfinder would not be required to find that Defendants knowingly or recklessly disregarded their obligations under the FLSA. Accordingly, the government's Motion should be denied as to the issue of willfulness.

## V. Disputed facts preclude summary judgment on Defendants' good faith defense.

In moving for summary judgment on Defendants' good faith defense, the government relies on the same evidence it put forth in seeking judgment on the issue of willfulness. The parties' burdens, of course, have reversed: because Defendants bear the burden of proving that they acted with good faith by taking "affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions," *Timberline S., LLC*, 925 F.3d at 856. So, to prevail here the government must demonstrate an absence of disputed fact such that it is entitled to judgment. Furthermore, the good faith defense requires a defendant to prove that the FLSA violations at issue were "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict." *Elwell v. Univ. Hosps. Home Care Servs.,* 276 F.3d 832, 840 (6th Cir. 2002) (citation omitted).

First, under the good faith component the employer "must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004). This is a subjective test "that requires that the employer have an honest intention to ascertain and follow the dictates of the [FLSA]." *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 907 (3d Cir. 1991). Here, Adhikari testified at length about his efforts to understand Defendants' obligations under the FLSA, including consulting multiple

41

attorneys. Notably, when the advice of the first two attorneys left him uncertain of what Americare's obligations were in light of information he received from other sources (for example, other home care agencies), Adhikari obtained guidance from someone he reasonably believed to be a true expert in the field—Linkosky. Based on the guidance he received—principally that an employer may lower an employee's rate with agreement from the employee—Adhikari and Americare instituted their post-September 6, 2019, pay practices. At a minimum, reasonable minds could differ on whether Adhikari's efforts evidence "an honest intention to ascertain what the Act requires and to comply with it." *Reich v. Lapatisserie, Inc.*, 1994 U.S. App. LEXIS 6608, at *4 (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)).

Next, "whether an employer had reasonable grounds to believe that its conduct did not violate the Act is decided under an objective standard." *Solis v. Min Fang Yang*, 345 Fed. App'x 35, 39 (6th Cir. 2009). Importantly, "[a]n employer may reasonably rely on advice of counsel as to whether an employment agreement violates the FLSA, even where the agreement is substantively found to be violative." *Michon v. Western Express, Inc.*, 2014 U.S. Dist. LEXIS 112238, at *11 (M.D. Tenn. Aug. 8, 2014) (citing *Featsent v. City of Youngstown*, 70 F.3d 900, 906-07 (6th Cir. 1995)). Here, assuming without conceding that Defendants violated the FLSA, their reliance on counsel—first, for the proposition that the Aides were exempt because they performed personal care and homemaking services, and, later, for the idea that they could lawfully agree with the Aides to lower the rate of pay—was objectively reasonable. Indeed, courts in this Circuit have found that even reliance on an attorney's

42

silence "*may* insulate an employer from liability for liquidated damages." *Casarez v. Producers Serv. Corp.*, 2020 U.S. Dist. LEXIS 68659, at *30 (quoting *Schneider v. City of Springfiedl*, 102 F.Supp.2d 827, 841 (S.D. Ohio 1999). Again, Linkosky's declaration—especially its contradictions with other record evidence—in light of Adhikari's contrary testimony at a minimum raises a genuine issue of fact as to whether Defendants reasonably relied on his advice. This is especially so in light of the vast gulf between Linkosky's appearance on behalf of Americare in the declaratory judgment actions and statements to DOL investigators that he believed Americare to be in compliance on the one hand, and his seeming attempts in his declaration to disclaim ever having provided Americare or Adhikari any meaningful advice regarding the FLSA whatsoever. At a minimum, the credibility issues inherent in resolving Adhikari's consistent testimony that he received guidance from Linkosky and the inconsistent evidence of Linkosky's statements during and after the investigation, preclude summary judgment.

