1    IN THE UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT

3        OF PENNSYLVANIA

4                * * * * * * * * *

5                                        *

6   MARTIN J. WALSH, SECRETARY OF LABOR,  *

7   UNITED STATES DEPARTMENT OF LABOR,    *

8      Plaintiffs                         *   Case No.

9      vs.                                *   2:21-CV-1391

10   INTRA-NATIONAL HOME CARE, LLC, and   *

11   DILLI ADHIKARI,                      *

12      Defendants                        *

13                                        *

14                * * * * * * * * *

15

16                   DEPOSITION

17                      OF

18               JOHN R. LINKOSKY

19                 March 22, 2023

20

21

22

23      Any reproduction of this transcript

24      is prohibited without authorization

25           by the certifying agency.



```
 1                        DEPOSITION

 2                            OF

 3    JOHN R. LINKOSKY, taken on behalf of the Plaintiffs

 4    herein, pursuant to the Rules of Civil Procedure,

 5    taken before me, the undersigned, Benjamin Morrow, a

 6    Court Reporter and Notary Public in and for the

 7    Commonwealth of Pennsylvania, at the law offices of

 8    Obermayer, Rebmann, Maxwell and Hippel, LLP, 525

 9    William Penn Place, Suite 1710, Pittsburgh,

10    Pennsylvania, on Wednesday, March 22, 2023, beginning

11    at 10:00 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1            A P P E A R A N C E S

 2   ANDREA LUBY, ESQUIRE

 3   U.S. Department of Labor

 4   Office of the Solicitor

 5   Philadelphia, PA  19103-2968

 6      COUNSEL FOR PLAINTIFFS

 7      VIA TELEPHONE

 8

 9   BRUCE FOX, ESQUIRE

10   Obermayer, Rebmann, Maxwell and Hippel, LLP

11   525 William Penn Place, Suite 1710

12   Pittsburgh, PA  15219

13      COUNSEL FOR DEFENDANTS

14

15   HARRY R. RUPRECHT, ESQUIRE

16   Fort Pitt Commons Building

17   445 Fort Pitt Boulevard, Suite 400

18   Pittsburgh, PA  15219

19      COUNSEL FOR DEPONENT

20

21   Also Present:

22   Hugh McKeegan

23   Brian Heeter

24   Halim Nardin

25   Bill February
```



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                            4

```
 1                        I N D E X

 2

 3   WITNESS: JOHN R. LINKOSKY

 4   EXAMINATION

 5       By Attorney Luby                        7 - 111

 6   EXAMINATION

 7       By Attorney Fox                       111 - 113

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                            5

| 1 | E X H I B I T S |
|---|---|

2                                                      PAGE

3  NUMBER        DESCRIPTION                      IDENTIFIED

4  Exhibit 22 ADP Records                              97

5  Exhibit 23 Intra-National Records                   98

6  Exhibit 24 Earning Statement                        99

7  Exhibit 25 Earning Record                          100

8  Exhibit 28 Hours Worked Table                       70

9  Exhibit 29 2/3/20 E-mail                            50

10 Exhibit 30 3/3/20 E-mail                            57

11 Exhibit 31 5/15/20 E-mail                           58

12 Exhibit 32 6/3/20 E-mail                            64

13 Exhibit 34 6/4/20 E-mail                            65

14 Exhibit 36 Rate Change Agreement                    68

15 Exhibit 39 2/14/23 E-mail                           93

16 Exhibit 40 10/13/21 E-mail                          86

17 Exhibit 41 9/30/21 E-mail                           79

18 Exhibit 42 9/23/21 E-mail                           77

19 Exhibit 45 6/22/20 E-mail                           72

20 Exhibit 46 2/14/23 E-mail                           76

21

22                    NONE ATTACHED

23

24

25



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                              6

```
 1              O B J E C T I O N S

 2

 3    ATTORNEY                                 PAGE

 4    Fox                  24, 24, 25, 25, 25, 40, 42,

 5                         85, 89, 95, 102, 103, 109

 6    Luby                 112

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              S T I P U L A T I O N
 2    ----------------------------------------------------
 3    (It is hereby stipulated by and between Counsel of
 4    Record that all objections, except as to the form of
 5    the question, are reserved until the time of trial,
 6    and it is further stipulated that the reading and
 7    signing of the deposition is not waived.)
 8    ----------------------------------------------------
 9              P R O C E E D I N G S
10    ----------------------------------------------------
11                  JOHN R. LINKOSKY,
12    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
13    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
14    FOLLOWS:
15                        ---
16                    EXAMINATION
17                        ---
18    BY ATTORNEY LUBY:
19    Q.Good morning, Mr. Linkoski.
20     We met before, but my name is Andrea Luby and I'm
21    counsel for the US Department of labor in this case. I
22    have a couple of law students, interns who are
23    listening in today, Halim Nardin and Billy February.
24    Co-Counsel on this case with me is Matthew
25    Talman.  He has some other commitments today, but may
```



JOHN R. LINKOSKY                                        March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                                8

1  be listening in for part of the deposition.

2  I know you're familiar with deposition

3  procedures, but I'm just going to put on the record

4  that the court reporter is creating a transcript of

5  everything that we say today.  Makes it important that

6  you respond to questions verbal, and that verbal

7  responses are clear. Yes or no instead of uh-huh or

8  uh-uh.  Please try to wait for the end of my question

9  before you respond.  If I ask you a question that's

10 not clear, please ask me to rephrase it.  I'm happy to

11 do that.

12 We'll take reasonable breaks.  I usually take a

13 break about once an hour.  If we go, probably past ---

14 we'll take a lunch break.  But if you need a break

15 other than those times, please just let me know.

16 There could be objections during this proceeding

17 and if that happens, I'll go ahead and discuss that

18 with opposing Counsel and so we'll get back to you

19 with the question.

20 ATTORNEY LUBY:

21 Mr. Fox, you're in the room.  Do you

22 want to note your presence on the record?

23 ATTORNEY FOX:

24 Yeah.  And we also have Counsel here for

25 John Linkosky.  I'm present on behalf of Defendants.



```
 1   With me is Hugh McKeegan who will be sitting in for a

 2   little while.

 3   ATTORNEY RUPRECHT:

 4   I'm Harry Ruprecht and I'm here for Mr.

 5   Linkosky.

 6   ATTORNEY LUBY:

 7   Thank you.

 8   ATTORNEY FOX:

 9   And, of course, we have Brian Heeter in

10   the room as well.

11   ATTORNEY LUBY:

12   Mr. Ruprecht, can you identify your firm

13   and your address?

14   ATTORNEY RUPRECHT:

15   I'm of Counsel with Beyer and Beyer and

16   Beyer, and I also have my own practice.

17   ATTORNEY LUBY:

18   And it's at ET?

19   ATTORNEY RUPRECHT:

20   I'm at Pittsburgh, Pennsylvania.

21   ATTORNEY LUBY:

22   Okay. Thanks.

23   BY ATTORNEY LUBY:

24   Q.Mr. Linkosky, do you have any documents in front

25   of you on the table?
```



1 | A.No, just a blank padding.

2 | Q.Okay.

3 | And did you bring any documents with you today to

4 | the deposition?

5 | A.No, I did not.

6 | Q.All right.

7 | Can you hear me clearly?

8 | A.I can hear you, yes.

9 | Q.And are you feeling healthy enough to testify

10 | today?

11 | A.I believe so.

12 | Q.And is there any reason why you might not be able

13 | to give truthful testimony today?

14 | A.Not that I can think of.

15 | Q.Are you represented today by Mr. Fox or Mr.

16 | Keegan?

17 | A.No.

18 | Q.But you are represented by Mr. Ruprecht.

19 | Correct?

20 | A.Yes.

21 | Q.Okay.

22 | Other than Mr. Ruprecht, did you speak with

23 | anyone to prepare for today's deposition?

24 | A.No.

25 | Q.Did you review any documents to prepare for this



1  deposition?

2  A.No.

3  Q.Just put some of your background on the record.

4  Describe your educational history for me.

5  A.How far back?

6  Q.Let's start with your college degree.

7  A.I have a degree in business administration from

8  Wilkes University in Wilkesboro, Pennsylvania.  And I

9  have a degree, a law degree, from Duquesne University

10  of Pittsburgh.

11  Q.How long have you been practicing law?

12  A.Approximately 30 years, since 1992.

13  Q.And when did you start working with the US

14  Department of Labor Wage and Hour Division as an

15  employee?

16  A.August of 1961.

17  Q.What was your first position with Wage and Hour?

18  A.I was initially an investigator.

19  Q.Did you have your law degree at that time?

20  A.No.

21  Q.What year did you get your law degree?

22  A.'92.  1992.

23  Q.How long were you an investigator?

24  A.Exclusively as an investigator, about five years.

25  There was a period of time when I was called an



JOHN R. LINKOSKY                                March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                         12

```
 1  enforcement officer.  I got promoted to an Assistant
 2  District Director.  It was the title at the time.
 3  They keep changing the titles of the offices.  I had
 4  the same job as Brian Heeter after five years.
 5  Q.You reported to the District director at that
 6  time?
 7  A.Yes, whatever I was.  Yes.
 8  Q.Do you remember who the first District Director
 9  was that you worked under?
10  A.Joseph Cassidy in Wilkes-Barre.
11  Q.Sorry?
12  A.Joseph Cassidy in Wilkes-Barre.
13  Q.Okay.
14  So you were an AD.  You were a middle manager in
15  the Wilkes-Barre office?
16  A.No, I was not.  No, I was not.
17  Q.You were in Pittsburgh?
18  A.Yeah. I'll give you a history if you want me to.
19  Q.Sure, yeah.  Go ahead.
20  A.I trained in Wilkes-Barre.  I was transferred to
21  Baltimore, and I was there until 1965.  And I got
22  promoted to Assistant District Director in Pittsburgh.
23  I reported to Hyman Richmond.  Mr. Richmond retired.
24  I reported to John H. O'Brien.  About that time, I was
25  promoted to be the District Director in Charleston,
```



1   West Virginia.  I'm Sorry.  It was about 1968.  And I

2   took my family down there and made the decision that I

3   didn't want to inflict West Virginia on my family.

4   And I came back to Pittsburgh as Assistant District

5   Director, and I finished up here, retired in 1992.

6   I started law school in Duquesne before that.

7   Went to night school, and I graduated in 1992 and I

8   retired and started ---.

9   Q.Congratulations.

10  A.Pardon?

11  Q.What did you do after 1992?

12  A.I started practicing law.

13  Q.Were you a sole proprietor?

14  A.Yes.

15  Q.And what was the name of your firm when you

16  started it?  What was the name of your practice?

17  A.John Linkosky and Associates.

18  Q.And who was your associate?

19  A.I was the associate.

20  Q.Okay.

21  So just to confirm ---.

22  A.My son graduated from law school six years before

23  I did.

24  Q.Did your son join your practice?

25  A.It's not like that.  It wasn't like that.  We



1   practiced individually.

2   Q.Okay.

3   And that's your son, John Linkosky?

4   A.Yes.

5   Q.Did you focus on any particular areas of law when

6   you became a sole practitioner?

7   A.Employment law, essentially limited to Fair Labor

8   Standards Act, the related acts, the Wage and Hour

9   Division forces, the government contract acts.  That

10  was Bacon, other government contract acts.  I think

11  the Wage and Hour forces were about 70 some different

12  pieces of legislation, because what's drawn in there

13  is all the legislation for the government contracts.

14  I also did age discrimination.  I did the first

15  age discrimination and industry in the Act for

16  successful age discrimination history in the Act.  I

17  also was very active in equal pay before I was an

18  attorney opposed to those things.  I have --- I think

19  I have one equal pay case since I've been practicing.

20  Mostly estate, double wage and prevailing wage and ???

21  (9:52) and Prevailing Wage Acts.

22  Q.And do you still actively practice law?

23  A.Yeah.  Yes.

24  Q.Did you say you won that age discrimination case

25  last year?



```
 1   A.Not last year.  In 1968.  I did --- I did the
 2   first age discrimination investigation under the Act
 3   and it was successfully resolved.  I have a letter
 4   from Secretary congratulating me.
 5   Q.Okay.  Thank you for letting me know that.
 6   Do you have experience representing health care
 7   companies?
 8   A.No.
 9   Q.No?
10   A.No, I don't have experience representing home
11   care companies.
12   Q.What about international?
13   A.I have no experience representing International.
14   Intra-National, by the way.  I-N-T-R-A.
15   Q.Do you have experience representing Intra-
16   National?
17   A.No.  No.
18   Q.I mean, it is right.  So you're familiar with the
19   Defendant in this case?
20   A.Correct.
21   Q.You've seen the caption?
22   A.Yes.
23   Q.And the Defendant --- one of the defendants in
24   this case is Intra-National Home Care, LLC.
25   Correct?
```



1   A.As I understand it, yes.

2   Q.What's your relationship with Intra-National Home

3   Care, LLC?

4   A.I was hired by Obermayer.  I can't think of the

5   other two names, to consult on wage and hour and Fair

6   Labor Standards Act and state and overtime act

7   situations during that period of time.  I didn't ???

8   (11:57) the issue of ---.

9   Q.Okay.

10  So you were a consultant with Obermayer.

11  Is that right?

12  A.Yes, yes.

13  Q.And in that role you interacted with Intra-

14  National?

15  A.I don't think that's exactly right.  I did not

16  have direct interaction with Intra-National.

17  Q.Did you have direct interaction with someone

18  named Meg Subedi, S-U-B-E-D-I?

19  A.I met Meg Subedi at times, yes.

20  Q.And you exchanged emails with him?

21  A.Yes, I did several emails.

22  Q.And you had interaction with Dilli Adhikari whose

23  name appears on the caption?

24  A.Yes.  Yes, I did.

25  Q.And that was through email?



1  A.I don't recall emails with Mr. Adhikari

2  Q.How did you interact with him then?

3  A.I didn't interact with him very much, and the

4  term interact seems very much more broad.  We talked

5  about that I would be involved, I would be there.  I

6  don't know about if I ever mentioned ---.

7  Q.You had meetings where he was in attendance?

8  A.Yes.

9  Q.Did you have any conference calls where he was on

10  the line?

11  A.I don't recall that.

12  Q.You spoke more frequently with Mr. Subedi.

13  A.I wouldn't characterize it as frequently.

14  Q.More often than you spoke with Mr. Adhikari.

15  Right?

16  A.I can't define that.  I can't say that.

17  Q.Have you been consulting with Obermayer about the

18  Intra-National litigation since 2018?

19  A.Yes, although contact with state, Pennsylvania

20  State ??? (14:53).

21  Q.Now, are you talking about the state

22  investigation of Intra-national or state laws more

23  generally?

24  A.I would say state laws more generally.

25  Q.Okay.



1  So you --- what year did you begin your role as a

2  consultant with Obermayer?

3  A.2018.

4  Q.What prompted you to join Obermeyer at that time?

5  A.An invitation to do so.

6  Q.They reached out to you?

7  A.As far as I remember, yes.

8  Q.Is that the same year that you were contacted by

9  a manager of Intra-National.

10  A.I don't know other than --- I don't remember when

11  I was contacted.  I'm not clear.

12  Q.Have you given Intra-National any legal advice

13  about the Fair Labor Standards Act.

14  A.Define legal advice.

15  Q.Have you given them any advice at all about the

16  Fair Labor Standards Act?

17  A.It's difficult to answer because the word advice

18  is broad.  I can't answer the question.

19  Q.Okay.

20  Did you have any conversation with any managers

21  at Intra-National about the Fair Labor Standards Act?

22  A.Okay.

23  Well, first of all, define managers.  Define who

24  you mean as managers.

25  Q.Let's focus in on Meg Subedi and Dilli Adhikari.



1  Did you have any conversation with Meg Subedi ---

2  A.Regarding what?

3  Q.---- any conversations about the Fair Labor

4  Standards Act?

5  A.Yes.

6  Q.Yes?  And during those conversations, did you

7  communicate to Mr. Subedi that you were not a lawyer

8  for Intra-National, that there was no attorney/client

9  relationship?

10 A.I don't think that ever came up.

11 Q.I'm sorry.  I didn't get that.

12 A.I'm sorry about my voice, but I don't think that

13 issue ever arose.  Nobody ever asked me that question.

14 Q.Okay.  Okay.

15 Do you attend the deposition of Mr. Adhikari in

16 this case?

17 A.Which one?

18 Q.The case where the caption appears on your

19 subpoena.  Did you attend Mr. Adhikari's deposition in

20 this case?

21 A.No.

22 Q.Did you attend any depositions in this case?

23 A.I attended one.

24 Q.Which one?  Sorry, go ahead.

25 A.I don't remember the date, but I did attend ---



1  but I think it was the first one.

2  Q.Do you recall the name of the witness?

3  A.Mr. Adhikari.  You asked about that.

4  Q.I'm trying to understand the scope of your

5  relationship with the Defendants in this case.  Why

6  did you attend Mr. Adhikari's deposition?

7  A.I was asked to.

8  Q.Who asked you?

9  A.Obermayer.

10  Q.Did they say why they wanted you to attend?

11  A.Not that I recall.

12  Q.Were you paid for your attendance?

13  A.I'm not sure.  I'm not sure.

14  Q.What's the first time --- tell me about your

15  first --- tell me about the first time that you spoke

16  with Mr. Subedi.

17  A.Oh, I don't remember that.

18  Q.How did you come to be involved at all with

19  Intra-National?

20  A.I was asked by Obermayer to look into some

21  things.

22  Q.Okay.

23  What did they ask you to look at?

24  A.Well, I looked at the Intra-National payroll for

25  June or July 2018, which showed how they were paying



1  direct care workers.

2  Q. How were they paying direct care workers?

3  A. They were paying hourly.  Well, that record

4  showed two different things.  The first three or four

5  pay periods, they were paying straight time.  After

6  that, they began to pay overtime at an hourly rate of

7  time and a half.

8  Q. Do you notice any fluctuations in the hourly rate

9  after they came to that being paid overtime?

10  A. Well, that occasion was when my job investigator

11  was with me.  He was looking at the records at the

12  same time.  And I did see --- well, he pointed out to

13  me a pay period that was different than the others.

14  The others were clear so many hours overtime, after

15  the 80 hours, at time and a half.  And then down after

16  about three months or so, there was one that was

17  hidden.

18  Q. That was Mr. Ablia?

19  A. I don't remember seeing.

20  Q. What was different?

21  A. The system.  No --- what the obligation --- I

22  can't say it that way.  The hours were fixed.  The

23  number of hours worked in a biweekly pay period were

24  fixed.  And whatever the fixed hours were worked on

25  that pay period, by those pay periods, time and a half