## VI. Summary judgment on the alleged record keeping violations would be premature.

The government points to four separate record keeping requirements it alleges Defendants violated: 29 C.F.R. §§ 516.2(a)(6), (7), (8), and (9). *See* ECF No. 78-1, PAGEID 25493, Pl.'s Br. in Supp. At 37. Section 211(c) of the FLSA mandates that employers "shall make, keep, and preserve such records" as required by regulations promulgated by the Secretary of Labor. In turn, 29 C.F.R. § 516.2(a) provides that "[e]very employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or

43

both sections 6 and 7(a) of the Act apply." The government's request for judgment on the alleged record keeping violations is premature for several reasons.

First, as discussed above, Defendants contend there are genuine disputes of fact as to whether the Aides at issue in this case are Defendants' employees. By its own terms, 29 C.F.R. § 516.2 only applies to "employees"; consequently, determining the existence of any record keeping violations should wait for resolution of the whether the Aides were Defendants' employees in the event the Court decline to grant summary judgment in the government's favor on the issue.

Next, many of the alleged record keeping violations depend in large part on the applicability of the live-in exemption, 29 U.S.C. § 213(b)(21). According to 29 C.F.R. § 516.12, for employees exempt from the overtime pay requirement under Section 213(b)(21) employers need not maintain records related to either (a) the "[r]egular hourly rate of pay for any workweek in which overtime compensation is due" or (b) "[t]otal premium overtime pay for overtime hours." 29 C.F.R. § 516.2(a)(6) & (9). Evidence here—which must be construed in Defendants' favor—suggests that, at a minimum, the vast majority of the Aides providing services to Americare's consumers reside in the same home as the individual for whom they care. Similarly, there would be no violation of § 515.2(a)(6) or (9) for Aides to whom the companionship exemption applies, as both of those provisions are dependent on overtime premium pay being due in the first place.

Defendants also dispute the government's assertion that their record keeping practices are violative of § 516.2(a)(7), Defendants have maintained records of hours

worked by the Aides each workday and each workweek in the form of the paper time-sheets submitted by the Aides. *See Solis v. Aguilar*, 2009 U.S. Dist. LEXIS 87021, at *28 (M.D. Tenn., Sept. 7, 2009) ("The Act requires no particular form for the records, but does require that the records include certain identifying information about the employee and data about the hours worked and the wages earned.").

That said, there is no dispute here that, by maintaining only bi-weekly payroll records, Defendants did not, as required by § 516.2(a)(8), keep records of "daily or weekly straight-time earnings." However, even here, as discussed above, the alleged record keeping violation depends on the government prevailing on the issue of whether an employment relationship existed between the Aides and Defendants.

For these reasons, Defendants submit that resolution of the alleged record keeping violations is premature, at best, at this juncture.

## VII.  Entry of an injunction would be premature at this stage.

Because disputed issues of fact and law preclude an entry of summary judgment on the government's primary claims for overtime violations, the Court should decline the government's request for an injunction at this stage of the proceedings. Furthermore, Defendants cannot be faulted, as the government argues, for asserting good faith arguments seeking to invalidate what they reasonably believe to be an unlawful regulation and for defending themselves in this action. Should this litigation ultimately conclude with a judgment that that Defendants' practices violated the FLSA, Defendants have every intention of coming into compliance.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's request for summary judgment on (1) its claims for alleged overtime violations; (2) the issue of willfulness; (3) Defendants' good faith defense; and (4) the government's request for injunctive relief.

Dated: <u>January 19, 2024</u>

<u>/s/ Bruce C. Fox</u>
Bruce C. Fox (PA 42576)
Michael E. Hooper (0073188)
*Trial Attorney*
Hugh T. McKeegan (PA 325673)
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
(412) 566-1500
bruce.fox@obermayer.com
hugh.mckeegan@obermayer.com

<u>/s/ Jonathan Berry</u>
Jonathan Berry
Michael B. Buschbacher
James R. Conde
BOYDEN GRAY PLLC
801 17TH ST NW, SUITE 350
WASHINGTON, DC 20006
(202) 955-0620
jberry@boydengray.com

46