```
 1  which were paid at a specific rate for the hours over
 2  80.  And that pay period, there was one or two hours
 3  worked beyond the fixed hours, and the rate was
 4  reduced from time and a half pay to at the reduced
 5  rate.
 6  Q.Did you have any conversations with anyone at
 7  Intra-National about that practice?
 8  A.The investigator pointed it out to me as wrong.
 9  And after ---.
10  Q.Did you agree that it's wrong?
11  A.No, I didn't because there were some questions to
12  as to whether --- at that time, there were some
13  questions.  Let me tell you something.  I would never
14  agree with the Wage and Hour investigators, say and
15  agree that it was wrong at that kind of situation.  I
16  just wouldn't do that.  I know what he was talking
17  about and I just didn't comment.
18  Q.Okay.
19  Given your expertise in Fair Labor Standards ---
20  the Fair Labor Standards Act, was it your opinion that
21  adjusting an employer's --- an employee's hourly rate
22  of pay inverse to the number of hours that employee
23  worked would violate the statute?
24  A.I don't jump to opinions.  I take my time and I
25  know the situation.  I found out whether or not it was
```



1 violate.  But at that time wouldn't commit myself to

2 one way or the other.

3 Q.So you didn't have an opinion at that time, even

4 your ---

5 A.No, no.  I didn't have an opinion.  I had what

6 were alleged to be facts and the determination as to

7 whether those facts met the Fair Labor Standards Act

8 was something I had to consider.

9 Q.Do you have an opinion on that now?

10 A.I found a case that was decided in 2022 saying

11 that was a violation in ??? (24:37).

12 Q.What was the name of that case?

13 A.I can't remember.

14 Q.Was it Comfort Care?

15 A.No.

16 Q.Okay.

17 Do you remember if it was from Pennsylvania?

18 A.I don't remember.  I don't remember where it was

19 from.  No, it wasn't Pennsylvania.

20 Q.Based on that --- say it again.

21 A.It wasn't Pennsylvania.  It was somewhere else.

22 Q.Based on that case that you reviewed, did you

23 reach an opinion about whether Intra-National's pay

24 practice was in compliance with the Fair Labor

25 Standards Act?



```
 1   ATTORNEY FOX:
 2   Objection to form.
 3   THE WITNESS:
 4   I did some further inquiry because
 5   somebody brought up the Supply, which is cited in the
 6   Interpretive Bulletin 778.  And I looked at that,
 7   decided the situation did not match.  And I talked to
 8   ??? (25:44) at that point.  I have never had a clear
 9   explanation for the Wage and Hour Division, other than
10   you mentioned ??? as to why that was wrong.
11   BY ATTORNEY LUBY:
12   Q.Why what was wrong?
13   A.Why reducing the rate for the hour to their work
14   was wrong.
15   Q.And what about reducing the rate anytime that
16   more or fewer hours are worked in a pay period?
17   ATTORNEY FOX:
18   Objection, form.
19   THE WITNESS:
20   It talks about a single pay period.  It
21   talks about the right of an employer to change the
22   rate of pay.
23   BY ATTORNEY LUBY:
24   Q.I'm talking about multiple pay periods.  Say an
25   employee works 100 hours in one biweekly pay period,
```



1  and the next day period they were working 120, and the

2  next day period they worked 100, and the next pay

3  period they work 120.  The regular rate was adjusted

4  each of those pay periods.

5  ATTORNEY FOX:

6  Objection to form.

7  BY ATTORNEY LUBY:

8  Q.Do you have an opinion about whether that's

9  legal?

10  ATTORNEY FOX:

11  Objection to form.

12  THE WITNESS:

13  That's a theoretical question.  I can't

14  answer whether it's legal or not.  Making judgments as

15  to whether or not, ??? (27:09)

16  BY ATTORNEY LUBY:

17  Q.Okay.

18  Do you believe in general that calculating the

19  hourly rate of pay based on the total number of hours

20  worked in a pay period and adjusting that regularly

21  would violate the FLSA?

22  ATTORNEY FOX:

23  Objection to form.

24  THE WITNESS:

25  I have never seen that happen.



```
1   BY ATTORNEY LUBY:
2   Q.Do you recall meeting with Mr. Adhikari at a
3   Double Tree Hotel?
4   A.Double Tree Hotel where?
5   Q.I believe Cranberry, Ohio.
6   A.I met with Mr. Adhikari and Mr. Fox at that
7   hotel.
8   Q.So I'm sorry.  Are you saying I did recall the
9   meeting?
10  A.I don't recall that meeting in any kind of
11  detail.  I just know that it happened.
12  Q.Okay.
13  Do you recall the topic of the meeting?
14  A.As I said, I don't recall in detail what the
15  topic was.
16  Q.Do you recall in general?
17  A.What?
18  Q.What do you recall about the topic?
19  A.As I say, I don't --- I don't have much
20  recollection about any single topic.  Excuse me.  I
21  don't have any recollection about any single topic
22  that was discussed if --- I just ??? (28:58).
23  Q.Did you keep any notes from any of your meetings
24  with Intra-National?
25  A.That's not my practice.  No, I did not.
```



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                              27

1  Q. Did you send billing records to Obermayer for

2  your meetings with Intra-National?

3  A. I charged Obermayer ??? (29:35)

4  Q. And make invoices for those charges?

5  A. I don't make invoices.

6  Q. What kind of records ---?

7  A. Excuse me.  What do you mean by invoices?  I was

8  paid for the hours I worked, period.

9  Q. Okay.

10  That was in writing?

11  A. No, it wasn't in writing.

12  Q. How did you make the claim then?

13  A. It was typed.

14  Q. It was tracked?

15  A. Typed.  T-Y-P-E-D.

16  Q. Oh.  Okay.  How was it timed?

17  A. I'm sorry?

18  ATTORNEY FOX:

19  He said it was typed.  Typed.

20  THE WITNESS:

21  With a typewriter.

22  BY ATTORNEY LUBY:

23  Q. Typed.  Okay.

24  Do you type it yourself?

25  A. No.



```
1   Q.Who typed it?

2   A.My secretary.

3   Q.When did you retain a secretary?

4   A.From my grandfather.

5   Q.Of those typed documents?

6   A.I don't understand the question.

7   Q.I assume they were typed.  They were typed on

8   paper.

9   Is that right?

10  A.Oh, sure.

11  Q.Do you have copies of those papers?

12  A.Not for many.  I don't keep those.

13  Q.Did the typed records include a description of

14  the work that you performed during those hours?

15  A.What do you mean by description?

16  Q.Words talking about what you performed.

17  A.Not in detail.

18  Q.How was your work described on those typed

19  documents?

20  A.Just typed.

21  Q.Did it say anything about what you did in, say,

22  legal research or conversations with the employer or

23  review of records?

24  A.There would be --- there would be such as that.

25  Q.About how many times have you met with Mr.
```



1   Subedi?

2   A.I can't tell.  I can't give you.  It's hard to

3   tell the amount of time.

4   Q.More than five?

5   A.I don't know.  I can't tell you.  I couldn't give

6   you any reasonable answer to that.

7   Q.More than 75?

8   A.Of course not.  Of course not.

9   Q.Of course not?

10  A.No.

11  Q.During your meetings with Mr. Subedi, what were

12  the general topics of those meetings?

13  A.I only --- I only had conversations with Mr.

14  Subedi about practices of Intra-National --- specific

15  practices of Intra-National related to Fair Labor

16  Standards Act compliance.

17  Q.Did you give Mr. Subedi any advice about how to

18  bring those or how to have those practices comply with

19  the FLSA.

20  A.I can't --- that's a difficult thing to answer

21  because there was a great deal of difficulty in

22  getting information from his facility.  And it was

23  very difficult to get definitive answers without lack

24  --- with the lack of information.  And so more

25  definitive is important.  I have asked for information



1    about certain practices and I --- to this day, I

2    haven't received the support for the practices.  So

3    you don't give me an opinion as to whether or not

4    those practices were correct unless you saw --- unless

5    I saw it.  I don't take opinions out of thin air.

6    Q.What practices are you talking about?

7    A.This whole program is unlike anything I've ever

8    seen with a Fair Labor Standards Act issue.  It's a

9    dedicated waiver program.  I was familiar with it

10   before Obermayer.  It is established by the US

11   Department of Health and Human Services.  All the

12   rules and regulations of its implementation and

13   continuation were established by that agency.  It

14   delegated the authority and responsibility to create a

15   program and govern it to the State of Pennsylvania and

16   the other states by the way.  Every state has that.

17   So all the responsibilities were laid down by the

18   Department of Human Services and all the authority was

19   laid down under Department of Human Services and said

20   to Pennsylvania, okay, do it.  Pennsylvania, their

21   responsibility was to determine the eligibility of an

22   applicant for the waiver, which is based on income.

23   They had to be Medicaid recipients first, and that was

24   established.

25   An individual called a service coordinator who



1   would determine the services that needed to be paid,

2   to be given to that individual.  And that would

3   involve an extensive inquiry.  Doctors, all kinds of

4   people who served that individual.  They would prepare

5   what was called an individual service plan.  That

6   defined the duties of any individual who was going to

7   provide the services.

8   They would then decide what hours they were going

9   to decide to provision of each duty.  I inquired of

10  the service coordinator one time how that was done,

11  because here we were talking about the hours worked

12  relative to Fair Labor Standards Act claim.  I was

13  told it was done by algorithm.  So they would

14  establish that.

15  And then the recipient of the services, 98

16  percent of the time was selected to provision the

17  provider of the services called the direct care

18  worker.  That person was the nominal provider of

19  services and had to be vetted, according to --- US

20  Department of Health and Human Services had very

21  specific requirements, as you think of that, and that

22  would have to be done.

23  Once that was done, that individual, every two

24  weeks, according to the state rule, would submit a

25  record of hours worked.  That record of hours worked



1   is almost identical to the approved hours determined
2   by the service coordinator.
3   I had serious questions one time because if they
4   said it's going to take an hour to prove --- to
5   provide breakfast to Grandpa, and Grandpa didn't eat
6   breakfast, under the Fair Labor Standards Act, it's a
7   problem, a question.  And I'm looking at this from the
8   Fair Labor Standards Act.  If I'm ever going to deal
9   with it, I'm looking at it from that standard. I
10  highly questioned whether or not those hours are
11  always worked precisely.  So that, to me, presented a
12  problem that had to be --- should have been addressed.
13  It had to be addressed in any Fair Labor Standards Act
14  action.
15  They later got to the point --- oh, at that time
16  that I looked at it, they were using county employees
17  as service coordinators.  They got around to stopping
18  that sometime, I can't tell you when, a higher order
19  called managed care organizations.  Managed care
20  organization assumed all the responsibilities and
21  authorities that I have described, requirements of the
22  state, including hiring service coordinators.  That's
23  the first --- the managed care organizations decide
24  whether the time is correct for all this, all that
25  sort of thing.  And the Fair Labor Standards Act issue



1  considering it was my opinion that somewhere, it was
2  either the state or the managed care organizations who
3  were the employers for the issue under the Fair Labor
4  Standards Act case.
5  Now, one time they were still using county
6  people.  They hired separate entities.  I'm thinking
7  of a situation where I saw associations for retarded
8  children.  The associations for retarded children
9  interviewed perspective direct care workers according
10  to the rules of the federal agency.  You had a direct
11  care worker if you met the rules.  Now, they weren't
12  based on their own rules.  They had to use those.
13  The hours worked would be submitted to them and
14  then submitted to the county for approval.  After they
15  were approved for funding, but everybody would ???
16  (42:38) us on sample records.  What's happening?  Was
17  the approved hours approved for the hours.  Hours
18  approved by the service coordinator were the hours
19  that were being reported as worked.  And for a wage
20  and hour --- old wage and hour hand, ask a question.
21  Right?  And that discretely whatever had to deal with
22  yourself.  I have to wonder if it was hours
23  inspection.
24  Q.Is that something you talked about with Intra-
25  National's managers?



1   A.No.

2   Q.No?

3   A.No.

4   Q.Did you talk with Mr. Adhikari or Mr. Subedi

5   about whether the managed care organizations were the

6   employee --- sorry, the employers of the direct care

7   workers?

8   A.No, no.

9   Q.No.  When you spoke with Mr. Subedi, did he

10  express concern about the cost of overtime premium

11  pay?

12  A.Not that I recall.

13  Q.Did he discuss the difficulties of paying

14  overtime premium pay, given the flat rate

15  reimbursement that Intra-National received?

16  A.I don't recall that I ever had that discussion

17  with Mr. Subedi. I don't remember ever having that

18  discussion with Mr. Subedi.  I was told one time, I

19  don't remember where I heard it, that Intra-National

20  asked about the culture of overtime, that it was

21  denied.  The state had increased the rates.  But

22  that's just something that's in my mind that I can't

23  tell you anything with detail about that, that kind of

24  thing.

25  Q.Maybe you can clear something up for me.  At the



1  deposition that you attended, Mr. Adhikari testified

2  that Intra-National found you on Google and reached

3  out to you.

4  Do you agree with that?

5  A.No, I don't know if I heard it.  If I heard it, I

6  would disagree, because that was not the way I was

7  retained.  I was retained by Obermayer.  It's pretty

8  hard to find me on Google.

9  Q.I don't think it's too hard to find you on

10 Google.  Let's see.  Do you have an estimate of how

11 many hours you've billed Obermayer for your work with

12 Intra-National?

13 A.No.

14 Q.Be it more than 100?

15 A.I can't speculate about that.

16 Q.There's been some testimony in this case that

17 Intra-National managers have met with you hundreds of

18 times.

19 Do you agree with that?

20 A.That's not true.  That's not true.

21 Q.In your consulting work, is it your regular

22 practice to keep written records of your conversations

23 with employers?

24 A.Conversations with employers?  I don't to be

25 honest.



1  Q.What was your most recent in-person meeting with

2  a manager of Intra-National?

3  A.I don't remember.

4  Q.Was it this year?

5  A.Describe meeting because I attended --- I

6  attended some depositions, but I didn't have one that

7  I would call a meeting.  I was in their presence.  I

8  don't recall having any 2023 ---

9  Q.Did you have any meetings with any Intra-National

10  managers in 2022?

11  A.Well, we left 2023.  Well, yeah.  We did speak to

12  some.

13  Q.What did you talk about during that meeting?

14  A.Potential depositions.

15  Q.In this case?

16  A.Yeah.

17  Q.Was anything else discussed?

18  A.Oh, I can't remember the details on discussions,

19  informal discussions with people.

20  Q.And in 2022, did you review any of Intra-

21  National's payroll records?

22  A.I don't think so.  I don't --- I should say I

23  don't recall.  I'm sorry.

24  Q.After your initial review of their records when

25  they switched from paying straight time to overtime



1  until, as you said, they started paying overtime, did

2  you review your records at any --- their records at

3  any point after that?

4  A.Not that I recall.  No, I just put that ???

5  (49:20).  And then those records were ??? as far as I

6  understand.

7  Q.Okay.

8  A.They provided to me ???.

9  Q.So that was during Wage and Hours' investigation?

10  A.Well, that's when the investigation started, when

11  I looked at one payroll record that he investigated.

12  And the frequent was to, like, deal out with those

13  records because hopefully, COVID, they weren't going

14  into the establishments, as far as I know.  And so

15  those records were handed over to the Department of

16  Labor.

17  Q.And were you involved in giving those records to

18  the Department of Labor?

19  A.Not involved.  I arranged ??? (50:17)  They're

20  entitled to the refugee ??? because of the

21  circumstances.  That's kind of an unusual thing.  The

22  circumstances were unusual.  I don't think that Wage

23  and Hour was allowing their investigators to go into

24  establishments at the time.

25  Q.Because of COVID?



A.Yeah.
Q.Was there a discussion with Wage and Hour at any point about Intra-National transcribing the records?
A.Yes. Intra-National was to --- requested to transcribe ??? (51:04) Yeah.
Q.And what does transcribe mean, just for people who might be less familiar with the Wage and Hour network terminology?
A.Copy, copy.
Q.Copy?
A.Yeah.
Q.Like with a photograph here.
A.Yes. But if you're doing transcriptions, you're doing calculations. You have to do the one something. You can't photocopy something that doesn't exist.
Q.So what actually ---? Tell me this, what does a transcription look like?
A.Oh, I can't describe a transcription.
Q.Is it an Excel file?
A.I don't know what an Excel file is. I am technologically ---.
Q.Does a transcription involve pulling data from a payroll record, putting it into a different format?
A.I don't know. It could be lots of different things. It could be --- I think the best people to



1  ask about that is where ??? (52:09) if they did it.

2  Not me because I've ---. they get into reference.

3  Q.Did you speak with Mr. Subedi about how to do the

4  transcription?

5  A.No.

6  Q.Did you speak with Mr. Subedi about doing a back

7  wage computation?

8  A.Not that I remember.

9  Q.Did you speak with anyone at Intra-National about

10  that?

11  A.Not that I remember.  Turn the records over for

12  DOL to do what they were going to do it.  Otherwise,

13  the DOL, as a routine, would come into the employer's

14  establishment, get the records, copy in effect.  In

15  fact, I think in the first instance, the investigator

16  made some copies, transcriptions, wage hour languages,

17  transcriptions.  That guy, that guy made some

18  transcriptions of the records.  How much he did, I

19  don't know.

20  The idea was --- my understanding was the Wage

21  Hour was not permitting the employees to go into

22  establishments.  That would have been the normal

23  course of business.  So they're entitled to the

24  records.  The easy thing is to give them to them and

25  let them do whatever they're going to do.  And that



1   way you don't have a problem.

2   Q.Did you have any discussions with Intra-National

3   or its managers about a state audit in 2018?

4   A.I don't recall having any direct contact with

5   anybody from Intra-National.  I spoke to a state

6   investigator about their prospect of an investigation.

7   Q.Tell me about that discussion.

8   A.In summary, they're already under investigation

9   by the US Department of Labor, and it's only a ???

10  (54:21) new deal ??? Please.

11  Q.Did the same agency agree?

12  A.Yes.

13  Q.The first time that you spoke with anyone at

14  Intra-National, were they paying straight time for

15  overtime on the records?

16  A.I can't answer that question because the record I

17  saw had some of that that they had done that --- they

18  had done it in the past.  The first record I saw were

19  paid overtime at time and a half.

20  Q.Okay.

21  Did you tell anyone at Intra-National that the

22  FLSA required them to pay overtime at time and half?

23  A.No, because they ---.

24  ATTORNEY FOX:

25  Object to the form.



1  You can answer.

2  THE WITNESS:

3  --- ??? (55:24)  They were doing it.

4  There's no need for me to tell them.

5  BY ATTORNEY LUBY:

6  Q.Okay.

7  Have you ever told anyone at Intra-National that

8  the FLSA requires them to keep track of weekly hours

9  worked as opposed to biweekly hours worked?

10  A.No, I did not.

11  Q.Okay.

12  When you reviewed their records, did you notice

13  that they only recorded biweekly hours worked?

14  A.My review of the records was limited to what I

15  just described.  And I knew for in the program, the

16  state program, that records of hours worked was

17  submitted for payment biweekly.  You could tell ---.

18  Q.Sorry.  Go ahead.

19  A.You could tell, I mean, they're paying overtime

20  after 80 hours.  My concern as a Wage Hour

21  investigator would be over 80 hours, meaning always

22  over 40.  That would be the concern.  There's no

23  question for me very little of the records that I saw,

24  and they were limited, but that was compliance.  If

25  they paid over 80, that was one circumstance, was



```
 1  compliant.

 2  Q. If the employee worked 20 hours in the first week

 3  and 60 hours in the second week of the biweekly pay

 4  period, they required maybe a total 20 hours of

 5  overtime, but it's only 80 hours?  Where ---?

 6  ATTORNEY FOX:

 7  Objection to form.

 8  THE WITNESS:

 9  Well, that issue came up with me in my

10  mind later, because the --- what didn't happen in this

11  case was the Wage and Hour Division never verified the

12  accuracy of records, as far as I know.  And I thought

13  that was a major failure because of what you just

14  mentioned.

15  I also think there was a major failure

16  because there were multiple members of the family.  So

17  what you just described, if A was being paid for ---

18  to pay working 35 hours a week, but half of that was

19  B, then the overtime liability was reduced, and I

20  think that should be --- should have been addressed.

21  See, I'm an old-fashioned Wage Hour guy.  One of the

22  things always we've done was to verify the accuracy of

23  the records.  Making assumptions, you brought up a

24  good reason for those assumptions, for not making

25  assumptions.  You see 80 hours.  That's quite ???
```



1   (58:34) to answer the question.

2   But I don't see the Wage Hour in this

3   case, from what I have seen in their calculations,

4   ever made any determination of the accuracy of the

5   hours worked.

6   Q. But Intra-National didn't have records of weekly

7   hours worked.

8   Right?

9   A. You could look at the ISP and find it out.  I'm

10  sorry.  The individual service plan can tell you how

11  many hours were to be worked.  In my opinion, the

12  proper investigative process would seek out the

13  individual service plans and determine what the hours

14  we worked. I saw records 15 hours a day, 7 days a

15  week.  No human being is going to work 15 hours a day,

16  7 days a week.  That was quite well explained.  That's

17  what the Wage and Hour Division calculated.

18  And it's just not possible, in my opinion.  It's

19  been 60 years involved with this.  And somebody says

20  they work 105 hours a week, they could only sleep for

21  8 or 9 hours a day for someone.

22  Q. But you didn't discuss that with anyone at Intra-

23  National.

24  Correct?

25  A. No, I did not because I think it should have been



```
 1   discussed with the Wage and Hour Division.  We never
 2   had that opportunity to discuss it with the Wage and
 3   Hour Division because of other problems, things ???
 4   (1:00:21)  They never held the final conference
 5   telling us ---.
 6   Q.We can talk about that later, but let me ask you
 7   another question.
 8   ATTORNEY FOX:
 9   Well, let the witness finish his --- the
10   witness was answering.
11   ATTORNEY LUBY:
12   He's not being responsive.
13   ATTORNEY FOX:
14   Please don't interrupt his answer.
15   ATTORNEY LUBY:
16   Can I have the court reporter read the
17   question back, please?
18   THE WITNESS:
19   Do you want me to finish the answer?
20   ATTORNEY LUBY:
21   Let the court reporter read the question
22   back please.
23                       ---
24   (WHEREUPON, THE PREVIOUS QUESTION WAS READ BACK.)
25                       ---
```

1  THE WITNESS:

2  It was called the service plan.  And

3  they were stereotyped.  The records are definitely ---

4  once they were established, the only --- I think they

5  were the only records anybody had to deal with.

6  What was reported to Intra-National or

7  anybody in Intra-National's position, by the way, I

8  don't want to say specifically Intra-National.

9  Anybody in Intra-National's position were biweekly

10  records.

11  This had to be the State of

12  Pennsylvania.  I don't know that for sure.  Biweekly

13  records signed by the recipient of services and the

14  direct care worker.  And those that I saw, not related

15  to Inter-National, that's what they were.  So

16  everybody's working seven days a week.  So you can see

17  2 weeks, 14 days, and it split it because the ISP says

18  those are the hours you can work, and that's what

19  you're reporting.  We do have the record on a weekly

20  basis because all you have to do is center it.

21  But the problem is, from my standpoint,

22  when I saw those not here, I saw something like that

23  for the first time under this program.  First thing

24  that came to mind, if there's a Wage Hour

25  investigation, this should be questioned.



 1  BY ATTORNEY LUBY:

 2  Q. And is that the end of the response?

 3  A. Yes.

 4  ATTORNEY LUBY:

 5  Okay.

 6  Let's go ahead and take a ten-minute

 7  break.

 8  ATTORNEY FOX:

 9  Sounds good.

10                              ---

11  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                              ---

13  BY ATTORNEY LUBY:

14  Q. I'm going to talk with you about Wage and Hours

15  investigation.  Did you attend the opening conference?

16  A. There was no opening conference.  What happened

17  was the investigator showed up to look at the records.

18  And I did meet with that investigator, which I've

19  described already.  But there was no typical Wage Hour

20  opening conference.  The only thing that I've seen

21  telling Intra-National what would go on is the typical

22  deployment letter --- appointment letter saying the

23  guy's going to show up a certain time.  And that was

24  delayed for months, three months, because I think it

25  was January 2020.  So that was the investigator.



1  Q. And as far as you know, that was the

2  investigator's first visit to Intra-National's office?

3  A. As far as I know, yeah.

4  Q. At that time, were you representing Intra-

5  National as their attorney?

6  A. That was the time --- not as their attorney.  I

7  was consulting with Obermayer.  I never regarded

8  Intra-National as my client, by the way.  But that was

9  the first act that I took on behalf of Intra-National,

10  as far as I recall.

11  Q. How did --- how did you know there was going to

12  be an opening conference that day?

13  A. Well, this whole investigation didn't go

14  typically, and I think it's because of COVID.  There

15  was no sit-down opening conference, well, we're going

16  to do this, we're going to do that and this is going

17  to --- what questions do you have.  That didn't

18  happen.  And, of course, neither was there a final

19  conference.

20  Q. Okay.

21  But I need you to answer my question, and my

22  question is, how did you know Wage and Hour was going

23  to go to Intra-National's work site that day?

24  A. There was a letter.  They sent a letter saying

25  those arrangements were made.



JOHN R. LINKOSKY                                      March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                              48

1  Q. How did you get a copy of the letter?

2  A. I don't recall that.  I don't recall that.

3  Q. Was your first --- I'm just trying to understand

4  how you got involved in this case?

5  A. Because Bruce Fox asked me to get involved.

6  Q. Okay.

7  And that was before January 2020?

8  A. Sometime, but I don't remember when.  I

9  originally got involved because of the state case.

10  Q. Okay.

11  A. And I was involved in other cases.  It wasn't

12  only this one.  There were others.

13  Q. Okay.

14  Sorry.  Go ahead.  The state case was in 2019?

15  A. Yeah.

16  Q. I'm sorry.  Is that yes?

17  A. Yes, I'm sorry.

18  Q. That's all right.

19  At any point during Wage and Hours investigation,

20  did you tell any of Intra-National's managers that the

21  company was not an employer of the home care workers?

22  A. No.

23  Q. And you had --- well, first of all, who's Brian

24  Heeter?

25  A. Well, Mr. Heeter is an Assistant District



JOHN R. LINKOSKY                                        March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                                49

```
1   Director of the Pittsburgh office.  He's brilliant in
2   that position.  He's very, very good.
3   Q.I agree.
4   Did you have a call with ---.
5   ATTORNEY FOX:
6   Note for the record, Mr. Heeter's
7   sitting here.
8   BY ATTORNEY LUBY:
9   Q.Did you have a call with Mr. Heeter after the
10  investigator's initial visit to discuss the
11  investigation?
12  A.That's too broad a question.  I had some --- I
13  had some discussions with Mr. Heeter.
14  Q.Do you have the exhibits --- oh, go ahead.
15  A.Can I finish?
16  Q.Sure.
17  A.I had some discussions with Mr. Heeter on
18  specific things, and one of them was the failure to
19  hold the final conference.  That was the most serious
20  one as far as I was concerned.
21  Q.I'm sorry.  I didn't catch that.  The most
22  serious one was what?
23  A.Failure to hold a final conference.  What
24  happened here is the DOL's position when there's an
25  out-of-state employer, Intra-National in Ohio, so this
```



1  office in Pittsburgh had to send it to Ohio as far as

2  I recall, to hold the final conference.  I asked

3  Brian, why wasn't it held?  That's what he told me,

4  but it was never held.  That's a very disturbing point

5  in this whole thing.

6  Q.Well, I want to start a little bit earlier than

7  that.  Do you have the exhibit book?  I believe Mr.

8  Heeter's got it.

9  A.That's the efficiency of Mr. Heeter I was talking

10  about.  I have Exhibits 23, 22, 21.

11  Q.So let's take a look at the exhibit behind tab

12  29.  It says Exhibit 29.

13  A. Yeah.

14  ATTORNEY LUBY:

15  I'll mark that for the record as Exhibit

16  29.

17                     ---

18  (Wherefore, Linkosky Deposition Exhibit

19  29, E-mail, dated 2/3/20, was marked for

20  identification.)

21                     ---

22  BY ATTORNEY LUBY:

23  Q.And feel free to take a minute to look through

24  that.

25  A.Yeah, that's right.  Okay.



1    Q.Just look up at me when you're done reading it.

2    A.Okay.

3    I didn't read the whole thing.  What parts of it

4    are you interested in?

5    Q.Sure.  I'll direct your attention.  So this is an

6    email from Brian Heeter.

7    Correct?

8    A.Yeah, yes.

9    Q.And it's dated February 3rd, 2020?

10   A.Yes.

11   Q.And sent it to you.

12   Correct?

13   A.Yes.

14   Q.Okay.

15   And Subject here is Intra-National plan of action

16   for records and 541 exemptions.

17   Do you see that?

18   A.Yeah.  Okay.

19   Q.And so Mr. Heeter is sending this email as

20   follow-up to a call about Intra-National on Friday.

21   Do you remember that call?

22   A.No.

23   Q.Okay.

24   Do you remember a plan of action being developed

25   with Wage and Hour to complete this investigation or



1  for any investigation to complete the back wage

2  computations?

3  A.I don't see a direct reference to back wage

4  calculations.  If you'll give me some guidance as to

5  what you're talking about maybe I can ---.

6  Q.Sure.  If you look under the paragraph that has a

7  heading January 2017 payroll and August 2018, it says

8  --- it appears that your clients paid these workers ST

9  for OT on the records in January 2017 and August 2018.

10  Do you see that?

11  A.No.

12  Q.And then it says you proposed that Intra-National

13  transcribe these violations for all affected employees

14  and submit the results to WHD for verification.  What

15  do you remember about that agreement for Intra-

16  National to transcribe the violations?

17  A.I don't remember anything about it as a matter of

18  fact.  I think what's here is what happened.  My

19  recollection is that records were sent to the

20  Department of Labor.  They did the transcriptions.  In

21  fact, I think there were more than one person, which

22  is understandable, doing the transcriptions, that is

23  copying the records so they could do calculations.

24  I have seen copies of the calculations and

25  they're stereotyped.  You know, it just shows each pay



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                              53

1   period.  Well, it considers that a salary was paid,

2   converted to show that the result of dividing the

3   standard hours, fixed hours, into the gross pay came

4   to within a few cents of $13.00, $13,04 or $13.06.

5   And that they continued as a result.  That's what I've

6   seen.  That was what --- the intent was to meet the

7   requirements, providing them the information they need

8   to do the investigation.  There's no sense in

9   resisting that.

10  They had COVID problems.  They couldn't send

11  people around.  So the idea was do everything to

12  convenience the conduct of the investigation to get it

13  over with.  I mean, there's no sense in resisting Wage

14  Hour's right to see records.  That's nonsense.

15  Q.Sure.  So just following up on something you said

16  there, you said you reviewed Wage Hours' computations.

17  What do you mean by that?

18  A.Oh, months later when you submitted them.  They

19  were submitted as part of discovery.

20  Q.In this lawsuit?

21  A.Don't use the term reviewed in the context of I

22  looked at every one.  I looked at samples.  I mean,

23  when there's 2,000 people involved, I wasn't going to

24  sit and charge Obermayer $450 an hour for looking at

25  the same thing over and over and over.



1  Q. Fair enough.  I want to look where it says

2  manipulation of rates.

3  A. Okay.

4  Q. Brian's writing to you that your records show

5  that certain employees' rates were changed depending

6  on the number of hours they worked.

7  Did you look into that after you received this

8  email?

9  A. Oh, I saw it the first time I looked at the

10 record.  The investigator pointed it out to me.  I

11 didn't look to see how often it happened until I saw

12 the calculations.  And I looked to see if it was

13 sporadic, if there was a pattern to it.  There wasn't.

14 There were people who that never happened to and it

15 happened a few times to some people.  I don't think it

16 happened --- my personal opinion was I didn't think it

17 happened as much as frequently to show some kind of

18 plot to violate the law.  I think that it was done

19 where it occurred, just the instances where the fixed

20 hours were exceeded.

21 And, you know, running through my mind at that

22 time was, what are the managed care organizations

23 doing, because what they were doing is forwarding that

24 information to ---.  DCW, Direct Care Worker, and the

25 recipient submitted that to the managed care



1   organization.  They got the records first.  Managed

2   care organization made the decisions and what hours

3   would be paid.

4   They sent it on to Intra-National, in effect

5   saying, pay these hours.  So that's the sequence of

6   it.  Intra-National didn't make any decision about

7   paying hours.  That was made by BMC only.  And, of

8   course, I saw that example.

9   I looked to some degree because please

10  understand, the mass of these records was that I was

11  not going to sit there and go through page after page

12  for no good reason.  I looked for incidents, and these

13  things happened.  They happened just occasionally.

14  And frankly, I didn't think it was a serious enough

15  violation to determine --- if I determined it was a

16  violation, it was a serious enough violation to charge

17  $15 million.  I thought that was preposterous.

18  Q.I'm sorry.  Go ahead.

19  A.I said I thought that was preposterous.

20  Q.Did you speak with anyone at Intra-National about

21  that?

22  A.No, I didn't speak to Intra-National.  That

23  wasn't going to happen.  There's nothing that Intra-

24  National could do about.  It already happened.

25  Q.Did you speak with Intra-National about whether



1 | their pay practices were compliant with the Fair Labor
2 | Standards Act ---
3 | A. That's a general ---
4 | Q. --- at this time?
5 | A. --- that's a general question.  Did I sit down
6 | with Intra-National and say your general pay practices
7 | is wrong?  Of course not, because the Department of
8 | Labor was going to tell us that the general pay
9 | practice was wrong and why, which never happened.
10 | The only thing I told Intra-National was the
11 | investigator pointed out when I said, they're saying
12 | you're in violation and they're okay, we'll give the
13 | records that are going to summarize what it is.
14 | That's what it amounted to.  And you did.  You added
15 | something to it.  The Department of Labor added
16 | something to it.
17 | Q. So did you work with Intra-National to gather
18 | table records for Wage and Hour?
19 | A. I did not gather anything.  That's a waste of
20 | time.  I told Intra-National what we agreed to and
21 | they were to carry it out.
22 | Q. At any point did you speak with Mr. Heeter about
23 | Intra-National computing the overtime back wages that
24 | were owed?
25 | A. I don't recall discussing that with Mr. Heeter.



1   I assumed they were going to do that because that was

2   the idea of presenting the records.  They had said

3   there's a violation.  They were going to apply their

4   opinion to those records and let us know.  I mean,

5   that happens in Wage --- well, it happened when I was

6   around.  That happened in Wage Hour cases a lot.  You

7   know, you just didn't want to waste time sitting down.

8   First, I didn't give the investigator help.  If

9   they sat down, went through all those records and did

10  it that way, it was a waste of time.  You're

11  interested in the result.  You're not interested in

12  how you get there.  Just do it most efficiently.

13                      ---

14  (Whereupon, Linkosky Deposition Exhibit

15  30, E-mail, dated 3/3/20, was marked for

16  identification.)

17                      ---

18  BY ATTORNEY LUBY:

19  Q.Let me direct your attention to the next exhibit

20  in the binder, Exhibit 30.

21  A.Okay.  All right.

22  Q.On the handwriting, have you seen this document

23  before?

24  A.I don't remember.  I don't remember the specific

25  document, seeing it before.  I obviously wrote it, so



1    I must have seen it at one time.

2    Q.Okay.

3    And as of March 3rd, 2020, you gave Mr. Heeter an

4    update that the records were almost finished.

5    Do you see that?

6    A.Yeah.

7    Q.What do you mean by almost finished?

8    A.Whatever we were supposed to do was almost done.

9    Q.Do you recall what you were supposed to do?

10   A.No.  You can tell I'm a little bit confused by it

11   because I thought what we were doing, what we were

12   doing, was submitting records to Wage Hour for their

13   calculations.  And this would --- that must be what

14   this refers to.

15                          ---

16   (Whereupon, Linkosky Deposition Exhibit

17   31, E-mail, dated 5/15/20, was marked

18   for identification.)

19                          ---

20   BY ATTORNEY LUBY:

21   Q.Okay.

22   Now let's take a look at Exhibit 31.  And for

23   this one, I'm going to start on the last page, but go

24   ahead and sort of page through it before I ask you

25   questions about it.



1    A. Okay.

2    Q. This is an email for Brian Heeter.

3    Correct?

4    A. Yeah, yes.

5    Q. Dated May 15th, 2020?

6    A. Yes.

7    Q. This email is asking for transcriptions, but also

8    back wage computations.

9    Do you agree with that?

10   A. No.

11   Q. So why don't you agree with that?

12   A. Because it doesn't mention transcriptions or ---

13   it doesn't mention calculations.  Unless you --- the

14   first paragraph from the bottom of 31, top of the

15   second page, I don't see any mention whatsoever.  What

16   that refers to is questioning their right to ask for

17   those records.  There's nothing about calculations.

18   Q. Well, I want to direct your attention to the

19   second sentence of the first paragraph.  The last time

20   we spoke in March, you were going to obtain samples of

21   the work being completed and forward them to me so we

22   could verify that the calculations were being done

23   correctly and that adequate progress was being made.

24   Do you see that?

25   A. No.



1   ATTORNEY FOX:

2   I'm sorry.  Where are you?

3   ATTORNEY LUBY:

4   Are we on the wrong page?  I'm on the

5   last page of Exhibit 31.

6   THE WITNESS:

7   The last page.

8   ATTORNEY FOX:

9   Okay.  Yeah, I think we're on the wrong

10  page.

11  THE WITNESS:

12  We're on the first page.

13  BY ATTORNEY LUBY:

14  Q.Oh, go to the last page of Exhibit 31.

15  ATTORNEY FOX:

16  There's a highlighted version.  I think

17  I'm going to swap that out.  Maybe she didn't want to

18  highlighted this for you.  She highlighted this.  I

19  didn't.  I'll switch it.

20  I gave him the highlighted version,

21  Andrea.  There was only one of them that had

22  highlights, so I'll just let him have that copy.

23  ATTORNEY LUBY:

24  Thank you.  I'll represent to you that

25  this highlight is mine and it wouldn't have been on



 1  the initial email.

 2  THE WITNESS:

 3  I see it.

 4  BY ATTORNEY LUBY:

 5  Q.And so I want to direct your attention correctly

 6  this time to the second sentence of the first

 7  paragraph.

 8  A.The last time we spoke in March, we're going to

 9  take samples, samples of work being completed and

10  forwarded to me so we could verify the calculations.

11  Yeah, I see it.

12  Q.So Intra-National was making those calculations?

13  A.That's what it seems like.  But it was --- some

14  of the stuff I saw later, that was done by Wage Hour.

15  I don't think that was done by Intra-National.

16  Q.Okay.  Got it.

17  And Mr. Heeter was --- there's a numbered list

18  here of what he was asking for?  Several examples of

19  the transcriptions and computations for at least ten

20  employees.

21  Do you see that?

22  A.Yeah.  Uh-huh (yes.)

23  Q.And he's asking for a progress report and

24  projected completion date.

25  Do you see that?



1  A.Yes.

2  Q.So my question here goes to liability.  At the

3  time that Intra-National was doing these computations,

4  had you advised them of any defenses they might have

5  to liability under the FLSA?

6  A.I don't remember that.  I'm certain --- I'm

7  certain that in my mind, knowing what the prospect was

8  that I was looking for that, but I don't remember

9  talking to Intra-National.  That wouldn't have done

10  any good.   You know, no sense of scaring the hell out

11  of them.

12  Q.Did you tell them that they were not employers?

13  A.No, no.

14  Q.Did you tell them that the direct care workers

15  were exempt?

16  A.Oh, there is a possibility.  I don't remember

17  telling Intra-National specifically this kind of

18  stuff.  I talked it over with Bruce, things going

19  through my mind because I was looking at the way out.

20  Obviously, that was my job.  We could talk about

21  exempt.  I don't even --- I couldn't even tell you how

22  many exemptions there are in the Fair Labor Standards

23  Act.  You could tell me what you think I was talking

24  about.  I could answer that question.  There were some

25  possibilities.



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                        63

1  Q. So I want to focus on what you told Intra-
2  National.  Did you tell them that the live-in
3  exemption applied to any of their direct care workers?
4  A. I would never have discussed that directly with
5  Intra-National.
6  Q. Did you tell them that the companionship
7  exemption applied to any of their direct care workers?
8  A. No, I did not.  I know about considering that.
9  You see, the process is to find the way out obviously.
10 Companionship exemption could have applied.  It's 15
11 813.  But I didn't just start holding that stuff out
12 to an employer, you know.  If that doesn't work,
13 you're going to look like you don't know what the heck
14 you're doing.  So you don't raise hopes until you're
15 certain.
16 Q. Did you tell anyone at Intra-National that Intra-
17 National was a payroll company rather than an
18 employer?
19 A. I don't remember telling them that.  I don't
20 remember considering that issue, and I'll explain why.
21 Because when I was with the Wage and Hour Division,
22 Paychecks came on the scene.  Paychecks does payroll.
23 and it was seriously considered within the Wage and
24 Hour Division that they were being --- they were an
25 employer because of that, and it was dismissed.  We



JOHN R. LINKOSKY                  March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE             64

```
1   did not take action against Paychecks like we're doing

2   now.  Interestingly now, we're doing HR, human

3   relations, work.

4   I'm involved in a case with one of those Paycheck

5   people.  Not Paychecks itself, but one of those

6   payroll people are now doing extensive human relations

7   work, and they're going to be an employer, I would

8   think, or possible.

9   I never discussed this with Intra-National for

10  the same reasons I just gave.  You can't raise hopes.

11  Q.Did you advise Intra-National that they did owe

12  back wages on those times when they adjusted an hourly

13  rate based on the hours worked in a particular pay

14  period?

15  A.I don't recall telling Intra-National.  But I

16  consulted with a member of your office, Mr. Krier, who

17  agreed with us.  Those were the violation weeks.  We

18  had the opportunity to settle the case on that basis.

19  And --- but you wanted an injunction and a three-year

20  statute of limitations, which was admitting to willful

21  violations of the law.  You could accept.

22                          ---

23  (Whereupon, Linkosky Deposition Exhibit

24  32, E-mail, dated 6/3/20, was marked for

25  identification.)
```



```
 1                        ---
 2   BY ATTORNEY LUBY:
 3   Q.I'm going to direct your attention to Exhibit 32.
 4   Is this something you reviewed during Wage Hour's
 5   investigation?
 6   A.I'm sorry?  Can you repeat the question?
 7   Q.Oh, sure.  Did you review Exhibit 32 during Wage
 8   and Hour's investigation?
 9   A.I don't recall.  I don't recall looking at it.
10   I've seen these things before, but I don't --- I don't
11   know whether I saw this or not.
12                        ---
13   (Whereupon, Linkosky Deposition Exhibit
14   34, E-mail, dated 6/24/20, was marked
15   for identification.)
16                        ---
17   BY ATTORNEY LUBY:
18   Q.I want to direct your attention to Exhibit 34.
19   And let's start on the last page.
20   A.Okay.  I'm on the last page.
21   Q.Okay.  Great.
22   So looking at the email from you to Mr. Heeter
23   dated June 24th, does this describe the records
24   testing that you did during Wage and Hour's
25   investigation?
```



JOHN R. LINKOSKY                      March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE              66

1   A. Yeah, this was my opinion about that.

2   Q. And so it was your opinion that those three

3   employee records didn't show up for basic scheme of

4   falsification.

5   Is that right?

6   A. That's what I said, yeah.

7   Q. Did you give any advice to Intra-National about

8   whether they engaged in an for basic scheme of

9   falsification?

10   A. No.

11   Q. Then let's look at the first page.  It looks like

12   Mr. Heeter responds to your email the same day saying,

13   I think there are enough examples like those in the

14   spreadsheet I sent you today that show the firm

15   changed rates when the hours went up or down.

16   Do you see that?

17   A. No, but I'll find it.

18   Q. Take your time.  It's near the bottom of the

19   page.  The email dated June 24th.

20   A. Okay.

21   I see it.  Uh-huh (yes.)

22   Q. So since Mr. Heeter had sent you a spreadsheet

23   that day, do you remember reviewing the spreadsheet?

24   A. No, I didn't remember.  I do notice here that

25   Brian, Mr. Heeter, had said that a one-time change



1  would not be an issue.  And what I have seen on many,

2  many --- well, I shouldn't say many, many, but several

3  cases, that there was a one-time change.

4  And I think what we're talking about here is the

5  determination of those frequency, that those changes

6  constituted willfulness.  I think every

7  employer/employee stands alone, and that the fact that

8  this happened from employee to employee and didn't

9  happen to many employees precludes that it is

10  pervasive and indicates a willful violation of the

11  law.

12  Q. Okay.

13  A. So excuse me.  Can I tell you one more thing?

14  Q. Sure.  Go ahead.

15  A. The situation here where there were these fixed

16  hours, and to comply fixed hours, and then you would

17  get from managed care organization that there were

18  more hours, and the rate had been changed to commit

19  compliance.  I can understand that being a mistake

20  rather than a pervasive example of falsification.

21  And the other thing about falsification is it's

22  right on the face of the record, there's no attempted

23  concealment here.  That's falsification.  Concealment

24  is falsification.  There's no falsification.  They did

25  it in the open.  Right?  So I think that goes to not



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                            68

1   being a pervasive example of willfulness.  If you

2   willfully violate the law, my experience is you

3   conceal it.  They didn't.  There's no concealment.  I

4   think that's a major factor.

5   Q.Did you have any discussions with Intra-National

6   about whether their violations were willful?

7   A.No, absolutely not.

8                          ---

9   (Whereupon, Linkosky Deposition Exhibit

10  36, Rate Change Assignment, was marked

11  for identification.)

12                         ---

13  BY ATTORNEY LUBY:

14  Q.Let's look at Exhibit 36.

15  A.Okay.

16  Q.It has a heading of Rate Change Assignment.

17  Do you see that?

18  A.Yes.

19  Q.Have you seen this before?

20  A.I haven't seen this one.  I have seen one of

21  these.  I know I have.  I don't know about this one.

22  Q.When did you see one of them?

23  A.Somewhere I've seen another one.  I couldn't

24  remember the names, but I have seen this document.

25  Q.Why did you review it?



1  A.I didn't review it.  I read it.

2  Q.Why did you look at it?

3  A.To see what the agreement was.  To see what ---

4  this apparently is a document that led them into ---

5  what I saw on the record of paying --- changing the

6  rate, paying time and time and a half.  And I didn't

7  see anything on this document that indicated a

8  violation of the law.

9  Q.And did you advise them to start using this kind

10  of document?

11  A.Absolutely not.  I never saw this document until

12  it came in discovery, to send to you discovery.  I

13  never had anything to do with it.

14  Q.Okay.  Sorry. I'm going to go backwards in the

15  book.

16  A.I want to point something out about this.

17  Q.Yeah.  Go ahead.

18  A.It goes to the final conclusion by the

19  Department.  This doesn't say one word that I

20  guaranteed a salary, nothing.  The Department of Labor

21  converted this to a salary --- to a salary basis, the

22  equivalent of a salary basis.  There's not a word

23  here.

24  And by the way, there's not a word in the

25  investigation that I was paid a salary or expected



1  salary.  There are five interviews in that case.

2  There's no mention from any employee that I expected

3  to be paid a salary.  I think that's a significant bit

4  of information since it's contrary to the Department's

5  determination.

6  Q.Did you discuss that with anyone Intra-National?

7  A.No, no.

8                        ---

9  (Whereupon, Linkosky Deposition Exhibit

10  28, Hours Worked Table, was marked for

11  identification.)

12                        ---

13  BY ATTORNEY LUBY:

14  Q.Let's look at Exhibit 28.

15  Have you seen this before?

16  A.I don't remember.  I don't remember.

17  Q.When you reviewed the discovery in this case, do

18  you think you saw this document?

19  A.I don't remember seeing it.

20  Q.Okay.

21  And if you look near the bottom of the document,

22  you see sort of a --- almost a table showing the

23  number of hours worked per day and a corresponding

24  hourly rate.

25  Do you see that?



1  A.No.  No.  Bottom of the document?

2  ATTORNEY FOX:

3  No, I think in the wrong document.

4  Exhibit 28.

5  BY ATTORNEY LUBY:

6  Q.Exhibit 28.

7  A.Okay.

8  ATTORNEY LUBY:

9  Thanks, Bruce.

10  THE WITNESS:

11  I've never seen this before.

12  BY ATTORNEY LUBY:

13  Q.So the bottom of the document, there's sort of a

14  table that correlates number of hours worked per day

15  and hourly rate.

16  Do you see that?

17  A.Yeah.  Yes, I do.

18  Q.Did you have any discussions with Intra-National

19  about this system ---

20  A.No, I did not.

21  Q.--- in 2018?

22  ATTORNEY FOX:

23  Direct discussions?

24  THE WITNESS:

25  I had no discussion with Intra-National



```
 1  about this.  I had no idea about this.  I'll tell you
 2  unequivocally I had no discussions with Intra-National
 3  on the development of their plan to pay an hourly rate
 4  and overtime.  I never discussed that.  I saw it for
 5  the first time when the Payroll delivered it to the
 6  investigator.  That's it.
 7                          ---
 8  (Whereupon, Linkosky Deposition Exhibit
 9  45, E-mail, dated 6/22/20, was marked
10  for identification.)
11                          ---
12  BY ATTORNEY LUBY:
13  Q.Okay.  Thank you.
14  Sorry about jumping around in this notebook, but
15  let's look at Exhibit 45, right behind tab 45.  So on
16  top of Tab 46.  And it has Mr. McKeegan at the top.
17  Do you see that?
18  ATTORNEY FOX:
19  No, not yet.
20  THE WITNESS:
21  Not yet.
22  ATTORNEY LUBY:
23  Oh, I'm sorry.  I thought you said okay.
24  Take your time.
25  ATTORNEY FOX:
```



1   45.

2   THE WITNESS:

3   It's 45?

4   ATTORNEY FOX:

5   45, yes.

6   THE WITNESS:

7   Yeah, okay.

8   I see it.

9   BY ATTORNEY LUBY:

10  Q.And this is an e-mail from you to Mr. Subedi on

11  June 22nd, 2020.

12  Is that right?

13  A.Yeah.  Yes, it is.

14  Q.And this was during Wage and Hour's

15  investigation?

16  A.I guess it was.  I don't know.

17  Q.Sure.

18  The first sentence in this e-mail says, please

19  tell me if I understand correctly what was done in

20  regard to overtime as of the first pay period on

21  August 2018.

22  Do you see that?

23  A.Yeah.  Yes.  I'm sorry.

24  Q.And the last sentence here says, was it the

25  policy to pay the lower rate when there was overtime



1    and the higher rate when there was no overtime?

2    Do you see that?

3    A.Yes.

4    Q.Why did you ask that?

5    A.I think it's --- that's described before that.

6    We're talking about the fixed number of hours served

7    and consumers that were approved.  Regular hours were

8    124 each pay period.  He worked 116 hours and was paid

9    $10.83 at the time for overtime.  He worked --- at a

10   later pay, he worked 51 hours, and was paid $12.50 an

11   hour.  Right?  Yeah, I see that.

12   What's wrong with that?

13   Q.Well, that's what I want to know.  Why did you

14   ask, based on your view of these records, about the

15   overtime policy?

16   A.Well, because I wanted to know.  They could have

17   paid the minimum wage.  They chose that pay period

18   because that's the enforceable rate in a nine week,

19   ten week.  And we just wanted to know why they paid

20   that rate.  You know, I can see it.  I can't see that

21   that's not a violation of the law.

22   Q.Did you tell anyone in Intra-National that paying

23   Mr. Hussein Seefe and his ??? (1:47:38) this way

24   violated the Fair Labor Standards Act?

25   A.You mean the 51 hours at $12.50?  Is that what



1  you're talking about?

2  Q. Well, I only want to review this whole paragraph

3  that we've looked at for this employee with these

4  various adjustments to his rate.

5  A. Well, look, they adjusted.  They paid him ---

6  established a new rate, and paid him time and a half

7  that rate.  He got to a 51-hour work week, biweekly

8  period.  There's no overtime worked.  The employer has

9  a perfect right to pay any rate he or she chooses,

10  because the only thing the law can enforce is minimum

11  wage in that week.

12  Q. Well, if they worked 124 hours in a pay period,

13  you split that in half, that's 62 hours a week.  So

14  there's overtime

15  A. It's not 51.  You can't tell from here whether

16  the 51 hours were 25 and 26 or 30 and 21.  There's no

17  overtime in that week.  The way I saw this, there was

18  no overtime in that pay period.  So therefore, the

19  only thing is due is the minimum wage, because the

20  minimum wage where the overtime requirement is to pay

21  time and a half the first week at the rate in the

22  first week of an overtime week.  And there's no

23  overtime at this point.

24  Q. I don't want to argue with you on that, but did

25  you tell anyone at Intra-National that their payment



JOHN R. LINKOSKY                                      March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                            76

1   of Mr. Seefe was compliant with the Fair Labor

2   Standards Act?

3   A. No, not that I can recall.  Not that I can

4   recall.

5                              ---

6   (Whereupon, Linkosky Deposition Exhibit

7   46, E-mail, dated 2/14/23, was marked

8   for identification.)

9                              ---

10  BY ATTORNEY LUBY:

11  Q. Let's look at the next exhibit, Exhibit 46.

12  A. Okay.

13  Q. And it looks like this reflects some

14  communication between you and Mr. Subedi about

15  records.

16  Do you agree with that?

17  A. Yeah, apparently.  I think that's right.

18  Q. Sorry.  Go ahead.

19  A. I think that's right because it refers on a

20  record sent at 11:00 a.m. Wednesday, Payroll or

21  calculations I had to do.  I wanted to know that.

22  Q. And you had asked him to send some records in

23  Excel format.  Do you see that?

24  A. Yeah.

25  Q. Did you get them in Excel format?



```
 1   A.I would have no idea. I'm technologically limited

 2   If I'm using a term like Excel format, somebody else

 3   gave it to me.  I think that they may have said I've

 4   sent it in Excel because I don't know what it is.

 5   THE WITNESS:

 6   I don't want you to disappear.

 7   ATTORNEY FOX:

 8   She's completely disappeared.  Let's

 9   see.

10   THE WITNESS:

11   I kept you going.

12                      ---

13   (WHEREUPON, A LUNCHY BREAK WAS TAKEN.)

14                      ---

15   ATTORNEY LUBY:

16   Back on the record after a lunch break.

17                      ---

18   (Whereupon, Linkosky Deposition Exhibit

19   42, E-mail, dated 9/23/21, was marked

20   for identification.)

21                      ---

22   BY ATTORNEY LUBY:

23   Q.And I have some more, a few more, exhibits to go

24   over.  The first one is Exhibit 42.

25   A.Can you hear me?
```

1  Q. Oh, I can now.

2  A. Oh, okay.

3  Q. Can you hear me okay?

4  A. Yeah, yeah.  It's just you weren't reacting, and

5  I'd thought you couldn't hear me.

6  Q. Okay.

7  Well, I think we've got it worked down now.

8  Exhibit 42?

9  A. Yeah.

10  Q. Okay.

11  Looking at about the middle of the page, it says

12  from Meg Subedi to you dated September 23rd, 2021.

13  Do you see that?

14  A. Yeah.  Yes.

15  Q. That was about a month before the Department of

16  Labor filed suit.  It looks like you're still trying

17  to look at some records from Scranton.

18  Do you see that?

19  A. Yes.

20  Q. Right below.  Why were you looking at payroll

21  records during that period of time?

22  A. Well, that's been given Wage and Hour law office,

23  and I can't think of their exact name, had initiated

24  an investigation in Scranton.  And I don't know that I

25  was looking at payroll records, but what I did was



1  speak to the Pennsylvania investigator and get that

2  ended, because they said there's no such as --- you're

3  doing the same thing that the other people are doing.

4  Q.Oh, okay.

5  So this is the same ---?  I'm sorry.  Go ahead.

6  A.I'm sorry.  I had to have some argument to make

7  --- to convince that investigator.  Right?  So I did.

8  Q.Okay.

9  So they agreed to close that?

10  A.They closed that, yeah.

11  Q.Did you ever look at the sample of the records

12  from Scranton?

13  A.No, wasn't necessary.

14                      ---

15  (Whereupon, Linkosky Deposition

16  Exhibit 41, E-mail, dated 9/30/21, was

17  marked for identification.)

18                      ---

19  BY ATTORNEY LUBY:

20  Q.Okay.

21  Let's go back to Exhibit 41.  And look at ---

22  well, are you on Exhibit 41?

23  A.Yeah, yeah.

24  Q.It looks like on September 30th of 2021, you're

25  telling Mr. Subedi they're having some trouble opening



1   some records that he sent.

2   Do you see that?

3   A.Yeah, I see that.

4   Q.And it's called an SCR sample.  Is that what it

5   says in the subject line of the email?

6   A.I don't see an SCR sample, but maybe there's

7   another page.

8   ATTORNEY FOX:

9   On the first page.

10  BY ATTORNEY LUBY:

11  Q.Yeah, the other page doesn't have much except for

12  a couple lines.

13  A.Oh, oh.  I see it.  I see it.  I see what you're

14  talking about.  Yeah.

15  Q.So what's an SCR sample?

16  A.I have no idea.

17  Q.Okay.

18  Do you know what these files were?

19  A.Sorry.

20  Q.Do you know what these files were?  It looks like

21  something TS 2019 and TS 2020 on the second page.

22  A.I don't see any reference to page two.  I don't

23  see any reference to it in that document.

24  Q.Yeah.  So when I look at page two, I don't know

25  if this is the SCR or not.  It looks like it's ???



1   (1:56:39)  One K-A-B-A-R-I ???

2   A.Oh.  Well, that's obviously an ??? (1:56:50)

3   name, that first name is.  So I wouldn't have any

4   idea.

5   Q.Okay.  That's fine.

6   I want to --- back on page one, direct your

7   attention to this email that you sent on October 2nd,

8   2021.  It says, has Intra-National stopped reducing

9   the regular rate when more than scheduled hours are

10  worked by the DCW at all locations, and if so, when?

11  Do you see that?

12  A.Yeah.

13  Q.Why did you ask that question?

14  A.I don't remember, but it's pretty obvious.  I'd

15  like to see, since I was told by the Department of

16  Labor that was a violation, as to whether they stopped

17  it.

18  Q.Did you, at this point in October of 2021,

19  communicate to anyone at Intra-National that doing

20  that would be a violation?

21  A.I told Dilli the first time they told me.  When I

22  walked out --- when I walked out of a meeting with the

23  investigator, I told him.  I told him.  He was sitting

24  across the room from the door.  And I said to him,

25  they say you're in violation.  And his reply was,



1   well, we got to do something about that.

2   Q.You're talking about the first time that the

3   investigator came to worksite?

4   A.Yes.  In January of 2020.  Yes.

5   Q.Are you sure that Dilli was there?

6   A.Yes.

7   Q.Okay.

8   A.I can still picture it.

9   Q.Were there any other managers from Intra-National

10  who were part of that discussion?

11  A.I don't know.  I don't remember.

12  Q.Okay.  That's fine.

13  Tell me everything you remember about that

14  conversation.

15  A.That was it.  The conversation was they say

16  you're in violation, and he made some comment to the

17  effective of well, we've got to figure it out or

18  something like that.  That was the end of the

19  conversation.

20  Q.He said he had to what?  I'm sorry.

21  A.I don't remember exactly what he said, but he was

22  obviously angry and made a negative comment about that

23  information.  I think that's the best way to describe

24  it.

25  Q.Was he angry with you?



1   A.Pardon?

2   Q.Was he angry with you?

3   A.I don't remember that he was.  I don't know.  I

4   probably would not have been very pleased if he was.

5   Q.I'm just wondering why you had the impression

6   that he was angry?

7   A.I'm old enough to recognize when some guy

8   responds that he's angry.  I mean, you know.  Why?

9   Because it was obvious to me.  That's why.  Holy

10  smoke.

11  Q.That's why you had the discussion with him right

12  after the investigator left?

13  A.Pardon?

14  Q.So you had this discussion right after the

15  investigator left?

16  A.No, the investigator was still in there.  He was

17  still working with directors.

18  Q.Oh, I see.  But it was just you and Mr. Adhikari

19  having this discussion or did you discuss it in front

20  of the investigator?

21  A.It wasn't in front of the investigator.  I closed

22  the door.  He was in there making some transcriptions,

23  and I think we talked about this before.  He made

24  transcriptions of some kind.  Typically, here's what

25  he would do.  In any way to our investigation, he saw



1  something.  He didn't have all the records.  He would

2  make some notes, transcriptions to show what he found

3  and go from there.  That would be typical.

4  And I didn't witness it, but I certainly would

5  have expected it above him because it's routine.

6  Q.Did you have any discussions with Mr. Adhikari

7  about that pay practice after that day?

8  A.I don't remember.  I don't remember.

9  Q.Do you know if you had any discussions about ---

10  well, let me bring it up.  Going back to Exhibit 41,

11  did Mr. Subedi answer your question?

12  A.What question?

13  Q.Has Intra-National stopped reducing the regular

14  rate when more than the scheduled hours are worked at

15  the DCW at all locations, and if so, when?

16  A.I don't remember.

17  Q.Do you remember, did you find out the answer?

18  Like, were --- by looking at the records, were you

19  able to tell?

20  A.Please understand.  I would ask for things never

21  kept.  That was an ongoing problem.  Some things that

22  I thought I should see, and I would not get them and I

23  --- that I asked for.  And then I'd have to look for

24  another avenue to deal with what I was trying to find

25  out.  But they weren't always responsive to my



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                              85

```
 1   requests.
 2   Q.Give me examples of times that they were
 3   nonresponsive. What did you ask for that you didn't
 4   get?
 5   A.Gee.  I can't think of something specific, but
 6   you could probably see in some of these emails that I
 7   asked him for information.  And it was routine, almost
 8   routine that I wouldn't get what I asked for.
 9   Don't forget, Meg was sick too at this time.
10   Q.You were sick?  They were sick?
11   A.Meg was sick.  Mr. Subedi was sick.  So there
12   were some problems when he would be there and that
13   sort of thing.
14   Q.Okay.  Sure.
15   Well, was the --- did you have problems receiving
16   what you'd ask for at times when Mr. Subedi was
17   healthy?
18   A.I did make determination ---.
19   ATTORNEY FOX:
20   I'm going to object to the form.  I
21   don't think we have testimony that he was healthy.
22   THE WITNESS:
23   I don't make --- I was going to say I
24   don't make determinations about somebody's health.
25   It's JD, not MD.  Sometimes, because I think I've seen
```



JOHN R. LINKOSKY                                   March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                            86

1  before that you're referring to --- there are some
2  references in here, we talked about them, we talked
3  about the documents.  They refer to some way he sent
4  them, and I didn't think or couldn't get them.
5  Couldn't alter them and stuff like that.
6  BY ATTORNEY LUBY:
7  Q.Okay.
8  So Mr. Subedi's health and technological
9  difficulties.  Were there any other reasons why you
10  wouldn't get information that you requested?
11  A.I have no idea about --- I can't know about any
12  other reasons why I didn't get what I requested.  I
13  know that I got some I deal with because I couldn't
14  open them and somebody didn't get.  That's all I can
15  tell you.
16                        ---
17  (Whereupon, Linkosky Deposition Exhibit
18  40, E-mail, dated 10/13/21, was marked
19  for identification.)
20                        ---
21  BY ATTORNEY LUBY:
22  Q.Fair enough.
23  Let's see.  Let's look at Exhibit 40.  I'm
24  looking at an email from you to Mr. Subedi about the
25  Scranton investigation, and it's dated October 13th,



1   2021.

2   Do you see that?

3   A. Yes.

4   Q. Great.  Thank you.  So I want to direct your

5   attention to the first paragraph.  Sorry, first

6   sentence of the second paragraph.  It says, as you

7   know, the fact that you're reducing the rate of pay

8   when the hours worked exceed the standard hours was a

9   practice with almost all the Nepali providers.

10  Do you see that?

11  A. Yes.

12  Q. How did you know that?

13  A. I suppose somebody told me because that refers to

14  all the Nepali providers.  Actually, you should know

15  because the DOL investigated a number of them and

16  found the same practice.

17  Q. Were you a consultant on --- with any of those

18  ---?

19  A. No, I'm sorry.  That was information that I got

20  from some way, that they were --- that the Nepali

21  people adopted the same thing, the same process.  And

22  I'm trying to think.  Well, yeah, I saw what other

23  Nepalis did.

24  Q. Okay.

25  A. Actually, I'll explain to you.  That was Everest,



JOHN R. LINKOSKY                 March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE         88

1   and that's the one we agreed with our proposal that

2   that was the only violation that we could have settled

3   on that basis.

4   Q. So I'm looking at the last couple sentences here.

5   It says I must have a complete understanding of what

6   went on in Scranton for the last two years.

7   Do you see that?

8   A. Yeah. Uh-huh (yes.)

9   Q. So until this state investigation started, had

10   you been providing any kind of ongoing advice or

11   information to Intra-National?

12   A. First of all, that's a very broad, general

13   question. I generally was not providing information

14   directly to Intra-National because --- I have reasons

15   for that. When you have a theory that you're trying

16   to develop and you talk about that theory and it

17   doesn't work out, you have very disappointed people.

18   So I just didn't run with every thought I had to

19   Intra-National.

20   And this references I was trying to convince the

21   State of Pennsylvania, who are no less dogged than the

22   US Department of Labor, that they should drop that

23   case. And that's what I was trying to do.

24   Q. What I'm trying to figure out really is the

25   nature of your business relationship, I guess, with or



1  the nature of your consulting relationship with Intra-

2  National because I've got testimony in the record that

3  you're reviewing every table before it goes out.  They

4  call you anytime they have a question about payroll.

5  They get ongoing legal advice from you, that you

6  approve of their pay practice, all kinds of things

7  like that.  I'm trying to figure out --- you know, I

8  want to know from you, I guess, how often and, you

9  know, for what purposes you interacted with Intra-

10  National?

11  ATTORNEY FOX:

12  I'm going to object to the form.  It's

13  vague and ambiguous and multipart question.

14  BY ATTORNEY LUBY:

15  Q.Yeah, that's not really my question.  I'm just

16  trying to set a frame for what I'm trying to find out

17  here.  So just directing your attention back to this

18  October 13th, 2021 email, it seems to me that it had

19  been a while since you looked at Intra-National's

20  payroll practices.

21    Is that true?

22  A.Well, that's a --- that's a general question.

23  Yeah, it's true.  This has to be narrowed down to what

24  I'm trying to do here.  I did not even know at one

25  point that they had a state Scranton operation.



1  There's a contact from the State of Pennsylvania.

2  They want to look at Intra-National.  My job was to

3  keep them from looking at Intra-National because here

4  you have another agency.  They're not quite as --- now

5  this is only my opinion.  They're not quite as adept

6  at what they do as the US Department of Labor.  And it

7  could turn into an unbelievable mess because they

8  don't function the way I think they should and I'm

9  used to.  So the idea was to drop it, to get them to

10  drop it.  And I did.  That's what was going on.

11  Q.So what I've heard so far today is that you

12  worked with Intra-National during the first state

13  investigation, then during the Wage and Hour federal

14  investigation, and then also during this 2021 state

15  investigation.  Do you do anything else besides

16  providing advise to violate companies under

17  investigation?

18  A.Well, there's a couple of things.  I don't

19  remember another state investigation.  I don't recall

20  that.  My recollection is there was one proposed state

21  investigation.  And when I talked to the investigator,

22  that investigation was stopped because they were

23  already investigated or by the state, they may have

24  been sued by that time.  That's what I'm talking

25  about.  I don't remember another state investigation.



1  Actually, I never looked at any locations.  One in
2  Michigan, for example.  It existed.  I found out that
3  it existed.  I didn't have anything to do with it.
4  There were others.  I just didn't pay attention.
5  Didn't have to.
6  Q.What about the private lawsuits?  Did you have
7  any involvement with those?
8  A.No.  All I know is the private lawsuits started,
9  and I think --- and I shouldn't say I know.  I think
10  that it started but I'm not certain.
11  Q.So you provided consulting services during the
12  Wage and Hour investigation and during the state
13  investigation.  Did you provide consulting services to
14  Intra-National at any other time?
15  A.Well, you keep saying did I provide consulting
16  services.  What do you mean by that?
17  Q.Well, whatever it is that you do when you
18  interact with Intra-National.  I don't want to get a
19  fight with you over terminology.  There's talking,
20  there's calling on the phone, there's having meetings,
21  there's looking at records.  I don't know what you
22  want to call that.
23  A.There's a heck of a difference between some of
24  those things and providing counseling.  I mean, I just
25  don't quite understand when you ask questions like



1  that, because I wasn't --- I wasn't counseling

2  anybody, you know.  You make a statement to them and

3  whether they follow it or not, that's their business.

4  You can't stop them.  I had no power to make them do

5  anything that I would have thought they should have

6  done.  It's a matter of pointing it out.  If you do

7  that, then it's persuasion, you know.  I didn't have

8  the power to say you better do this.  I can't.

9  Q.Okay.  Thank you.

10  Did you have any interactions with Intra-National

11  that didn't involve a government investigation?

12  A.Absolutely not.  I don't know what you mean by

13  other kinds of --- I mean, I socialized.  That's for

14  sure.

15  Q.Great, because, now Mr. Adhikari made it seem

16  that they have an ongoing relationship with you, that

17  you give them ongoing legal advice about their paying

18  practices.  It sounds like you're telling me that's

19  not true?

20  A.I'm saying Mr. Adhikari is exaggerating to a

21  degree, and he wasn't getting the information directly

22  from me, you know.  I mean, he character --- if he's

23  characterizing it that way, that's simply inaccurate,

24  although I would say that Mr. Adhikari's relying ---

25  it's his perception of that, I would say.



1                          ---

2    (Whereupon, Linkosky Deposition Exhibit

3    39, E-mail, dated 2/14/23, was marked

4    for identification.)

5                          ---

6    BY ATTORNEY LUBY:

7    Q.Okay.

8    So let's look at a couple more e-mails.  Let's

9    look at Exhibit 39.  And you see an email there?  It's

10   directed to Inspector --- I'm going to say Piccillo,

11   P-I-C-C-I-L-L-O.

12   A.What's the date of it?  Oh, I see it.  That's

13   Salvatore Piccillo.  It's Piccillo, like the ---.

14   Q.Piccillo, oh.  Of course it is.  Was he the

15   investigator from the state investigation that you're

16   just talking about?

17   A.Yeah, he was the investigator.  They don't call

18   them investigators.  They call something else.

19   Q.Oh, thank you.  And this is the email that you

20   sent to him about the investigation?

21   A.No, it's from me obviously.  That's true.

22   Q.Okay.

23   How did you learn that there was a state agency

24   investigation of Intra-National?

25   A.I don't remember.  I don't remember.



1  Q.Okay.

2  So earlier you were saying that you weren't

3  providing consulting services.  But when you were

4  pointing things out, you said, what kind of things

5  about Intra-National --- other than this one

6  discussion that you had with Mr. Adhikari when Wage

7  and Hour came to the worksite, did you point any other

8  things out to the management and Intra-National about

9  their FLSA compliance?

10  A.They are --- pointing things out.  I don't know

11  what you mean by pointing things out.  You have to ---

12  please understand that these things are going on.  The

13  approach that Subedi would take way back is looking at

14  things and seeing potential problems, whether they

15  --- , the extend of those problems, and how there are

16  ---could they be solved?  If they're not, what's the

17  consequence?  That's the process.

18  So it's an ongoing process when you're involved

19  in something like this.  So the specifics of it are

20  very difficult to deal with, to describe, or to

21  remember.  You know, it's constantly --- well, I

22  shouldn't say constantly.  Pretty regularly, trying to

23  find out how this can resolve, if it can be.  And you

24  look at what a whole bunch of people are doing.  I

25  look at what the Department of Labor was doing.  And



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                              95

1  it was very, very different or very, very attitudes

2  toward or beliefs as women's ??? (2:19:18) or should

3  be.

4  Don't forget, I was with the Department of Labor.

5  I was responsible for this kind of stuff.  And I look

6  out from that standpoint.

7  Q. No, understood.  So when you did identify an

8  issue and pointed it out to Intra-National, did they

9  always correct it?

10 A. Well, you can see by some of these things that

11 I'm asking, I first saw the issue of the deduction or

12 reduction of the regular rate in January of 2020, and

13 I'm asking the question of Meg Subedi in 2021, did

14 they start or still doing it?  Where?  You can see

15 that in the meantime, I had no means to know.

16 Q. Okay.

17 I want to take you back to Exhibit 28.

18 A. Okay.

19 Q. Now, Mr. Adhikari testified that he created this

20 system based on your advice.

21 Does that --- do you know anything about that?

22 A. Absolutely not.

23 ATTORNEY FOX:

24 Objection to form.

25 What system?



1  THE WITNESS:

2  If you're talking about ---?

3  ATTORNEY LUBY:

4  Exhibit 28.

5  THE WITNESS:

6  I don't know anything about this.  I did

7  not develop the denti system.  They did whatever.

8  There's no way I could.  I didn't know anything about

9  their finances.  I didn't know what they --- what

10 their expenses were.  There's no way I could do

11 anything like that.  Nor am I qualified to do anything

12 like that.

13 BY ATTORNEY LUBY:

14 Q.Have you given them any explanation of FLSA

15 requirements in general before July 2018?

16 A.No, I wouldn't do that.

17 Q.Okay.

18 Did you provide any training to Mr. Subedi about

19 how to follow policies set forth in Exhibit 28?

20 A.Absolutely not.

21 Q.Okay.  Sorry for the delay.  I was skipping ahead

22 a little bit, so that'll safe some time at the end.

23 Since 2018, have you reviewed Intra-National's

24 payroll records on a monthly basis?

25 A.I'm sorry.  Was that the question?



```
 1   Q.Yes.  I'm sorry.  Since 2018, have you reviewed

 2   Intra-National's payroll records on a monthly basis?

 3   A.No, I did not.

 4   Q.Does Mr. Subedi call you when he has questions

 5   about FLSA compliance?

 6   A.No.  I shouldn't say no.  He would not typically

 7   do that.  I don't recall him calling me and asking me

 8   an FLSA question.  I don't recall.

 9   Q.Would he --- was he in the practice of emailing

10   you if he had questions about the FLSA?

11   A.Not that I recall.

12                      ---

13   (Whereupon, Linkosky Deposition Exhibit

14   22, ADP Records, was marked for

15   identification.)

16                      ---

17   BY ATTORNEY LUBY:

18   Q.Okay.

19   I want to take a look at Exhibit 22, which is the

20   first exhibit in the binder.

21   A.Okay.  Find 22.

22   Q.Great.  And you see it says ADP, employee's

23   record in the lower left-hand corner?

24   A.Yeah, I see that.

25   Q.Okay.
```



1  Did you review these records during Wage and

2  Hours' investigation?  Did you see these records or

3  any of them during Wage and Hours' investigation?

4  A.I don't recall.  It wasn't typical.  Wage and

5  Hour was doing the investigation.  I wasn't doing the

6  investigation.  I wish I was doing it.  We gave them

7  the records.  That's it.

8  Q.Okay.

9  So your involvement during that investigation was

10  to make sure that the payroll records were received by

11  Wage and Hour, and that was it?

12  A.Yeah.  Principally, that was it because that was

13  the commitment that was made.  That's what I

14  understood we were doing.  Of course, you have an

15  obligation to provide Wage and Hour with the records.

16  There's no question.  You would have to --- you'd have

17  to because next thing you know you'd have enemies in

18  Wage Hour not get what they wanted.  You know, don't

19  forget, I understand their point of view.  I lived it

20  for 30 years.

21                          ---

22  (Whereupon, Linkosky Deposition Exhibit

23  23, Intra-National Records, was marked

24  for identification.)

25                          ---



```
 1   BY ATTORNEY LUBY:

 2   Q.Yeah, I think we're on the same page here.

 3   Absolutely.  Let's see.  Let's look at Exhibit 23, the

 4   next one in the binder.

 5   A.Okay.

 6   I have it.

 7   Q.Do you recognize this document?

 8   A.No, I don't recognize it.

 9   Q.Okay.

10   Has Intra-National ever sent you documents in

11   this format to look at?

12   A.I don't recall getting the format.

13                        ---

14   (Whereupon, Linkosky Deposition Exhibit

15   24, Earning Statement, was marked for

16   identification.)

17                        ---

18   BY ATTORNEY LUBY:

19   Q.Okay.

20   Let's look at Exhibit 24.

21   A.Okay.

22   Q.And do you see the record that says earnings

23   statement, ADB in the upper right?

24   A.Okay.

25   I see that.  Yeah.
```



1  Q.We talked a little bit about during Wage and

2  Hours' investigation, you looked at some sample

3  employees and how they were paid.  When you did that,

4  was that based on records like Exhibit 25 or Exhibit

5  23 or something else?

6                          ---

7  (Whereupon, Linkosky Deposition Exhibit

8  25, Earning Record, was marked for

9  identification.)

10                         ---

11  THE WITNESS:

12  Well, this is 23, because I just told

13  you I hadn't seen those records.  I really did not get

14  into the records at all.  I didn't get into a lot of

15  records.  I don't recall looking at these pay stubs

16  because --- am I supposed to be in 25 or 24?

17  BY ATTORNEY LUBY:

18  Q.No, 24.

19  A.24.  Okay.

20  Q.22 and 24.

21  A.Well, 24 doesn't tell you anything.  If you look

22  at 24, that's group ??? (2:29:22).

23  Q.So when you look at something more like 25, do

24  you recognize it?  It says ADP including earnings

25  record in the lower left.



1  A.Yeah, this kind of record just wasn't really this

2  way.  Left to right and right to left.  I don't --- I

3  don't recall looking at it.

4  Q.Oh, yeah.  That's true.  You kind of have to

5  rotate the exhibit.  But are earnings, employee

6  earnings records like this, the kind of document that

7  you looked at during Wage and Hours' investigation?

8  A.I'd like to show you this --- you turn it this

9  way, across the page top to bottom.  Really?  I don't

10  recall looking at those at all.

11  Q.Okay.

12  After the investigation that focused on Scranton,

13  did you review any payroll records from Intra-

14  National?

15  A.I don't recall.

16  Q.Did you provide any advice to Intra-National?

17  A.No.  About what?  Advice about what?

18  Q.Well, let's start broad and say any advice about

19  meeting FLSA.

20  ATTORNEY FOX:

21  I'm sorry.  Can I have the question

22  back?

23  ATTORNEY LUBY:

24  Are you asking the court reporter or are

25  you asking me?



```
 1   ATTORNEY FOX:

 2   Either one.

 3   BY ATTORNEY LUBY:

 4   Q. I asked if he had given any advice about the

 5   FLSA?

 6   ATTORNEY FOX:

 7   Objection to form.  It's overly broad.

 8   THE WITNESS:

 9   I can't --- I can't recall.  This whole

10   idea that I was regularly, if that's the idea,

11   regularly giving advice to Intra-National or anybody

12   else, well, I shouldn't say it that way.  To Intra-

13   National about the advice is just not probable in the

14   way you deal with these things.  You're not going to

15   the employer all the time saying oh yeah, you

16   shouldn't be doing this and this is what it is and you

17   should be doing this.

18   We made arrangements.  Wage and Hour was

19   getting directors.  Actually, until we got back from

20   Wage and Hour what their conclusions were, because we

21   were getting some variety of conclusions if you

22   remember, we read one of these emails where it said,

23   well, just one reduction of the rate when there were

24   more than fix hours is not necessarily --- not enough.

25   I also had feedback from Wage Hour that that was the
```



1   only violation, you know.

2   BY ATTORNEY LUBY:

3   Q.Did you help the parties work that out?

4   A.Pardon?

5   Q.So you provided --- let me withdraw that.

6   It sounds like your role was primarily limited to

7   assisting Intra-National during government

8   investigations?

9   ATTORNEY FOX:

10  Object to the form.

11  THE WITNESS:

12  Your question was interrupted by

13  something.  Can you repeat it please?

14  BY ATTORNEY LUBY:

15  Q.Oh, sure.  The services you provided to Intra-

16  National, were they focused exclusively on government

17  investigations?

18  A.Well, first of all, I was providing the

19  information to Obermayer.  And what kind of government

20  investigation do you remember of an FLSA specialist?

21  Q.Right.

22  So government investigations, I guess, we've

23  identified two so far, the Scranton investigation by

24  the state and the Wage and Hour investigation.  You

25  assisted with both those.



1   Did you assist with anything else?

2   A.Anything else?  That's too broad a question.  I

3   can't answer, you know, give you a short answer to

4   that.  I was doing all kinds of --- well, I shouldn't

5   say all kinds, but I was also doing work on non-

6   related cases for Obermayer.  FLSA issues, you know,

7   but not necessarily for ---.

8   Q.I just meant for Intra-National.  So you advised

9   Intra-National about the FLSA through the Wage and

10  Hour investigation, the state investigation.  Did you

11  advise them during any other --- well, let's start

12  with government investigations?

13  A.Reacting to the investigations, not necessarily

14  given advice.  I was reacting.  That state

15  investigation, I was reacting to what they wanted and

16  what they were going to do and what they were trying

17  to do and why they should have any reason to do it.

18  You know, I think with them, I just thought that

19  the best thing for anybody was to get them off the

20  case because there's no sense duplicating.  You're

21  going to have --- you're going to have competing

22  arguments.  And frankly, the state is not very good at

23  this.

24  My humble opinion, you know, if I had a choice

25  having a single entity subject to both, I'd rather



```
 1   have my job, which I understand more, of course.

 2   Q.And so let me write it this way.  When is the

 3   last time that you billed Obermayer for working with

 4   Intra-National?

 5   A.I don't remember.

 6   Q.I'm sorry.  You broke up for a minute there.

 7   A.I don't remember.

 8   Q.Okay.

 9   Do you know if you billed them this year?

10   A.I'm sorry.

11   Q.Do you know if you billed them in 2023?

12   ATTORNEY FOX:

13   For Obermayer or anybody else?

14   BY ATTORNEY LUBY:

15   Q.Well, I asked if he billed Obermayer since 2023.

16   A.I probably have, yes.

17   Q.For services for Intra-National?

18   A.I billed Obermayer for services to Obermayer

19   definitely.

20   Q.Okay.

21   Did you bill Obermayer --- what did you say?  I'm

22   sorry.  Can you repeat that?

23   A.I billed Obermayer definitely.  I didn't bill

24   Intra-National.  You know I was here for depositions

25   in '23.
```



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                        106

1  Right?  I was here for Mr. Adhikari's deposition.
2  So, I mean, I would have billed that.  But I can't
3  ---.
4  Q.How about for services you provided to Obermayer?
5  A.Sure.  I was here to see what he was saying for
6  Obermayer.
7  Q.Has it ever come to your attention that Intra-
8  National has a practice of making miscellaneous
9  deductions from an employee's pay?
10 A.Can you repeat that please, ma'am?  Can you
11 repeat it please?
12 Q.Yeah.  Has it ever come to your attention that
13 Wage and Hour --- sorry.  Has it ever come to your
14 attention that Intra-National subtracts miscellaneous
15 deductions from employees' pay?
16 A.Yes, Mr. Heeter told me that.
17 Q.Did you discuss that with Intra-National?
18 A.I asked why, Yes.  I didn't discuss it.  I asked
19 why you're doing it.  Oh, no.  I asked why you're
20 doing it.  I believe Mr. Heeter.  I mean, you know, if
21 he said they're doing it, they're doing it.  I said,
22 okay, why are you doing it?  That's all.
23 Q.Who do you ask?
24 A.Meg Subedi.
25 Q.And what did he say?



1   A.They prepared their payrolls, it seems, like in

2   advance, because they had --- and I'm not sure of that

3   but it seems possible, at least because they work with

4   fixed hours.  The hours don't change except

5   intermittently so it would be possible to have the

6   payroll done beforehand until you got the records.

7   I wouldn't do it, but it could be.  And then they

8   would receive notice from the MCO that, for example,

9   the recipient of services was two days in the

10  hospital.  Couldn't count the services, so they're not

11  going to pay for it.

12  So Intra-National had already paid for hours that

13  they're recovering.  That was --- they're recovering

14  hours that were paid that should not have been paid

15  because they didn't know the guy didn't provide the

16  services.  The MTC didn't provide the services because

17  they should be more prepared.

18  What that raised in my mind was if this happened,

19  reporting regularly that all the services on the ISP

20  have been performed, verified by the recipient,

21  alleged recipient of services, I'll use that in this

22  context, alleged, and the DCW possibly could not have

23  been performed, and Intra-National was being billed

24  for it and required to pay overtime when those

25  services were not performed.



1  Look, if the ISP said you got an hour and a half

2  for breakfast and the recipient said I don't feel

3  well, I don't want breakfast, that should not have

4  been charged.  But it was, at least, because it was so

5  standardized, they took the ISP hours as charged as

6  done.

7  That's why I think Wage Hour, if they understood

8  this program, would have looked into the accuracy of

9  the records.  The law says the employer must keep an

10 accurate record of the daily and weekly hours work.

11 These people could have very well been instructed.

12 When you start to make breakfast, put down 7:00 when

13 you start.  Put down 10:30 when you finish.  And those

14 hours are the actual hours worked.

15 That was never done in this case.  Everybody

16 reported what the ISP said the third party had

17 established.  Those records were established by the

18 service coordinator.  Those hours and those duties

19 were established by the service coordinator, and there

20 was an assumption that they were always done.

21 And when would the Service Coordinator show up?

22 Every three months.  That's what I heard.  So nobody

23 was supervising any of this stuff.

24 And I really --- it's my opinion that the DOL

25 should have looked into that.  Look, I have never seen



1    a Wage Hour investigation under these circumstances

2    when you have all these parties involved making vital

3    decisions and then it's up to Wage Hour to sort them

4    out.  And I think they should have.

5    Q.So when you learned about this miscellaneous pay,

6    did you look at any payroll records to confirm what

7    ??? (2:43:11) was telling you?

8    A.No.  I trust Brad Heeter.  He will tell me --- he

9    will not tell me something which wasn't happening.

10   Q.But did you look at any records to verify whether

11   those deductions correlated with the kind of sounding

12   billing fraud that you're talking about?

13   ATTORNEY FOX:

14   Objection to form.  There's been no

15   discussion of billing fraud.

16   THE WITNESS:

17   I didn't say it was billing fraud.  I

18   said it was a mistake, that they paid wages that they

19   were later told by the DC or by the organization that

20   they should not have paid and they would not be paid

21   for them.  That's the problem.  There's no fraud

22   involved in that thing.  That's simply --- what it is,

23   is a demonstration of the lack of control that Intra-

24   National had.  This is another way I looked at it.  It

25   was a lack of control that Intra-National had, which



1   would be an essential part of being an employer.

2   If you can't decide what --- if you

3   don't know or can't decide what's to be paid, you

4   know.  I understand the FLSA definition of employer is

5   extremely broad.  But other people have more duties as

6   employers than Intra-National.  And, you know, it's my

7   thrust in looking at this is try to establish that

8   this was not true.  You know, that they should not

9   have been summarily determined to be an employer

10  without some analysis of what went on here.

11  The MCO had all the power.  The state

12  transferred the power to the MCO.  They couldn't pick

13  employees.  The recipient picked who --- they couldn't

14  decide not to hire one because the standards of the

15  federal government told who could be hired.

16  BY ATTORNEY LUBY:

17  Q.So did Mr. Heeter show you that the miscellaneous

18  deductions on the payroll records correlated exactly

19  with the overtime premium pay for the direct care

20  workers?

21  A.No, I don't believe Mr. Heeter would have told me

22  something which wasn't true.

23  Q.Did you look at the payroll records?

24  Is that true?

25  A.No, I just told you.  I had Brian Heeter tell me



```
 1   that he looked at records or something about the

 2   records and saw that, and I accept it as fact.

 3   ATTORNEY LUBY:

 4   How about we take a five-minute break?

 5   I think we're about done here, but I just want to look

 6   over my notes.  I'll leave the chat if you want.

 7   ATTORNEY FOX:

 8   Yeah, sure.

 9                      ---

10   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

11                      ---

12   ATTORNEY LUBY:

13   Back on the record.  I don't have any

14   more questions for you today.  I wanted to thank you

15   for your time and your attention during the

16   deposition.  And your Counsel may want to talk to you

17   about read and signing, but that's it for me.

18   ATTORNEY FOX:

19   I just have one question, one follow-up

20   question, Mr. Linkosky.

21                      ---

22                   EXAMINATION

23                      ---

24   BY ATTORNEY FOX:

25   Q.During the course of your 30-year career with the
```



JOHN R. LINKOSKY                                    March 22, 2023
WALSH V. INTRA NATIONAL HOME CARE                            112

1   DOL and your subsequent career as a specialist in FLSA

2   matters, have you ever seen an investigation that was

3   conducted as poorly as this one?

4   ATTORNEY LUBY:

5   Objection to form.

6   Go ahead.

7   THE WITNESS:

8   I have never seen an investigation of

9   any entity or any --- I'm using a lot of words.  Any

10  system like this.  This is unique in so many different

11  ways.  I think that --- I think that there are

12  shortcomings in the investigation process but I don't

13  believe anybody --- at least I never saw anything

14  quite like this where you have all these parties

15  making decisions and you can't do anything about it.

16  And I don't know if the DOL could

17  have gone in and questioned this stuff.  I know that

18  people in Dilli's position couldn't go in there and

19  question the hours.  I think the DOL could probably

20  have done it if they would have done it.  But they had

21  the restriction of the virus, which is another

22  problem.  I don't think the investigation was very

23  good on the investigators' level, period. Thank you.

24  ATTORNEY FOX:

25  Okay.  Thank you.



 1   I have no further questions.

 2   ATTORNEY RUPRECHT:

 3   John, one thing.  Not my house.  What

 4   she's saying is, you have a right to request this

 5   transcript.  And when we get it, you've got 30 days to

 6   see if you want to make corrections, additions or

 7   that, or you can waive it.

 8   What do you want to do?

 9   THE WITNESS:

10   I want the transcript.

11   ATTORNEY RUPRECHT:

12   You want to read?

13   THE WITNESS:

14   Yes.

15   ATTORNEY RUPRECHT:

16   Okay.

17   ATTORNEY FOX:

18   Okay.

19   I think we're done then.

20   ATTORNEY LUBY:

21   Let's go off the record.

22                   * * * * * * * *

23         DEPOSITION CONCLUDED AT 2:34 P.M.

24                   * * * * * * * *

25   COURT REPORTER:



1   Mr. Fox, I just need to know if she'd

2   like a copy.

3   ATTORNEY FOX:

4   Oh, the court reporter has a question.

5   I'm sure she's gone, but I'm sure she'll want a copy.

6   COURT REPORTER:

7   And would you like an email copy or hard

8   copy?

9   ATTORNEY FOX:

10  Whatever.  You know, we'll want an email

11  copy, a hard copy and the mini script. I guess we

12  won't need the exhibits attached since we have this

13  binder.

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   COMMONWEALTH OF PENNSYLVANIA   )
 2   COUNTY OF ALLEGHENY           )
 3                     CERTIFICATE
 4   I, Benjamin Morrow, a Notary Public in and
 5   for the Commonwealth of Pennsylvania, do hereby
 6   certify:
 7   That the witness, John R. Linkosky, whose
 8   testimony appears in the foregoing deposition, was
 9   duly sworn by me on 3/22/23 and that the transcribed
10   deposition of said witness is a true record of the
11   testimony given by said witness;That the proceeding
12   is herein recorded fully and accurately;
13   That I am neither attorney nor counsel for,
14   nor related to any of the parties to the action in
15   which these depositions were taken, and further that I
16   am not a relative of any attorney or counsel employed
17   by the parties hereto, or financially interested in
18   this action.
19   Dated the 4th day of April, 2023
20
21
22   Benjamin Morrow,
23   Court Reporter
24
25
```



Benjamin Morrow

```
 1  Reference No.: 9439585

 2

 3  Case:  WALSH V. INTRA NATIONAL HOME CARE

 4

         DECLARATION UNDER PENALTY OF PERJURY
 5
         I declare under penalty of perjury that
 6  I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the
 7  same has been read to me, and the same is
    true and accurate, save and except for
 8  changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET
 9  hereof, with the understanding that I offer
    these changes as if still under oath.
10

11          _____

12          John R. Linkosky

13

14              NOTARIZATION OF CHANGES

15                  (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                    Notary Public,

24

25  in and for the State of _____
```



```
1   Reference No.: 9439585
    Case:  WALSH V. INTRA NATIONAL HOME CARE
2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24
    SIGNATURE:_____DATE:_____
25  John R. Linkosky
```



Reference No.: 9439585
Case:  WALSH V. INTRA NATIONAL HOME CARE

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
John R. Linkosky



# EXHIBIT 1

**McKeegan, Hugh**

___

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:07 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Intra National - Scranton 2021 pay stubs |

This is 10/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Fri, Nov 12, 2021 at 10:39 AM
Subject: Intra National - Scranton 2021 pay stubs
To: Meg Subedi <msubedi@intrahc.com>

Meg,

I followed your instructions  regarding the thumb drive and that location has only time sheets. I need to see the 2021 pay stubs.

Can you e-mail to me the paystubs of 5-6 DCWs selected at random from each quarter of 2021, instead of all the 2021 paystubs and time sheet?

Thanks, John

John R. Linkosky

John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA  15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net

# EXHIBIT 2

## McKeegan, Hugh

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:19 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: DOL-Pittsburgh |

This is 25/59

---------- Forwarded message ---------
From: **Meg Subedi** <msubedi@intrahc.com>
Date: Thu, Jun 25, 2020 at 4:55 PM
Subject: Fwd: DOL-Pittsburgh
To: INTRANATIONAL HOMECARE <dechintranational1@yahoo.com>


---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Mon, Jun 22, 2020 at 2:56 PM
Subject: DOL-Pittsburgh
To: Meg Subedi <msubedi@intrahc.com>
Cc: INTRANATIONAL HOMECARE <dechintranational1@yahoo.com>, Fox, Bruce <bruce.fox@obermayer.com>

Meg,

Please tell me if I understand  correctly what was done in regard to overtime as of the first pay period on August 2018.

As of the first pay period of August 20018, the hourly rate paid to caregivers was reduced- For example, Ahmed Nsaif was paid $12.50 an hour, his rate was reduced to $10.62, and he was paid time and one half that rate thereafter.  He worked a fixed number of hours serving the consumer that were approved by the Service Coordinator. The regular hours were 124 each pay period. In pay period ending 12/16/18, he worked 116 hours and was paid $10.83 and time and one half for the overtime.  However, during the period 10/22/18 to 11/4/18 he worked 51 hours and was paid $12.50 an hour. Was it the policy to pay the lower rate when there  was overtime, and the higher rate when there was no overtime?

John


John R. Linkosky


John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA  15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net


This electronic message contains information from the law firm of John Linkosky Assoc. that may be privileged and confidential. The information is intended to be for the use of the intended recipient only.  If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this message is prohibited.  If you are not the intended recipient, please delete the information immediately.




--
Thank You


Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC


Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*



--
Thank You


Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

# EXHIBIT 3

**McKeegan, Hugh**

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:09 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Intra-National Home Care - Scranton, Pa. |

This is 13/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Wed, Nov 3, 2021 at 2:55 PM
Subject: RE: Intra-National Home Care - Scranton, Pa.
To: Piccillo, Salvatore <sapiccillo@pa.gov>
Cc: Meg Subedi <msubedi@intrahc.com>, Fox, Bruce <bruce.fox@obermayer.com>, Thompson, George <george.thompson@obermayer.com>

Inspector Piccillo,

I have received the records related to your inquiry, and will review them and report my findings to you.

As promised, here is a description of the program that is involved.

Medicaid eligible individuals can waive their right to enter nursing homes, and apply to have needed services provided in their homes. Application is made to the State of Pennsylvania Department of Human Services, which has the authority and responsibility to create and supervise a program to enable treatment for such applicants in their homes, from the U.S. Department of Health and Human Services  The State department employs what are called Managed Care Organizations (MCOs), to initiate, supervise, and direct the program the State created. Employees of the MCO called Service Coordinators , determine the eligibility of the applicant, the services to be performed, the hours of service to be provided, create an Individual Service Plan (ISP),which is sent to the State for approval.  Upon approval,  the prospective service provider called a Direct Care Worker (DCW),  is selected by the Consumer, (recipient of the services) who also selects a Provider, which is the role played by Intra National. (IN). The identity of the selected DCW is sent to IN for vetting according to State requirements. If the proposed DCW passes the tests, he/she can be hired. IN is paid for its services according to a State schedule of rates, applied in 15 minute increments to the type and hours of service provided, for each hour of service provided by a DCW. From that amount, IN is to establish a rate of pay for the DCW, calculate the payroll,  pay for all hours worked by the DCW, including overtime pay, pay applicable required taxes (FICA), absorb administrative costs, and the remainder is compensation for IN for the services provided. The amounts paid by the State are non-negotiable. The DCW, with the Consumer, reports the hours of service provided, which always match the total hours to be provided in the ISP, to IN via the MCO, from which IN calculates and pays the DCW.  IN has no control whatsoever over the hours to be worked by the DCW,  the duties to be performed, the selection the of the DCW, or any aspect of employment of the DCW. IN is essentially a payroll service

The U.S. Department of Labor, Wage-Hour Division, has conducted investigations of Intra National in Pennsylvania and Ohio, pursuant to the Fair Labor Standards Act , (FLSA), the compliment to the PMWA. Intra National has  taken the position that Intra National is not an employer of the DCWs pursuant to the above facts of the relationship of Intra National to the DCWs. It is the position of Intra National that the State of Pennsylvania and the MCO are the joint employers of the DCWs. Those cases are in  litigation in the respective federal courts for the Western District of Pennsylvania and the Southern District of Ohio. Due to the fact that the PMWA is interpreted in light of the FLSA, It seems to be practical to forego a PMWA  investigation pending resolution of the federal cases., and I suggest that.

However, you have informed me that you have evidence of the payment of straight time for all of 113 hours worked in a 2 week pay period. My review and familiarity with the payroll practices of Intra National lead me to believe that to be improbable,

but my experience in the area of overtime pay tells me that it may not be impossible. If you can provide me with the name of the DCW who had that experience, I assure you that I will thoroughly pursue its resolution.

If you have any questions, or need further explanation, Call me.

John R. Linkosky, Esq.

**From:** Piccillo, Salvatore <sapiccillo@pa.gov>
**Sent:** Tuesday, November 2, 2021 8:59 AM
**To:** linklaw@comcast.net
**Cc:** Hickey, Joseph <jhickey@pa.gov>
**Subject:** Intra-National Home Care

Attorney Lincosky:     As per our conversation on 11/2/21 I will be awaiting the summary of your position on the case discussed.

Thank you, Salvatore

Salvatore Piccillo / Labor Law Investigator

Bureau of Labor Law Compliance

Pennsylvania Department of Labor & Industry

201-B State Office Building

100 Lackawanna Avenue / Scranton PA 18503

Phone: 570-954-8710 / Email: sapiccillo@pa.gov

--
Thank You


Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101


*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

Intra-National  042563

# EXHIBIT 4

## McKeegan, Hugh

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:09 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Scranton investigation |

This is 14/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Wed, Oct 13, 2021 at 10:16 AM
Subject: Scranton investigation
To: Meg Subedi <msubedi@intrahc.com>

Meg,

I hope your Mom is doing better.

I need a firm date and time when I can look at the Scranton records. ███████████████
████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

As you know the practice of reducing the rate of pay when the hours worked exceed the standard hours was a practice with almost all Nepali Providers. I have some of those cases and I have defenses that have been developed in the USDOL cases that may be claimed in a State action. The State law is very similar to the federal law, and is interpreted in light of federal law. We can discuss those when we meet and I can explain them. Before any decision can be proposed, I must have a complete understanding of what went on in Scranton for the last two years. You can call me if you choose to discuss this. There are a number of things to discuss regarding the entire situation.

John

John R. Linkosky

John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA 15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net

This electronic message contains information from the law firm of John Linkosky Assoc. that may be privileged and confidential. The information is intended to be for the use of the intended recipient only. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you are not the intended recipient, please delete the information immediately.

--
Thank You

Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

# EXHIBIT 5

**McKeegan, Hugh**

---

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:11 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: SCR SAMPLE |

This is 17/59

---------- Forwarded message ---------
From: **Linklaw** <linklaw@comcast.net>
Date: Sat, Oct 2, 2021 at 1:07 PM
Subject: Re: SCR SAMPLE
To: Meg Subedi <msubedi@intrahc.com>
Cc: John Linkosky <linklaw@comcast.net>


Thanks, Meg. Has Intra National stopped reducing the regular rate when more than the scheduled hours are worked by a DCW at all locations, and if so when? I also have another issue to discuss. I will call you.
John




Sent from my iPad


On Sep 30, 2021, at 1:39 PM, Meg Subedi <msubedi@intrahc.com> wrote:


TRY THIS ONE

On Thu, Sep 30, 2021 at 9:49 AM John R. Linkosky <linklaw@comcast.net> wrote:

> Meg,
>
> I cannot open all the records sent. Please end those that are not PDF in PDF.
>
> Thanks. John
>
>
> _____
>
> **From:** Meg Subedi <msubedi@intrahc.com>
> **Sent:** Wednesday, September 29, 2021 4:22 PM
> **To:** John R. Linkosky <linklaw@comcast.net>
> **Subject:** SCR SAMPLE

📄 **KADARIYA DIL M TS 2019.pdf**

📄 **kadariya DIL M TS 2020.pdf**

--

Thank You

Meg Subedi

Chief Finance Officer

Intra-National Homecare, LLC

INTRANATIONAL HOME CARE

Phone: 814-218-4970

Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

--

Thank You


Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101


*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*
<SAPKOTA CHET PS 2021.webloc>
<SAPKOTA CHET PS 2020.pdf>
<SAPKOTA CHET PS 2019.pdf>
<SAPKOTA CHET 2019 TS.pdf>


--
Thank You


Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101


*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

Intra-National  042568

**McKeegan, Hugh**

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:11 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Scranton Investigation b PMWA |

This is 18/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Thu, Sep 23, 2021 at 12:42 PM
Subject: RE: Scranton Investigation b PMWA
To: Meg Subedi <msubedi@intrahc.com>


Thanks, Meg. Just give me a time and date except for 9/27/2021.

John


---

**From:** Meg Subedi <msubedi@intrahc.com>
**Sent:** Thursday, September 23, 2021 12:38 PM
**To:** John R. Linkosky <linklaw@comcast.net>
**Subject:** Re: Scranton Investigation b PMWA


Sure

I will arrange next week.


On Thu, Sep 23, 2021 at 12:30 PM John R. Linkosky <linklaw@comcast.net> wrote:

> Meg,
>
> John
>
> Thanks for getting back to me. Do you have time for me to come over and look at a sample of the records, and some time sheets. I have never seen records from Scranton.
>
> Maybe we can save some rime.
>
> John

# EXHIBIT 6

**McKeegan, Hugh**

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:11 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Scranton Investigation b PMWA |

This is 18/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Thu, Sep 23, 2021 at 12:42 PM
Subject: RE: Scranton Investigation b PMWA
To: Meg Subedi <msubedi@intrahc.com>


Thanks, Meg. Just give me a time and date except for 9/27/2021.

John


---

**From:** Meg Subedi <msubedi@intrahc.com>
**Sent:** Thursday, September 23, 2021 12:38 PM
**To:** John R. Linkosky <linklaw@comcast.net>
**Subject:** Re: Scranton Investigation b PMWA



Sure

I will arrange next week.



On Thu, Sep 23, 2021 at 12:30 PM John R. Linkosky <linklaw@comcast.net> wrote:

> Meg,
>
> John
>
> Thanks for getting back to me. Do you have time for me to come over and look at a sample of the records, and some
> time sheets. I have never seen records from Scranton.
>
> Maybe we can save some rime.
>
> John

**From:** Meg Subedi <msubedi@intrahc.com>
**Sent:** Thursday, September 23, 2021 11:54 AM
**To:** John R. Linkosky <linklaw@comcast.net>
**Subject:** Re: Scranton Investigation b PMWA

JOHN

I am working on it. It might take 2 weeks at max to complete it.

On Tue, Sep 21, 2021 at 12:08 PM John R. Linkosky <linklaw@comcast.net> wrote:

Meg,



John R. Linkosky

John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA  15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net

Intra-National  042570

This electronic message contains information from the law firm of John Linkosky Assoc. that may be privileged and confidential. The information is intended to be for the use of the intended recipient only. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you are not the intended recipient, please delete the information immediately.

--

Thank You

Meg Subedi

Chief Finance Officer

Intra-National Homecare, LLC

Phone: 814-218-4970

Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

--

Thank You

Meg Subedi

Chief Finance Officer

Intra-National Homecare, LLC

Phone: 814-218-4970

Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

--
Thank You

Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

## McKeegan, Hugh

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:10 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Ambika bhattarai |
| **Attachments:** | AMBIKA BHATTARAI.pdf.webloc; AMBIKA BHATTARAI PAYSTUB 2019.pdf; AMBIKA BHATTARAI EVV MIS PUNCH 2020.pdf; AMBIKA BHATTARAI 2021 EVV MIS PUNCH 2021.pdf; AMBIKA BHATTARAI TIME SHEET 2020.pdf |

This is 16/59

---------- Forwarded message ---------
From: **Meg Subedi** <msubedi@intrahc.com>
Date: Mon, Oct 4, 2021 at 10:22 AM
Subject: Ambika bhattarai
To: John R. Linkosky <linklaw@comcast.net>


 **AMBIKA BHATTARAI TIME SHEET 2019.pdf**

 **AMBIKA BHATTARAI TIME SHEET 2019.pdf**


--
Thank You



Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101


*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*



--
Thank You

# EXHIBIT 7

**McKeegan, Hugh**

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:07 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Intra National - Scranton 2021 pay stubs |

This is 10/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Fri, Nov 12, 2021 at 10:39 AM
Subject: Intra National - Scranton 2021 pay stubs
To: Meg Subedi <msubedi@intrahc.com>

Meg,

I followed your instructions regarding the thumb drive and that location has only time sheets. I need to see the 2021 pay stubs.

Can you e-mail to me the paystubs of 5-6 DCWs selected at random from each quarter of 2021, instead of all the 2021 paystubs and time sheet?

Thanks, John

John R. Linkosky

John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA 15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net

This electronic message contains information from the law firm of John Linkosky Assoc. that may be privileged and confidential. The information is intended to be for the use of the intended recipient only. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you are not the intended recipient, please delete the information immediately.

--
Thank You


Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

# EXHIBIT 8

**McKeegan, Hugh**

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:19 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: DOL-Pittsburgh |

This is 25/59

---------- Forwarded message ---------
From: **Meg Subedi** <msubedi@intrahc.com>
Date: Thu, Jun 25, 2020 at 4:55 PM
Subject: Fwd: DOL-Pittsburgh
To: INTRANATIONAL HOMECARE <dechintranational1@yahoo.com>

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Mon, Jun 22, 2020 at 2:56 PM
Subject: DOL-Pittsburgh
To: Meg Subedi <msubedi@intrahc.com>
Cc: INTRANATIONAL HOMECARE <dechintranational1@yahoo.com>, Fox, Bruce <bruce.fox@obermayer.com>

Meg,

Please tell me if I understand correctly what was done in regard to overtime as of the first pay period on August 2018.

As of the first pay period of August 20018, the hourly rate paid to caregivers was reduced- For example, Ahmed Nsaif was paid $12.50 an hour, his rate was reduced to $10.62, and he was paid time and one half that rate thereafter. He worked a fixed number of hours serving the consumer that were approved by the Service Coordinator. The regular hours were 124 each pay period. In pay period ending 12/16/18, he worked 116 hours and was paid $10.83 and time and one half for the overtime. However, during the period 10/22/18 to 11/4/18 he worked 51 hours and was paid $12.50 an hour. Was it the policy to pay the lower rate when there was overtime, and the higher rate when there was no overtime?

John

John R. Linkosky

John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA  15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net

This electronic message contains information from the law firm of John Linkosky Assoc. that may be privileged and confidential. The information is intended to be for the use of the intended recipient only.  If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this message is prohibited.  If you are not the intended recipient, please delete the information immediately.

--
Thank You

Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

--
Thank You

Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

# EXHIBIT 9

## McKeegan, Hugh

| | |
|---|---|
| **From:** | Meg Subedi <msubedi@intrahc.com> |
| **Sent:** | Tuesday, February 14, 2023 12:16 PM |
| **To:** | McKeegan, Hugh |
| **Subject:** | Fwd: Records |

This is 21/59

---------- Forwarded message ---------
From: **John R. Linkosky** <linklaw@comcast.net>
Date: Thu, Jul 2, 2020 at 11:57 AM
Subject: RE: Records
To: Meg Subedi <msubedi@intrahc.com>


Are the records sent at 11:00 AM Wednesday, payroll or calculations?


**From:** Meg Subedi <msubedi@intrahc.com>
**Sent:** Thursday, July 2, 2020 11:27 AM
**To:** John R. Linkosky <linklaw@comcast.net>
**Subject:** Re: Records


$13


On Thu, Jul 2, 2020 at 11:09 AM John R. Linkosky <linklaw@comcast.net> wrote:

Meg,

Please send the records sent in Google drive to me in Excel. Thanks. I have reviewed some of those from 2017 that were not in Google drive, those sent at 11:00 AM on Wednesday. I see overtime apparently calculated at $6.50 an hour. What was the rate paid for the first 80 hours?

John


John R. Linkosky

John Linkosky & Assoc.

Attorneys at Law

715 Washington Ave

Carnegie, PA  15106

412-278-1280

412-278-1282 (Fax)

linklaw@comcast.net


This electronic message contains information from the law firm of John Linkosky Assoc. that may be privileged and confidential. The information is intended to be for the use of the intended recipient only.  If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this message is prohibited.  If you are not the intended recipient, please delete the information immediately.


--

Thank You




Meg Subedi

Chief Finance Officer

Intra-National Homecare, LLC


Phone: 814-218-4970

Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*

--
Thank You

Meg Subedi
Chief Finance Officer
Intra-National Homecare, LLC



Phone: 814-218-4970
Fax: 412-881-7101

*This e-mail message, including any attachments, is for the sole use of the intended recipients(s) and may contain private, confidential, and/or privileged information. Any unauthorized review, use, disclose, or distribution is prohibited. If you are not the intended recipient, employee, or agent responsible for delivering this message, please contact the sender by replying the email and destroy all the copies of the original email message.*