**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JULIE A. SU, Acting Secretary of Labor, | : |
| United States Department of Labor, | : Civil Action No. 2:21-cv-05076-EAS-KAJ |
| | : |
| Plaintiff, | : Judge Edmund A. Sargus, Jr. |
| | : |
| v. | : |
| | : Magistrate Judge Kimberly A. Jolson |
| AMERICARE HEALTHCARE SERVICES, LLC | : |
| and DILLI ADHIKARI, | : |
| | : |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………………………iv

SUMMARY OF ARGUMENTS PRESENTED........................................................ ix

I. STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................1

    A. Defendant Americare's Operations ..................................................................1

    B. Defendant Adhikari's Ownership and Control over Americare ........................3

    C. The Aides are Defendants' Employees…………………………………………4

    D. Defendants Failed to Comply with the Overtime Provisions of the FLSA………10

    E. Defendants Owe Overtime Back Wages to 1,702 Employees  …………………..12

    F. Defendants have No Viable Good Faith Defense to Avoid Liquidated
       Damages Because they Knew they were Required to Pay Overtime
       Before the Violations Occurred in this Case……………………………………14

    G. Defendants Willfully Violated the FLSA  ……………………………………17

    H. Defendants' Recordkeeping Violations ...........................................................18

    I. Defendants' Continued FLSA Violations ..........................................................19


II. LAW AND ANALYSIS .......................................................................................19

    A. Background  ......................................................................................................19

    B. Standard of Review  .........................................................................................20

    C. Defendants are Employers Covered under the FLSA ......................................20

    D. Defendant Adhikari is Individually Liable as an "Employer" Under Section 203(d)
       of the FLSA .....................................................................................................22

    E. Defendants Employ the Aides and, as such, Aides Are Entitled to the Protections
       of the FLSA .....................................................................................................24

    F. No Exemption From the FLSA's Overtime Requirement Applies to Defendants' Employees,
       Even After *Loper Bright*…………………………………………………………26

          *1. History of Domestic Service Employee Regulations*……………………………27

          *2. These Regulations Remain Valid*………………………………………………29

    G. Defendants Violated the FLSA's Overtime Provisions and Owe
       Back Wages Totaling $7,478,820.79 .............................................................35

          *1. From October 19, 2018 to August 11, 2019, Defendants Violated*
             *the Act by Paying Straight Time for Overtime and, as a Result,*
             *Owe $555,905.40 in Back Wages* ...........................................................35

          *2. From August 12, 2019 Through April 14, 2024, Defendants Violated the*
             *Act by Artificially Lowering Employee's Regular Rate When Calculating*
             *Overtime Owed, Resulting in Back Wages Totaling $6,922,915.39.* ...................36

          *3. Plaintiff Is Entitled to Back Wages for Defendants' Overtime Violations*
             *that Have Continued Since April 14, 2024.* ...............................................39

    H. Defendants Are Liable for $7,478,820.79 in Liquidated Damages ...................39

    I. Defendants' Violation of the FLSA's Overtime Provision Was Willful............42

    J. Defendants Violated the FLSA's Recordkeeping Provisions  .............................45

K.  The Acting Secretary is Entitled to Injunctive Relief ........................................................46

**III.CONCLUSION**…………………………..…………………….…………………………....**48**

## **TABLE OF AUTHORITIES**

### **Cases**

*149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, *modified*, 331 U.S. 795 (1947) .................... 37

*Acosta v. Min & Kim, Inc.*, 919 F.3d 361(6th Cir. 2019) ....................................................... 36, 39

*Acosta v. Off Duty Police Servs.*, 915 F.3d 1050 (6th Cir. 2019) ................................................. 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 20

*Auer v. Robbins*, 519 U.S. 452, 457-58 (1997)……………………………………………………..31

*Avila v. A Healthy Living Home Health, Inc.*, 7:14-cv-00982, 2017 WL 9471511 (S.D. Tex. July 17, 2017) ................................................................................................................................. 25

*Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 739 (1981) ..................................................... 19, 20

*Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir. 1998)............................... 23

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008)……………………………………………35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 20

*Chao v. First Nat. Lending Corp.*, 516 F. Supp. 2d 895 (N.D. Ohio 2006), *aff'd,* 249 Fed. Appx. 441 (6th Cir. 2007)..................................................................................................................... 40

*Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002).................................................... 20

*Chevron USA, Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984)………………29

*Crouch v. Guardian Angel Nursing, Inc.*, 3:07-ca-00541, 2009 WL 3737887 (M.D. Tenn. Nov. 4, 2009) ..................................................................................................................................... 25

*Doe v. U. of Kentucky*, 971 F.3d 553 (6th Cir. 2020) ................................................................. 20

*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991)....................................... 22, 23

*Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983)..................................................................... 22

*Elwell v. U. Hosps. Home Care Services*, 276 F.3d 832(6th Cir. 2002).......................... 40, 43, 45

*Encino Motorcars v. Navarro*, 579 U.S. 211, 214 (2016) .......................................................... 19

*Franklin v. Jenn's Angels, LLC*, No. CV 21-399-SDD-SDJ, 2022 WL 69213 (M.D. La. Jan. 6, 2022) ..................................................................................................................... 22

*Hatmaker v. PJ Ohio, LLC*, No. 3:17-cv-146, 2019 WL 1367663 (S.D. Ohio Mar. 26, 2019) ... 22

*Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468 (6th Cir. 1999) ............................ 43, 44

*Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015)……………...………29, 32, 34

*Kansas v. Garland*, 2024 WL 3360533 (D. Kan. July 10, 2024)……………………………..31

*Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015) ................................................ 24

*Long Island Care at Home, Ltd*. v. *Coke*, 551 U.S. 158, 164 (2007)……28, 29, 30, 31, 32, 33, 34

*Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024),144 S. Ct. 2244 (2024)…………..ix, 29, 30, 31, 32, 33, 34

*Marshall v. Brunner*, 668 F.2d 748 (3d Cir. 1982)....................................................................... 40

*Marshall v. Murray*, No. 76-167, 1979 WL 1986 (M.D. Pa. Sept. 14, 1979) ............................. 38

*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir. 1991)................................................ 39

*Martin v. Funtime, Inc.*, 963 F.2d 110 (6th Cir. 1992) ........................................................... 46, 47

*Martin v. Indiana Michigan Power Co.*, 381 F.3d 574 (6th Cir. 2004)........................................ 39

*Mason v. Pathfinders for Independence, Inc.*, 8:19-cv-307-WFJ-TGW, 2022 WL 1092238 (M.D. Fla. April 12, 2022)................................................................................................... 25, 26

*Mayfield v. Dep't of Labor*, 2024 WL 4142760, *4 (5th Cir. Sept. 11, 2024)………………31, 33

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)............................................................. 42

*Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017)...................................................... 36, 39

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ........................................................ 24

*Overnight Motor Transportation Co. v. Missel*, 316 U.S. 578 (1942) ........................................ 19

*Park v. Central USA Wireless*, No. 1:17-CV-448, 2019 WL 4743648

(S.D. Ohio Sept. 29, 2019) ................................................................................ 22

*Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234 (D. Or. 2014) ....................... 41

*Powers v. Emcon Associates, Inc.*, 14-cv-03006-KMT, 2017 WL 4075766 (D. Colo. May 14,

2018) .............................................................................................................. 26

*Reich v. Midwest Body Corp.*, 843 F. Supp. 1249 (N.D. Ill. 1994) ............................ 36

*Reich v. Montfort, Inc.,* 144 F.3d 1329 (10th Cir. 1998) ......................................... 43

*Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58 (2d Cir. 1997) .................... 41

*Reich v.Petroleum Sales Inc.*, 30 F.3d 654 (6th Cir. 1994) ...................................... 47

*Schaffner v. Monsanto Corp.*, No. 22-3075, 2024 WL 3820973 (3d Cir. Aug. 15, 2024).........31

*Sec. of Lab. v. Timberline S., LLC*, 925 F.3d 838 (6th Cir. 2019) .......................... 21, 40

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)............................................................35

*Solis v. Min Fang Yang*, 345 Fed. Appx. 35 (6th Cir. 2009) .................................... 40

*Su v. Nursing Home Care Management Inc.*, Civil Action No. 21-cv-02583, 2023 WL 3440237,

(E.D. Pa. May 12, 2023) ................................................................................. 44

*Tennessee v. Becerra*, No. 24-5220, 2024 WL 3934560 (6th Cir. Aug. 26, 2024)……………..34

*Turner v. Medical Case Management & Social Services*, 4:17-cv-00836-BP, 2018 WL 5084884

(N.D. Tex. Oct. 18, 2018) ............................................................................... 24

*U.S. Dept. of Lab. v. Cole Enterprises, Inc.*, 62 F.3d 775 (6th Cir. 1995).................... 22

*United States Dep't of Lab. v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277

(4th Cir. 2019)............................................................................................... 37

*Walling* v. *Green Head Bit & Supply Co.,* 138 F.2d 453 (10th Cir. 1943)................... 38

*Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944) ..................................... 36, 37

*Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945) ...................... 36

*Walsh v. KDE Equine, Inc.*, 56 F.4th 409 (6th Cir. 2022) ............................................................ 45

*Walsh v. Loving Kindness Healthcare Sys.*, LLC, No. 2:20-CV-1087-RJC, 2021 WL 2700852

    (W.D. Pa. July 1, 2021) ........................................................................................................ 22

*Walsh v. McDevitt*, 21-CV-2225, 2023 WL 2154961 (C.D. Ill. Feb. 7, 2023) ............................ 21

## **Statutes**

29 U.S.C. § 202(a) ................................................................................................................ 21, 27

29 U.S.C. § 203(d) ................................................................................................................ 22, 24

29 U.S.C. § 203(e)(1) .................................................................................................................. 24

29 U.S.C. § 203(r) ....................................................................................................................... 20

29 U.S.C. § 203(s) ....................................................................................................................... 20

29 U.S.C. § 206(a) ....................................................................................................................... 27

29 U.S.C. § 206(f) ........................................................................................................................ 27

29 U.S.C. § 207 ............................................................................................................................ 20

29 U.S.C. § 207(a)(1) ...................................................................................................... 27, 35, 36

29 U.S.C. § 207(l) ........................................................................................................................ 27

29 U.S.C. § 211(c) ....................................................................................................................... 45

29 U.S.C. § 213(a)(15) ..................................................................................................... 27, 30, 31

29 U.S.C. § 213(b)(21) ................................................................................................................ 27

29 U.S.C. § 217 ............................................................................................................................ 46

29 U.S.C. § 260 ............................................................................................................................ 40

## **Regulations**

29 C.F.R. § 516.2(a) .................................................................................................................... 45

29 C.F.R. § 516.2(a)(6) ................................................................................................................ 46

29 C.F.R. § 516.2(a)(7)………………………………………………………………45, 46

29 C.F.R. § 516.2(a)(8)………………………………………………………………..46

29 C.F.R. § 516.2(a)(9)………………………………………………………………..46

29 C.F.R. § 552.3 ………………………………………………………………………. 21

29 C.F.R. § 552.109………………………………………………………………28, 33

29 C. F.R. § 552.109(a)…………………………………………………………28, 33

29 C.F.R. § 552.109(c)……………………………………………………………28, 33

29 C.F.R. § 778.108 ……………………………………………………………………. 36

29 C.F.R. § 778.316 ……………………………………………………………………. 37

29 C.F.R. § 778.500 ……………………………………………………………………. 37

## SUMMARY OF ARGUMENTS PRESENTED

It is undisputed that Defendants Americare Healthcare Services, LLC ("Americare"), and Dilli Adhikari ("Adhikari") (together, "Defendants") have engaged in a pattern of unlawful wage practices. Defendants knew of their overtime obligations under the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. §§ 201, *et seq*., yet continued to disregard those obligations to avoid paying employees what they were owed under the law. Defendants also knew that under the Department's relevant regulations, no exemption from the FLSA's overtime obligations applied to their employees, and nothing about the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024),144 S. Ct. 2244 (2024), changes that fact. Defendants willfully violated the overtime provisions of the Act by (a) paying straight time for overtime hours worked, and (b) by later engaging in a scheme to mask their overtime violations (*i.e.*, paying straight time for overtime) by lowering employees' regular rate of pay when employees worked overtime hours and paying what appeared to be time and a half on that lowered, artificial rate. Furthermore, Defendants failed to maintain required records of employee weekly work hours, making their violations more difficult to detect. These willful violations continued from October 29, 2018 through the present ("Relevant Period").

The above-listed violations are evidenced by Defendants' payroll and time records. Indeed, undisputed evidence – Defendants' own records – establish Defendants willfully violated the Act and, as a result, are liable for $7,478,820.79 in back wages and an additional $7,478,820.79 in liquidated damages for the period October 19, 2018 through April 14, 2024. This liability will continue to increase until Defendants come into compliance with the FLSA. The nature and extent of these violations warrant permanent injunctive relief.

Accordingly, Plaintiff respectfully requests this Court grant her Motion for Summary Judgment in its entirety.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS ("UMF")

### A.  Defendant Americare's Operations

1.    In 2016, Adhikari purchased and took over the operations of Americare, continuing the policies, rules, and procedures from the previous owner. (ECF 64-1 at PAGEID 365 and 377-378, 30(b)(6) Dep., 45:21-24 and 47:15-48:2).

2.    Americare is a third-party home care company that provides home health care services to clients in their private homes. (ECF 64-1 at PAGEID 340 and 469-470, 30(b)(6) Dep., 20:5-24 and 149:19-150:4; ECF 64-2 at PAGEID 854, 30(b)(6) Dep., Ex. 9, Americare Employee Handbook, p. 14; ECF 65-4 at PAGEID 3634-3362, 30(b)(6) and Adhikari Continued Dep., Ex. 13, Complaint in *Intra-National Health Care, LLC and Americare Home Healthcare Services, Inc. v. U.S. Dept. of Labor*, 2:20cv-1545 (W.D. Pa.) at ¶ 1).

3.    Americare's employees regularly handled or otherwise worked with goods or materials that traveled across state lines. (ECF 64-1 at PAGEID 418-419, 30(b)(6) Dep., 98:20-99:2; ECF 64-2 at PAGEID 694, 30(b)(6) Dep., Ex. 7, Joint Stipulation at ¶ 2).

4.    In calendar years 2018, 2019, 2020, 2021, and 2022, Americare had an annual dollar volume of sales or business done of at least $500,000. (ECF 64-2 at PAGEID 694, 30(b)(6) Dep., Ex. 7 at ¶ 1).

5.    Americare is an enterprise engaged in commerce or in the production of goods for commerce as defined in the FLSA, 29 U.S.C. § 203(s)(1). (*Id*. at ¶ 3).

6.    Americare hires and retains Home Health Aides ("Aides")[1] that perform a number of services for clients, including the following named categories and specifically enumerated activities: personal care (*e.g.*, assist with bathing, hair care, skin care, oral hygiene, dressing),

---

[1] During depositions, the term "Home Health Aides" was used interchangeably with "Direct Care Workers" and "Personal Care Assistants."

nutrition (*e.g.*, meal preparation, assist with feeding), incidentals/safety measures (*e.g.*, make bed, trash removal), elimination (*e.g.*, bathroom, bedpan/urinal), mobility (*e.g.*, assist with ambulation, turn and position), treatments (*e.g.*, temperature, pulse/blood pressure, medicine reminders). (ECF 66-1 at PAGEID 3763-3765, Bharati Dep., 60:2-62:5; ECF 66-1 at PAGEID 3801-3803, Bharati Dep., Ex. 9, Weekly Care Sheet; ECF 64-2 at PAGEID 854, 30(b)(6) Dep., Ex. 11 at p. 14, Job Description).

7.      In its declaratory judgment action against the DOL, which involves the question of whether Americare was required to pay Aides overtime under the Act, Americare pled it employed Direct Care Workers (a/k/a Home Health Aides). (ECF 61-1 at PAGEID 1142, 30(b)(6) and Adhikari Continued Dep., 64:3-15; ECF 65-4 at PAGEID 3638, 30(b)(6) and Adhikari Continued Dep., Ex. 13 at ¶ 20).

8.      Americare has offices in Columbus, Cleveland, Cincinnati, and Akron, and each office has an Area Director. (ECF 66-1 at PAGEID 3713-3714, Bharati Dep., 10:25-11:6). Aides report directly to the Area Director. (ECF 66-1 at PAGEID 3714, Bharati Dep., 11:7-9).

9.      The Area Director (also known as the "Office Manager") ensures Aides are properly hired, the Aides are providing the proper care to clients, and the Aides are correctly clocking in and out using the electronic verification device. (ECF 66-1 at PAGEID 3712 and 3714, Bharati Dep., 9:12-25, 11:2-6). When an Aide has a question about their job, they are directed to speak with the Area Director. (ECF 66-1 at PAGEID 3714, Bharati Dep., 11:10-12).

10.     Each Area Director, as well as the Human Resource Director, reports to the Administrator, Gopal Dhital. (ECF 66-1 at PAGEID 3713 and 3717, Bharati Dep., 10:14-21 and; 14:16-18; ECF 71-1 at 4289-4290, Dhital Dep., pp 9:23-10:15). Dhital is a member of Americare's executive team and serves on its Board of Directors. (ECF 64-1 at PAGEID 552-553, 30(b)(6)

Dep., 232:22-233:10; ECF 64-3 at PAGEID 890, Ex. 21, Defendants' Interrogatory Responses, No. 2).

11.     As the Administrator, Dhital supervises the payroll department.  (ECF 64-1 at PAGEID 422-423, 30(b)(6) Dep., 102:5-7 and 103:2-5). As part of this job function, Dhital ensures the hours worked by Aides are recorded properly and verifies the payroll before it is sent to the payroll company. (ECF 71-1 at 4307-4308 and 4313-4314 Dhital Dep., 27:15-28:7; 33:13-34:3; ECF 69-1 at PAGEID 3968, Adhikari Dep., 26:13-19).

12.     Dhital reports to Dilli Adhikari who is the sole owner of Americare. (ECF 71-1 at 4289, Dhital Dep., 9:14-15; ECF 64-1 at PAGEID 552, 30(b)(6) Dep., 232:18-21; ECF 64-3 at PAGEID 890, 30(b)(6) Dep., Ex. 21, Int. 2).

**B.     Defendant Adhikari's Ownership and Control over Americare**

13.     Adhikari is the only individual that receives profits from Americare. (ECF 64-1 at PAGEID 552, 30(b)(6) Dep., 233:11-13).

14.     During the Relevant Period, Adhikari has been involved in the day-to-day operations of Americare, including supervising and coaching the work performance of the Administrator and all Area Directors of Americare; ensuring FLSA compliance and other types of regulatory compliance; contracting with different managed care organizations and Ohio area agencies on aging (which provide reimbursements to Americare); hiring administrative staff, including the Administrator, Area Directors, Managers, Office Manager, office staff, registered nurses (RNs), and licensed practical nurses (LPNs); determining the salaries and pay of the administrative staff; setting the work schedule for the administrator; and establishing company policies and procedures for Aides, including overtime policies. (ECF 66-1 at PAGEID 3956-3963 and 3967-3968, Adhikari Dep., 14:7-20:16, 21:12-17, 25:16-26:12). Adhikari also had the

authority to discipline and terminate the employment of the administrative staff. (ECF 69-1 at PAGEID 3962-3964, Adhikari Dep., 20:5-13, 21:12- 22:16).

15.     Adhikari and Dhital are responsible for deciding pay policies, including whether Aides are paid an overtime premium, whether Aides are treated as exempt from minimum wage or overtime requirements, and what deductions may be taken from their wages. (ECF 64-3 at PAGEID 892-893, 30(b)(6) Dep., Ex. 21, Int. 5; ECF 69-1 at PAGEID 3968, Adhikari Dep., 26:1-12).

16.     Adhikari also makes overarching employment policy decisions for Americare, along with the Area Directors and Dhital. (ECF 69-1 at PAGEID 3965, Adhikari Dep., 22:17-24).

17.     Adhikari is the sole individual at Americare to determine how much to pay Aides. (ECF 71-1 at PAGEID 4294-4295, Dhital Dep., 14:12-15:7).  If an applicant requests to be paid at a certain rate, Human Resources, the Area Director, or the Administrator will communicate the request to Adhikari and then Adhikari will make the decision about the pay rate. (ECF 71-1 at PAGEID 4295-4299, Dhital Dep., 15:8-16:25, 17:13-18:10).

18.     Adhikari makes decisions related to the recordkeeping of hours worked by the Aides. (ECF 69-1 at PAGEID 4000, Adhikari Dep., 58:8-59:7; ECF 69-3 at PAGEID 4158-4159, Adhikari Dep., Ex. 15 at RFA 30).

**C.  The Aides are Defendants' Employees.**

19.     Prospective Aides who want to work for Americare first fill out a job application. (ECF 66-1 at PAGEID 3729, Bharati Dep., 26:7-10; ECF 67-1 at PAGEID 3826, Acharya Dep., 12:3-6).

20.     Americare requires no particular level of schooling or education (such as a high school diploma) for Aides to work for the company. (ECF 64-1 at PAGEID 447, 30(b)(6) Dep., 127:5-15).

21.     Americare does not require Aides to have any home care work experience prior to working for Americare. (ECF 64-1 at PAGEID 448, 30(b)(6) Dep., 128:7-12).

22.     Americare's Human Resources Department screens prospective employees by conducting background checks to ensure the individual has not been suspended from the Medicaid program, does not have a disqualifying criminal record, is eligible to work in the United States (E-Verify), and does not have tuberculosis. (ECF 66-1 at PAGEID 3730-3731, Bharati Dep., 27:4-28:21; ECF 67-1 at PAGEID 3840-3843, Acharya Dep., 16:25-19:8; ECF 64-1 at PAGEID 496-498, 30(b)(6) Dep., 176:1-178:5).

23.     During the hiring process, Americare's Human Resources Department checks two of the applicant's references and conducts a face-to-face interview. (ECF 67-1 at PAGEID 3836, Acharya Dep., 12:7-16).

24.     Applicants who fail one or more of these background checks are not hired by Americare. (ECF 66-1 at PAGEID 3730-3731, Bharati Dep., 27:18-28:2, 28:14-16).

25.     During the Aides hiring process, Americare checks whether the applicant has their home health aide, first aid, and CPR certifications. (ECF 67-1 at PAGEID 3838, Acharya Dep., 14:11-17).

26.      During the hiring process, an Americare nurse meets with the Aide applicant and administers a clinical skills test to ensure they are competent for the position. (ECF 67 at PAGEID 3838, Acharya Dep., 14:2-7). The skills tested include bathing, oral hygiene, toileting and elimination, positioning, safe transfer technique, ambulation, fluid intake, adequate nutrition,

documenting patient status and care, reporting body functions and changes to supervisor, and recognition of emergencies. (ECF 64-1 at PAGEID 499-500, 30(b)(6) Dep., 179:20-180:11; ECF 64-2 at PAGEID 838, 30(b)(6) Dep., Ex. 11., p. 57, Initial Competency Test).

27.     If the applicant is not competent in a certain area, an Americare nurse will train the applicant before approving them. (ECF 67-1 at 3837-3839, Acharya Dep., 13:7-14:7, 14:18-15:18).

28.     In addition, once the Aide starts, an Americare nurse will travel to the client's home and make sure the Aide can perform the necessary clinical skills.  If the Aide's skills are unsatisfactory, the nurse will instruct them how to perform the task. (ECF 67-1 at PAGEID 3853-3854, Acharya Dep., 29:12-30:1; ECF 64-1 at PAGEID 498-499, 30(b)(6) Dep., 178:16-179:20; ECF 64-2 at PAGEID 836-837, 30(b)(6) Dep., Ex. 11, Skills Demonstration Checklist, pp. 55-56).

29.     When they begin work for the day, each Aide electronically signs in through an app on their phone or on a separate device provided to the client called Electronic Visit Verification ("EVV"). (ECF 66-1 at 3738-3740, Bharati Dep., 35:22-37:2). When the Aide ends work, using the EVV, the Aide signs out and the client confirms the work was performed by either recording their voice or signing the verification. (*Id.* at 37:3-22). The sign in/sign out data is transmitted to Americare every day. (ECF 66-1 at 3740-3741, Bharati Dep., 37:23-38:11). From this data, Americare can track the Aide to ensure they are serving the client at the correct location.  (*Id.* at 38:12-17).

30.     In addition, Aides complete weekly paper activity sheets, which reflect tasks completed by Aides and the number of daily hours worked with respect to a specific client, and return the sheets to Americare. Americare verifies the number of hours on the daily paper activity

sheets with the EVV data, and then reports the total hours to payroll. (ECF 66-1 at PAGEID 3741-3742, Bharati Dep., 38:25-40:23; ECF 66-1 at PAGEID 3801-3803, Bharati Dep., Ex. 9).

31. Americare's Director of Nursing and the applicable Area Director counsels Aides if they fail to report that a client has been hospitalized or fail to report an "incident" with the client. (ECF 66-1 at PAGEID 3744, Bharati Dep., 42:6-17).

32. When Americare receives a complaint from a client that an Aide is not reporting on time or if the client is otherwise unhappy, Americare will call the Aide and remind them about their responsibilities and the job duties they are required to perform during working hours. (ECF 67-1 at PAGEID 3849-3851, Acharya Dep., 25:24-27:7). Americare has received complaints from clients whose relatives work as their Aide. (*Id.* at pp. 26:13-27:3).

33. Americare has disciplined Aides, including issuing written warnings that are placed in their personnel files. (*Id.* at p. 27:8-13).

34. Americare's nurses conduct annual performance evaluations of the Aides. (ECF 66-1 at PAGEID 3746, Bharati Dep., 43:7-9; ECF 67-1 at PAGEID 3854, Acharya Dep., 30:13-31:6). Americare evaluates Aides on a number of skills, including assisting with self-administered medications; providing personal care and bathing; and taking accurate temperatures, pulse, respiration, and blood pressure; administering enemas; and collecting specimens. (ECF 67-1 at PAGEID 3854-3855, Acharya Dep., 30:22-31:2; ECF 67-1 at PAGEID 3877-3878, Acharya Dep., Ex. 15, Appraisal Form).

35. Americare maintains personnel files on each of its Aides. (ECF 66-1 at PAGEID 3759, Bharati Dep., 56:10-25). The Aides' personnel files contain, among other things, criminal record searches, background check results, a skills demonstration checklist, initial competency checklist, performance appraisals/evaluations, employment application, provisional employment

form/hire of affidavit, employment agreement, employee training checklist, training and orientation package, Sexual and Other Harassment policy, Confidentiality of Information Agreement, Equal Employment Opportunity and Diversity in the Workplace Statement, Conflict of Interest Policy, Attendance and Reporting Policy, Termination Policy, and a Transportation/Automobile Waiver of Liability agreement. (ECF 64-1 at PAGEID 494-527, 30(b)(6) Dep., 174:21-207:18; ECF 64-2 at PAGEID 834-873, 30(b)(6) Dep., Ex. 11, Employee Personnel File).

36.     Americare maintains workers' compensation insurance coverage on behalf of the Aides, as well as liability coverage. (ECF 64-1 at PAGEID 450, 30(b)(6) Dep., 130:1-10). Americare issues Aides W-2s for their pay. (ECF 64-1 at PAGEID 494, 30(b)(6) Dep., 174:13-15).  It also paid payroll taxes on Aides' wages and claimed employee wages on its tax returns during the Relevant Period. (ECF 64-1 at PAGEID 388, 30(b)6) Dep., 68:2-5; ECF 65-5 at 3664, 3673, 3682, 3691, 30(b)(6) and Adhikari Continued Dep., Ex. 14-17).

37.     Americare provides supplies to the Aides such as hand sanitizer, masks, and gloves. (ECF 64-1 at PAGEID 455-456, 30(b)(6) Dep., 135:21-136:5).

38.     Americare's Aides do not own their own companies or independently advertise their services. (ECF 64-1 at PAGEID 457-458, 30(b)(6) Dep., 137:12-138:6).

39.     Americare requires its Aides to undergo 16 hours of continuing education training every year, and Americare provides this training. (ECF 67-1 at PAGEID 3851, Acharya Dep., 27:16-24). Every two months, Americare requires Aides to come into its office for in-service training by Americare's nurses on topics approved by the Department of Medicaid. Aides are required to take a written test after each training. (ECF 67-1 at PAGEID 3851, Acharya Dep., 28:5-25; ECF 66-1 at PAGEID 3760-3761, Bharati Dep., 57:1-58:8). Americare keeps track of each

Aide's training and, if an Aide does not complete their training, they cannot work for Americare. (ECF 67-1 at PAGEID 3853, Acharya Dep., 29:1-11).

40.      Americare requires Aides to sign an employment agreement with Americare before starting work. (ECF 67-1 at PAGEID 3843, Acharya Depo, p. 19:9-17; ECF 64-1 at PAGEID 506, 30(b)(6) Dep., 186:10-19; ECF 64-2 at PAGEID 853, 30(b)(6) Dep., Ex. 11, p. 13, Employment Agreement). The employment agreement requires the Aide to follow numerous Americare rules and procedures, including rules and procedures regarding confidential information, wound care, and medication policies.  (ECF 64-1 at PAGEID 506, 30(b)(6) Dep., 186:10-19; ECF 64-2 at PAGEID 853, 30(b)(6) Dep., Ex. 11, p. 13, Employment Agreement).  The employment agreement also states the applicant may not seek employment with any of Americare's clients during assignment or one year following an assignment. (*Id.*)

41.      Upon being hired, applicants are given an Employee Handbook, which states they are at-will employees and can be terminated by the company at any time or quit at any time. Aides also sign a document acknowledging receipt of the Employee Handbook that states they are at-will employees. Americare retains the signed copy of the acknowledgement receipt. (ECF 67-1 at PAGEID 3857 and 3864-3866, Acharya Dep., 33:3-17, 40:10-42:3; ECF 64-1 at PAGEID 466, 30(b)(6) Dep., 146:9-17; ECF 64-2 at PAGEID 701-829, 30(b)(6) Dep., 9, Employee Handbook).

42.      If an Aide cannot work because they are going on vacation, they must call the Americare office in advance, and Americare will provide a backup aide to perform the services for the client. (ECF 66-1 at PAGEID 3766-3767, Bharati Dep., 63:23-64:11).

43.      If an Aide cannot work due to their own illness, that Aide must call the Americare office to make the company aware. (ECF 64-1 at PAGEID 464-465, 30(b)(6) Dep., 144:18-145:25).

**D.  Defendants Failed to Comply with the Overtime Provisions of the FLSA.**

44.     From October 19, 2018 through April 14, 2024, Defendants failed to pay Aides the overtime premium rate of time and a half for hours worked over forty in a pay period. (ECF 111-1 at PAGEID 26793-26796, Declaration of Stephen Alloway, ¶¶ 18-30).

45.     From at least October 19, 2018 to August 11, 2019[2], Defendants did not pay overtime to its Aides when they worked more than 40 hours in a workweek. Instead, Defendants' payroll and time records for this period show Defendants paid Aides straight time for all hours worked, including overtime hours, *i.e.*, Defendants paid Aides their normal regular rate for hours worked over 40 in a workweek. (ECF 64-3 at PAGEID 917-918, 30(b)(6) Dep., Ex. 22, Responses to Plaintiff's First Request for Admissions, No. 18; ECF 69-1 at PAGEID 3980, Adhikari Dep., 38:6-10; (ECF 111-1 at PAGEID 26793-26794, Alloway Decl, ¶¶ 18-21).

46.     Beginning on or about August 12, 2019, Defendants changed the manner in which they compensated Aides by adjusting their regular rates of pay downward when they worked overtime hours to, in effect, pay them straight time for all hours worked. (ECF 111-1 at PAGEID 26794-26796, Alloway Decl., ¶¶ 22-29).

47.     When an Aide worked more than 80 hours in a two-week pay period, Americare would lower the Aide's regular rate of pay and pay one and one-half times that lowered rate for overtime hours worked. (ECF 64-3 at PAGEID 897-898, 30(b)(6) Dep., Ex. 21, Int. 10; ECF 70-1 at PAGEID 4248-4251, Pradhan Dep., 23:3-26:25; ECF 111-1 at PAGEID 26794, Alloway Decl., ¶ 22).  This practice resulted in Aides receiving straight time, *i.e.*, their normal hourly rate outside of Defendants' scheme, for overtime hours worked. (ECF 111-1 at PAGEID 26794, Alloway

---

[2] Although Defendants admit that they paid straight time for overtime until September 6, 2019, the payments of straight time for overtime lasted until August 11, 2019.  Beginning with the September 6, 2019 pay date, which captured work dates beginning August 12, 2019, Defendants began the rate manipulation.

Decl., ¶ 22).  For example, for the two-week pay period ending March 8, 2020, Americare Aide Sujata Duhal had a listed hourly rate of $11.45 per hour for a 96-hour two-week pay period. In the following two-week pay period that ended March 22, 2020, Sujata Dahal's listed hourly rate was changed to $12.50 per hour for a 77-hour (non-overtime) two week pay period. In the following two-week pay period that ended April 5, 2020, Sujata Dahal's listed hourly rate was reduced to $10.75 per hour for a 119-hour two week pay period. (ECF 64-1 at PAGEID 529-531, 30(b)(6) Dep., 209:10-211:25; ECF 64-3 at PAGEID 874-876, 30(b)(6) Dep., Exs. 12-14, ADP Time Records). In short, the more hours Sujata Dahal worked in a pay period, the lower his hourly rate dropped. Defendants produced no rate change agreements for Sujata Duhal in this litigation. (ECF 65-1 at PAGEID 1087-1091, 30(b)(6) and Adhikari Continued Dep., 9:23-13:22; ECF 65-2 at PAGEID 1170-1250, 30(b)(6) and Adhikari Continued Dep., Ex. 3, Rate Change Agreements Produced). When calculating Sujata Dahal's hourly rate over those three pay periods by taking his gross pay and dividing it by the number of hours they worked, the calculations always resulted in Americare paying Sujata Dahal $12.50 or $12.51 per hour for all hours worked. Accordingly, Defendants paid Sujata Dahal straight time for all hours worked, including overtime hours. (ECF 64-1 at PAGEID 535-537, 30(b)(6) Dep., 215:3-217:1); see additional example at ECF 111-1 at PAGEID 26794-26795, Alloway Decl., ¶ 23).

48.  Notably, Adhikari testified Americare "restructured" Aides' base rates "to be dependent upon the number of hours they worked." (ECF 65-1 at PAGEID 1146, 30(b)(6) and Adhikari Continued Dep., 68:16-25). Americare admitted the same in its declaratory judgment action. (ECF 65-1 at PAGEID 3650, 30(b)(6) and Adhikari Continued Dep., Ex. 13 at ¶ 74).

49. Indeed, Americare's Payroll Coordinator testified that when an Aide's working hours changed, he would change the Aide's regular rate of pay. (ECF 70-1 at PAGEID 4248-4250, Pradhan Dep., 23:8-25:9).

50. Defendants claimed they changed Aides' pay rates as described above because they "don't have enough money to pay them." (ECF 64-1 at PAGEID 552, 30(b)(6) Dep., 232:11-13).

51. Adhikari testified Aides receiving $12.50 per hour as straight time "is a blessing for these people," and the Department of Labor should "thank" Americare for paying them this amount. (ECF 64-1 at PAGEID 537-538, 30(b)(6) Dep., 217:24-218:4).

52. Even after Defendants began to manipulate employees' regular rates, there have been some instances where Defendants have continued to pay straight time for overtime hours worked without attempting to mask the violation.  (ECF 111-1 at PAGEID 26795, Alloway Decl., ¶ 24).

53. For example, during the pay period between January 22, 2023 and February 19, 2023, Defendants paid Aide Gyan Adhikari $13.00 an hour for all hours worked no matter whether they worked overtime or not. (*Id.*)

**E.     Defendants Owe Overtime Back Wages to 1,702 Employees.**

54. The Department of Labor Wage and Hour Division ("WHD") obtained limited payroll.  WHD records for Americare's Aides covering the period of October 19, 2018 through calculated the amount of the back wages owed using the following records: (a) Defendants' self-audit from the period October 19, 2018 through August 23, 2019; (b) records from Automatic Data Processing, Inc. ("ADP") from August 24, 2019 through October 1, 2021; and (c) Defendants' Excel spreadsheets and payroll reflecting employee payroll for the period of October 2, 2021 through April 14, 2024. (ECF 111-1 at PAGEID 26790-26791, Alloway Decl., ¶ 8).

55. The back wage calculations were completed the same way throughout the entire investigation period. The calculations consisted of taking the total gross pay received by an employee in a pay period and dividing it by their total hours worked to determine a regular rate of pay (Gross Pay ÷ Total Hours = Regular Rate). The regular rate of pay was then multiplied by 0.5 to represent the half-time rate (Regular Rate x 0.5 = Half-Time Pay Rate). The half time rate was then multiplied by the total overtime hours worked in a pay period to determine the total back wages due in that pay period (Half-Time Pay Rate x (Total Hours Worked – 80) = Total Back Wages Owed for Two-Week Pay Period). (ECF 111-1 at PAGEID 26795, Alloway Decl., ¶ 25).

56. All hours worked over 80 in a pay period were considered overtime hours worked. Using this method is beneficial to the employer as overtime would not be calculated during pay periods in which employees may have worked overtime in the first week of the pay period and under 40 hours in the second week. (ECF 111-1 at PAGEID 26796, Alloway Decl., ¶ 27).

57. For the period of October 19, 2018 through August 11, 2019, Americare paid straight time for overtime resulting in $555,905.40 in back wages. (*Id.*)

58. For the period of August 12, 2019 through April 14, 2024, Americare failed to pay employees $6,922,915.39 in back wages by manipulating Aides' regular rates of pay to, in effect, pay straight time for overtime, and by paying straight time for overtime without manipulation. (*Id.*).

59. In sum, as of April 14, 2024, there are 1,702 employees who are owed back wages in the amount of $7,478,820.79. (*Id*) Americare has provided no evidence that they have been complying with the FLSA since April 14, 2024 and thus, it is likely that the employees are entitled to additional back wages after that date. (*Id.*).

13

**F. Defendants Have No Viable Good Faith Defense to Avoid Liquidated Damages because They Knew They Were Required to Pay Overtime Before the Violations Occurred in this Case.**

60.     Defendants knew as early as July 2018 – three months before the violations at issue in this case – that Aides were entitled to overtime compensation. (ECF 69-1 at PAGEID 3985-3987, Adhikari Dep., 43:6-45:1; ECF 69-2 at PAGEID 4105, Adhikari Dep., Ex. 2, Adhikari Deposition Transcript in *Secretary of Labor v. Intra-National Home Care, LLC*, W.D. Pa. Case No. 2:21-cv-1391, pp. 127:10-128:24; ECF 64-1 at PAGEID 400, 30(b)(6) Dep., 80:21-25).

61.     In 2013, Adhikari founded and started operating a home healthcare agency in Michigan called Intra-National Home Care, Inc. ("Intra-National"). (ECF 64-1 at PAGEID 361-362, 30(b)(6) Dep., 41:25-42:5; ECF 69-2 at PAGEID 4076, Adhikari Dep., Ex. 2, pp. 11:22-12:3). In 2015, Intra-National started servicing clients in Pennsylvania. (ECF 69-2 at PAGEID 4084, Adhikari Dep., Ex. 2 at 42:7-9).

62.     Adhikari admitted that due to the Department of Labor's publication of a final rule (the "2013 Home Care Rule"), third-party home care agencies were no longer exempted from paying overtime compensation. (ECF 64-1 at PAGEID 371, 30(b)(6) Dep., 51:12-15; ECF 69-2 at 4094-4095, Adhikari Dep., Ex. 2, pp. 84:13-85:5).

63.     After he learned about the 2013 Home Care Rule, Adhikari claims to have consulted with an attorney one time in 2016 or 2017 and that unnamed attorney advised him some "personal care" services are exempted from overtime requirements. He did not remember the attorney's name or address, and believed the advice came from an undated, unspecified Supreme Court or Supreme Court of Colorado case. (ECF 64-1 at PAGEID 371-372, 30(b)(6) Dep., 51:19-52:13).

64.     Adhikari claims that after this meeting, he was still "trying to understand" and it was "very tough and difficult to understand the exact rules," so he consulted with another attorney

named "Castelli" in 2017 or 2018, who has since passed away. Adhikari claims "Castelli" verbally told him that home care workers doing work for their family members are not owed overtime but provided no documentation to support that claim. (ECF 64-1 at PAGEID 375-376 and 382, 30(b)(6) Dep., 55:5-56:11; 62:3-9).

65.     In early 2018, the Pennsylvania state labor department initiated an investigation against Adhikari's home care company Intra-National. Additionally, at least one class action was filed against Intra-National in 2017 for unpaid overtime compensation. (ECF 64-1 at PAGEID 382-385 and 595, 30(b)(6) Dep., 62:19-63:14, 64:20-65:6, 275:3-12).

66.     After those events, in 2018, Adhikari asserts he consulted with an alleged third attorney, John Linkosky ("Linkosky"), about overtime obligations of both Americare and Intra-National. (*Id.* at pp. 62:19-63:14; 64:20-65:9; 70:11-14; 275:3-12).

67.     Notably, Attorney Linkosky advised Adhikari to start paying overtime to the Aides. (ECF 64-1 at PAGEID 602-603 and 605, 30(b)(6) Dep., 282:25-283:10; 285:23-24). After consulting with Attorney Linkosky in April or May 2018, Adhikari understood the Aides were entitled to overtime premium pay. (Ex. 69-2 at PAGID 4105, Adhikari Depo., Ex. 2, pp. 127:22-128:24).

68.     Adhikari admits that, consistent with providing advice that overtime was required, Attorney Linkosky advised him that he had to set a pay rate and could not fluctuate an Aide's rate of pay "every time." (ECF 64-1 at PAGEID 390-391, 30(b)(6) Dep., 70:15-71:6). Attorney Linkosky advised the rate could not be "[t]his payroll like $12.50, next payroll $11, next payroll $13, next payroll $11." (*Id*. at p. 71:1-4).

69.     Adhikari also admits Attorney Linkosky advised him that to change an Aide's rate of pay, Americare would need an agreement with each such Aide for each rate change. (ECF 64-

1 at PAGEID 396, 30(b)(6) Dep., 76:8-24). Adhikari claims at first the agreements Americare had with the Aides were verbal, but thereafter, all agreements were written agreements to change rates. (ECF 64-1 at PAGEID 396-397, 30(b)(6) Dep., 76:8-24 and 77:2-11).

70.     Despite this, Defendants only produced 81 written rate change agreements, each of them only covering a single rate change. Here, over 1,700 Aides are at issue, some of whom had changes to their regular rates made multiple times. (ECF 65-1 at PAGEID 1087-1091, 30(b)(6) and Adhikari Continued Dep., 9:25-13:22; ECF 65-2 at PAGEID 1170-1250, 30(b)(6) and Adhikari Continued Dep., Ex. 3).

71.     Although Adhikari testified Linkosky gave him legal advice about certain issues related to the payment of overtime to Americare's Aides, Attorney Linkosky states under oath that he never advised Adhikari, Americare, or any other Americare manager or officer (or any member of Defendants' litigation law firm, Obermayer) that Americare's Aides were exempt from the minimum wage or overtime provisions of the FLSA. (ECF 72-1 at 4340-4341, Declaration of John Linkosky Decl. at ¶¶ 5, 8). In addition, Attorney Linkosky states that he never advised Adhikari, Americare, or any Americare manager or officer (or any member of Defendants' litigation law firm, Obermayer) that they did not have to pay overtime compensation to their Aides. (*Id*., at ¶ 10).

72.     Adhikari claims he also learned in 2018 that similar home care agencies were being investigated by the Department of Labor, were advised by the Department of Labor that they needed to pay their home health aides overtime compensation, and, as a result, began paying overtime to their home health aides. (ECF 64-1 at PAGEID 398 and 400, 30(b)(6) Dep., 78:10-25; 80:2-25).

73. Additionally, Adhikari attests it was his understanding that third-party agencies of home care aides are precluded from claiming the companionship exemption to the FLSA. (ECF 65-1 at PAGEID 1145, 30(b)(6) and Adhikari Continued Dep., 67:7-17). Indeed, consistent with this understanding, Americare filed a declaratory judgment action against the United States Department of Labor asking the United States District Court for the Western District of Pennsylvania to declare the Aides exempt from the FLSA minimum wage and overtime requirements pursuant to the companionship exemption. (ECF 65-1 at PAGEID 1145, 30(b)(6) and Adhikari Continued Dep., 64:2-12; ECF 65-4 at PAGEID 3634-3362, 30(b)(6) and Adhikari Continued Dep., Ex. 13).

**G.    Defendants Willfully Violated the FLSA.**

74. Adhikari admitted that as early as 2016 or 2017, he knew third-party home care agencies were no longer exempted from paying overtime compensation due to the implementation of the 2013 Home Care Rule. (ECF 64-1 at PAGEID 371, 30(b)(6) Dep., 51:12-15; ECF 65-1 at PAGEID 1145, 30(b)(6) and Adhikari Continued Dep., 67:7-17).

75. Adhikari, who was responsible for Americare's overtime compensation policies, gave sworn testimony that as early as July 2018, he understood Aides were entitled to overtime compensation. (ECF 69-1 at PAGEID 3984-3986, Adhikari Dep., 42:10-44:25; ECF 69-2 at PAGEID 4105, Adhikari Dep., Ex. 2 at pp. 127:10-128:8).

76. The Pennsylvania state labor department initiated an investigation in early 2018 against Adhikari's home care company Intra-National Home Care, and at least one class action was filed against Intra-National Home Care in 2017 for unpaid overtime compensation, which was settled through mediation. (ECF 64-1 at PAGEID 382-385 and 595, 30(b)(6) Dep., 62:19-63:14, 64:20-65:6, 275:3-12).

77.     Adhikari testified that in 2018, Attorney Linkosky advised him to start paying overtime to the Americare Aides. (ECF 64-1 at PAGEID 602-603 and 605, 30(b)(6) Dep., 282:25-283:10 and 285:20-24).

78.     By June or July 2018, when employees at his Pennsylvania home care company Intra-National worked more than 40 hours in a workweek, Adhikari began reducing the workers hourly rates through hourly rate adjustments to establish a new regular rate and then paying time and a half overtime on that artificially lowered rate for hours worked over 40 in a work week. (ECF 69-1 at PAGEID 3980, Adhikari Dep., 38:11-16; ECF 69-2 at PAGEID 4108, Adhikari Dep., Ex. 2, pp. 137:15-138:10; ECF 69-4 at PAGEID 4209. Adhikari Dep., Ex. 15, Notice to Intra-National Employees).

79.     From at least October 19, 2018 to August 11, 2019, Defendants paid Americare Aides straight time for all overtime hours worked without any manipulation of rates or concealment. (ECF 64-3 at 917, 30(b)(6) Dep., Ex. 22, RFA 18; ECF 69-1 at PAGEID 3980, Adhikari Dep., 38:6-10; ECF 111-1 at PAGEID 26796, Alloway Decl., ¶ 28).

80.     However, since August 2019, Defendants have been manipulating and lowering Aides' regular rates when they work overtime, as Adhikari did at Intra-National. (ECF 69-1 at PAGEID 4028-4034, Adhikari Dep., 86:21-92:9; ECF 69-1 at PAGEID 4199, Adhikari Dep., Ex. 14, Payroll Summary; ECF 111-1 at PAGEID 26794, Alloway Decl., ¶ 22). This manipulation is intended to show that Americare is paying overtime when, in fact, the employees earn the same amount of money as if they were paid straight time for overtime. (ECF 111-1 at PAGEID 26794, Alloway Decl., ¶ 22).

**H.     Defendants' Recordkeeping Violations**

81.     Defendants failed to maintain records of weekly hours worked. In particular, Defendants failed to produce documents reflecting weekly hours worked for any period of time during the Relevant Period. (ECF 111-1 at PAGEID 26792, Alloway Decl., ¶ 15).

82.     Defendants failed to consistently maintain records of the regular hourly rate worked. In particular, for various periods of time during the Relevant Period, Defendants listed a regular hourly rate that was not the correct hourly rate for Aides. (*Id*. at ¶ 16).

83.     Defendants failed to maintain records of total weekly overtime premium pay, as Defendants often recorded overtime premium pay being paid to Aides when, in reality, Defendants only paid Aides straight time for hours worked. (ECF 111-1 at PAGEID 26793, Alloway Decl., ¶ 17).

## I.     Defendants' Continuing FLSA Violations

84.     Based on the latest records obtained in this litigation, Defendants continue to manipulate rates and are not paying Aides one and a half times their regular rates when they work more than 40 hours in a workweek. (ECF 111-1 at PAGEID 26796, Alloway Decl., ¶ 31).

## II.     LAW AND ANALYSIS

### A.  Background

The FLSA was enacted "to 'protect all covered workers from substandard wages and oppressive working hours.'" *Encino Motorcars v. Navarro*, 579 U.S. 211, 214 (2016 (*Encino I*) (*quoting Barrentine v. Ark.-Best Freight Sys*., 450 U.S. 728, 739 (1981)). The FLSA guarantees a "fair day's pay for a fair day's work" and protects employees from "the evil of 'overwork' as well as 'underpay.'" *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt)). These rights cannot be waived or

otherwise modified by contract because that would thwart the FLSA's humanitarian and remedial purposes. *Barrentine*, 450 U.S. at 741 (collecting cases).

**B. Standard of Review**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Summary judgment will be granted unless a reasonable factfinder could return a verdict for the nonmoving party on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To oppose a properly supported motion for summary judgment, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial, and in turn, the reviewing court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. U. of Kentucky*, 971 F.3d 553, 557 (6th Cir. 2020) (*quoting Anderson*, 477 U.S. at 250–52) (internal quotations omitted). If the evidence presented by the nonmoving party "is merely colorable or is not significantly probative, summary judgment may be granted." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002) (*quoting Anderson*, 477 U.S. at 249–50).

**C. Defendants are Employers Covered under the FLSA.**

There are two ways in which employees gain protection under the FLSA: "enterprise coverage" and "individual coverage." 29 U.S.C. §§ 203(r) and 203(s); 29 U.S.C. § 207. Defendants are covered by the FLSA under both options.

The FLSA applies to "an enterprise engaged in commerce or in the production of goods for commerce," which includes an enterprise that "has employees engaged . . . in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and "whose annual

gross volume of sales made or business done is not less than $500,000." *Sec. of Lab. v. Timberline S., LLC*, 925 F.3d 838, 843-44 (6th Cir. 2019) (*quoting* 29 U.S.C. § 203(s)(1)(A)). "Commerce" means trade [or] commerce . . . among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

Here, Defendants admitted that in calendar years 2018 through 2022, Americare's employees handled or otherwise worked with goods or materials that traveled across state lines. (UMF, ¶ 3). Additionally, Defendants admitted that in calendar years 2018 through 2022, Americare had an annual dollar volume or sales made or business done of at least $500,000. (*Id.* at ¶ 4). Moreover, Americare is an enterprise engaged in commerce as defined in the FLSA, 29 U.S.C. § 203(s)(1). (*Id.* at ¶ 5). Therefore, there is no dispute that Americare was a covered enterprise under the FLSA during the Relevant Period, and Plaintiff is entitled to judgment as a matter of law on this issue.

Plaintiff has also established individual coverage under the Act by proving the employees listed in Exhibit 1 to the Complaint engaged in commerce pursuant to Section 2(a) of the FLSA. Section 2(a) states in pertinent part, "[T]he employment of persons in domestic service in households affects commerce." 29 U.S.C. § 202(a). Domestic service, in turn, includes:

> [S]ervices of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use.

29 C.F.R. § 552.3. Here, it is undisputed that the individuals in Exhibit 1 administered feedings, bathings, dressings, and light cleaning in Defendant's clients' homes. (UMF at ¶ 6). In fact, many courts have held that similar domestic care workers are covered by the FLSA based on 29 U.S.C. § 202(a). *See, e.g., Walsh v. McDevitt*, 21-CV-2225, 2023 WL 2154961 (C.D. Ill. Feb. 7, 2023)

(home health aides engaged in activities such as "laundry, housework, bathing, meal preparation, and shopping on behalf of their clients."); *Franklin v. Jenn's Angels, LLC*, No. CV 21-399-SDD-SDJ, 2022 WL 69213, at *2 (M.D. La. Jan. 6, 2022); *Walsh v. Loving Kindness Healthcare Sys.*, LLC, No. 2:20-CV-1087-RJC, 2021 WL 2700852, at *1 (W.D. Pa. July 1, 2021). As such, Plaintiff has met the requirements of establishing "individual coverage."

### D. Defendant Adhikari is Individually Liable as an "Employer" Under Section 203(d) of the FLSA.

There are no disputed material facts regarding Defendant Adhikari's status as an "employer" under Section 203(d) of the FLSA. An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). One who controls significant functions of the business, determines salaries, and makes hiring decisions has operational control and qualifies as an employer for the purposes of the FLSA. *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991); *see also U.S. Dept. of Lab. v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) ("a corporate officer who has operational control of the corporation's covered enterprise is an 'employer' under FLSA, along with the corporation itself"). Exclusive control over day-to-day functions is not necessary. A Section 203(d) employer "need only have 'operational control of significant aspects of the corporation's day to day functions.'" *Elliott Travel*, 942 F.2d at 966 (*quoting Donovan v. Agnew*, 712 F.2d 1509, 1514 (1st Cir. 1983)).

"In the Sixth Circuit, being the 'top man' at a corporation that functions for an individual's profit is sufficient to impose FLSA liability." *Hatmaker v. PJ Ohio, LLC*, No. 3:17-cv-146, 2019 WL 1367663, at *4 (S.D. Ohio Mar. 26, 2019). Indeed, in *Park v. Central USA Wireless*, No. 1:17-CV-448, 2019 WL 4743648, at *1 (S.D. Ohio Sept. 29, 2019), the court held that even though one relied on a third-party organization to perform administrative functions (and, therefore, did not manage or control field operations, hire, or monitor hours worked), that individual can still be

found to be a Section 3(d) employer. "This is true even when an individual employer alleges that other, lower members of management made day-to-day operational decisions." *Id.* at \*4.

During the Relevant Period, Adhikari has been the sole owner of Americare, which operated for his sole profit. (UMF, ¶¶ 12-13). Adhikari admitted under oath that during the Relevant Period, he contracted with different managed care organizations and Ohio area agencies on aging and was directly involved in managing the day-to-day operations of Americare. (*Id.* at ¶14). He set Aides' rate of pay and made key decisions for the company, such as establishing company employment policies and procedures, making decisions regarding FLSA compliance and other types of regulatory compliance, determining whether to treat employees as exempt, creating overtime policies, setting Aides' pay rates, and determining how to maintain records of hours worked by the Aides. (*Id.* at ¶¶ 15-17). *See Elliott Travel*, 942 F.2d at 966 (an individual who has a "strong degree of authority over the corporation's finances" and can "caus[e] the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits," is an employer under the Act) (quoting *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)). Adhikari also supervised the work performance of the Administrator, who approved the payroll and supervised the Area Directors to whom the Aides reported. (UMF, ¶¶ 10-12). Adhikari also hired staff (including the administrator, managers, directors, office manager, office staff, RNs, and LPNs) who have a direct role in supervising and training Aides; determined the salaries and pay of the administrative staff; made the final decision to discipline and/or terminate office and administrative staff; and created the work schedule for the administrator. (*Id.* at ¶ 14).

Accordingly, Adhikari has admitted all facts necessary to establish he is an "employer" under section 3(d) of the FLSA, and the Acting Secretary is entitled to summary judgment on Adhikari's individual liability.

### E. Defendants Employ the Aides and, as such, Aides Are Entitled to the Protections of the FLSA.

Record evidence establishes Americare employed the Aides at issue. The Act defines "employees" as "any individual[s] employed by an employer." 29 U.S.C. § 203(e)(1). "Employers" are defined as "any person acting directly or indirectly in the interest of any employer in relation to an employee." 29 U.S.C. § 203(d). "The FLSA's definition of 'employee' is strikingly broad and 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (quoting *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992)). The Sixth Circuit has "interpreted this framework . . . to set forth a standard that employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Keller*, 781 F.3d at 807 (internal citation and quotation marks omitted).[3]

Americare has already admitted it is an employer under the Act. Specifically, in its declaratory judgment action against the DOL, Americare pled it was an employer of the Aides. (UMF, ¶ 7). *See Turner v. Medical Case Management & Social Services*, 4:17-cv-00836-BP, 2018 WL 5084884, *3 (N.D. Tex. Oct. 18, 2018) (granting summary judgment where defendant admitted in pleadings that it was an "employer"). Once hired, Americare maintained workers'

---

[3] Courts in the Sixth Circuit use a multi-factor economic reality test comprised of six factors to determine if the worker is an employee covered by the FLSA. *Acosta v. Off Duty Police Servs.*, 915 F.3d 1050, 1055 (6th Cir. 2019). Additionally, a January 2021 rule published by the Department of Labor, 86 Fed. Reg. 1168, *et seq.*, identifies five factors (two of which are "core" factors) to determine employee or independent contractor status. Under both standards, and as Defendants admit, the workers here are employees of Defendants under the FLSA.

compensation insurance coverage on behalf of the Aides, as well as liability coverage. (UMF, ¶ 36). Americare issued W-2s to Aides. (*Id.* ). It also paid payroll taxes on the wages of Aides and claimed employee wages on its tax returns. (*Id.*). In addition, Americare controlled and, in fact, regularly changed Aides' hourly rates because "they don't have enough money to pay them." (UMF, ¶¶ 46-51).

Americare's classification of Aides as employees is consistent with case law determining at the summary judgment stage that home health aides like Americare's Aides are "employees." *See, e.g., Mason v. Pathfinders for Independence, Inc.*, 8:19-cv-307-WFJ-TGW, 2022 WL 1092238 (M.D. Fla. April 12, 2022); *Avila v. A Healthy Living Home Health, Inc.*, 7:14-cv-00982, 2017 WL 9471511 at *3 (S.D. Tex. July 17, 2017); *Crouch v. Guardian Angel Nursing, Inc.*, 3:07-ca-00541, 2009 WL 3737887 at *21 (M.D. Tenn. Nov. 4, 2009). For example, in *Pathfinders*, the plaintiff-employee at issued worked for an employer that was a licensed Medicaid waiver provider offering in-home healthcare and companion services to elderly individuals and adults with disabilities. The plaintiff-employee lived with the client and provided them with supportive care and daily supervision, which included helping with cooking, grocery shopping, housekeeping, and grooming. In finding that an employer-employees relationship existed, the court relied upon a number of facts, including that the defendants controlled the hiring process, set the plaintiff's wages, and required the plaintiff to adhere to policies set forth in the employee handbook, to submit reports about the care provided, and to notify them in advance if she needed to take time off from work so they could find another caregiver to cover her shifts. *Pathfinders*, 2022 WL 1092238 at *5.

Like the employer in *Pathfinders*, Americare treated Aides as employees. Americare hired Aides, disciplined them, and had the authority to fire Aides for poor performance. (UMF, ¶¶ 19-

27, 33, 41). Americare screened Aides prior to hire by performing background checks, including ensuring the individual had not been suspended from the Medicaid program, did not have a disqualifying criminal record, and was eligible to work in the United States (E-Verify). (*Id*. at ¶ 22). Americare interviewed Aides, called their references, and tested their competency. (*Id*. at ¶ 23). Americare established and enforced employment policies and requirements, including a lengthy employee handbook. (*Id*. at ¶ 41). Aides were required to sign an employment agreement with Americare, which includes non-compete language barring Aides from seeking employment with any of Americare's clients during assignment or for one year following assignment with that client. (*Id*. at ¶ 40). *See Powers v. Emcon Associates, Inc.*, 14-cv-03006-KMT, 2017 WL 4075766 (D. Colo. May 14, 2018) (citing non-compete agreement as evidence of employee-employer relationship).

Americare also supervised Aides. Americare reviewed Aides' performance and conducted annual performance evaluations of Aides. (*Id*. at ¶ 34). Americare also provided on-going training to Aides and addressed customer complaints regarding Aides' performance and behavior. (UMF, ¶¶ 27, 32, 39). If an Aide took scheduled time off, *e.g.*, vacation, they had to report it to Americare in advance, and Americare provided a backup aide to offer services to the client. (*Id*. at ¶ 42). If an Aide could not work due to illness, the Aide had to call and report the absence to Americare. (*Id*. at ¶ 43). *See Pathfinders*, *supra*.

Accordingly, the Aides are Americare's employees.

### F. No Exemption From the FLSA's Overtime Requirement Applies to Defendants' Employees, Even After *Loper Bright*.

Defendants know they can only avoid overtime liability by attempting to rely on an exemption from the FLSA's minimum wage and overtime requirements that applies to certain domestic service employees. But Defendants also know that under the Department's existing

regulations, they may not claim the exemption, so they assert that the relevant regulation is contrary to law and arbitrary and capricious. That is incorrect. The regulation was properly promulgated under an express statutory delegation of rulemaking authority, and its validity has not been called into question by recent Supreme Court caselaw.

### 1. *History of Domestic Service Employee Regulations*

Before 1974, domestic service employees, including those providing personal care or home health assistance, were not covered by the FLSA's minimum wage and overtime provisions unless the workers were "employed in an enterprise engaged in commerce or in the production of goods for commerce," often effectively meaning that they worked for a large enough company that placed them in a private home. 29 U.S.C. §§ 206(a), 207(a)(1) (1970). The Fair Labor Standards Act Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55, explicitly extended FLSA protections to domestic service employees, *see* 29 U.S.C. §§ 202(a), 206(f), 207(l), but exempted "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). The 1974 amendments also exempted from the Act's overtime requirements any domestic service employee who "is employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21). These amendments included an express grant of rulemaking authority empowering the Secretary of Labor to "prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act." 1974 Amendments, Pub. L. No. 93–259, § 29(b), 88 Stat. 76. That grant of authority, which allows the Department to issue substantive rules regarding the 1974 amendments, is in addition to the Department's authority to "define and delimit" the terms of the companionship services exemption, 29 U.S.C. § 213(a)(15).

In 1975, the Department exercised its substantive rulemaking authority by promulgating a regulation that provided that the exemptions for companionship services and live-in domestic service employees could be claimed not only by an individual or family member who hired a worker directly, but also by third-party employers who assigned members of their workforce to particular homes.  40 Fed. Reg. 7404, 7407 (Feb. 20, 1975) (29 C.F.R. 552.109 (1975)).

In 2007, the Supreme Court considered a challenge to the third-party employment regulation brought by an employee of a home care agency who contended that she was entitled to minimum wage and overtime protections.  *See Long Island Care at Home, Ltd*. v. *Coke*, 551 U.S. 158, 164 (2007).  The Supreme Court held that the FLSA "expressly instructs the agency to work out the details of th[e] broad definitions" of domestic service employment and companionship services—and "whether to include workers paid by third parties within the scope of the definitions is one of those details." *Id.* at 167.  Because the Department's third-party employment regulation fell "within the statutory grant of authority," the Supreme Court rejected the employee's challenge. *Id.* at 173, 174.

As contemplated by the Supreme Court's *Coke* decision, the Department amended its regulations in 2013, through notice-and-comment rulemaking.  As relevant here, the 2013 regulation at 29 C.F.R. 552.109 provides that third-party employers may not avail themselves of the FLSA's exemptions for companionship services or live-in domestic service employees.  *See Final Rule, Application of the Fair Labor Standards Act to Domestic Service*, 78 Fed. Reg. 60454, 60557 (Oct. 1, 2013) (29 C.F.R. 552.109(a), (c)).

Shortly after the 2013 regulation was promulgated, trade associations representing third-party employers challenged the 2013 regulation in an action brought under the Administrative Procedure Act (APA).  The regulation was upheld by a unanimous panel of the D.C. Circuit in

*Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015).  The D.C. Circuit explained that *Coke* had concluded that "the treatment of third-party employers under the exemption…had been 'entrusted [to] the agency.'"  *Id.* (brackets in original) (quoting 551 U.S. at 165).

2.  *These Regulations Remain Valid*

As Defendants are well aware, the 2013 Home Care Rule squarely forecloses Defendants from availing themselves of the FLSA's exemptions for companionship services or live-in domestic service employees.  The Supreme Court's decision in *Loper Bright* does not affect the validity of the Home Care Rule.

In *Loper Bright*, the Supreme Court overruled the deference framework for interpreting statutes administered by federal agencies derived from *Chevron USA, Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837 (1984).  *See* 144 S. Ct. at 2273.  The Court held that "the APA requires" that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Id*.  The Court recognized, however, that "in a case involving an agency, … the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."  *Id*.  at 2263.  The Supreme Court explained that Congress "often" enacts such statutory authorizations, such as by "expressly delegat[ing] to an agency the authority to give meaning to a particular statutory term," "empower[ing] an agency to prescribe rules to fill up the details of a statutory scheme," or authorizing the agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility."  *Id.* at 2263 & n.5-6 (internal quotations and citations omitted).

The Court in *Loper Bright* further explained that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency," the "role of the reviewing court" is to "identify and respect such delegations of authority, police the outer statutory boundaries of those

delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 2263, 2268. By "identify[ing] and respect[ing]" Congressional delegations of authority to administrative agencies, courts "stay out of discretionary policymaking left to the political branches." *Id.* at 2268. And although courts should "not defer to an agency interpretation of the law simply because a statute is ambiguous," where "a particular statute delegates authority to an agency consistent with constitutional limits, courts *must* respect the delegation, while ensuring that the agency acts within it." *Id.* at 2273 (emphasis added).

Here, Congress explicitly delegated to the Department the authority to promulgate regulations regarding the domestic service employee exemptions. Indeed, the Court in *Loper Bright* specifically identified the companionship services exemption as an example of an express delegation that afforded the agency discretionary authority. *See* 144 S. Ct. at 2263 & n.5. In amending the FLSA in 1974 to cover domestic service employees generally and add the companionship services and live-in domestic service employee exemptions, Congress expressly authorized the Department "to prescribe necessary rules, regulations, and orders with regard to the" 1974 amendments. *See* 1974 Amendments, Pub. L. No. 93–259, § 29(b), 88 Stat. 76. Additionally, as highlighted in *Loper Bright*, Congress instructed the Department to "define[] and delimit[]" the terms used in the statutory provision setting forth the companionship services exemption. 29 U.S.C. 213(a)(15).

The Supreme Court's decision in *Coke* confirms that Congress expressly delegated authority to the Department to define the scope of the domestic service employee exemptions. In *Coke*, the Court held that the FLSA "expressly instructs the agency to work out the details" of the domestic service employee exemptions, and "whether to include workers paid by third parties within the scope of the definitions is one of those details." 551 U.S. at 167. In reaching this

conclusion, the Supreme Court recognized that Congress delegated broad authority to the Department to implement the 1974 amendments through legislative rules.  The power "to prescribe necessary rules, regulations, and orders with regard to the" 1974 amendments, the Supreme Court held, "provides the Department with the power to fill [statutory] gaps through rules and regulations." *Coke*, 551 U.S. at 165 (citing Pub. L. No. 93-259, § 29(b), 88 Stat. at 76); *see also Schaffner v. Monsanto Corp.*, No. 22-3075, 2024 WL 3820973, at *9 n.9 (3d Cir. Aug. 15, 2024) (concluding that a statute authorizing the EPA Administrator "to prescribe regulations to carry out the provisions" of the statute is precisely the type of "express" delegation that "empower[s] an agency to prescribe rules to 'fill up the details' of a statutory scheme"); *see also Kansas v. Garland*, 2024 WL 3360533 (D. Kan. July 10, 2024) at *6 (similar).  Furthermore, the Court in *Coke* recognized that Congress granted the Department authority to "define[] and delimit[]" the term "companionship services," 29 U.S.C. § 213(a)(15), which is an additional source of authority to issue legislative rules. *See Coke*, 551 U.S. at 162; *Loper Bright*, 144 S. Ct. at 2263 n.5; *Mayfield v. Dep't of Labor*, 2024 WL 4142760, *4 (5th Cir. Sept. 11, 2024) (referring to "define and delimit" language related to the Act's exemption for employees employed in an executive, administrative, or professional capacity as an "uncontroverted, explicit delegation of authority"); *Auer v. Robbins*, 519 U.S. 452, 457-58 (1997) (FLSA provision granting the Department of Labor authority to "define[] and delimit[]" an exemption gives the Department broad authority to issue legally binding rules).  The Supreme Court's analysis in *Coke* therefore makes clear that the Department's discretionary authority delegated by Congress with the FLSA's 1974 statutory amendments are precisely the type of delegations that "courts must respect" under *Loper Bright*.  144 S. Ct. at 2272.

Having recognized this discretionary authority, the Supreme Court in *Coke* also "fix[ed] the boundaries" of those delegations.  *Loper Bright* 144 S. Ct. at 2263; *see also Coke,* 551 U.S.  at

166 ("examin[ing]" the challenger's "claim[] that the regulation falls outside of the scope of Congress' delegation").  The Supreme Court explained that when the 1974 amendments were enacted, the FLSA's minimum wage and overtime requirements already applied to some, but not all, domestic service workers paid by third parties.  *See Coke*, 551 U.S. at 167.  "In finding it within the Department's 'broad grant' of authority to decide 'whether to include workers paid by third parties within the scope' of the companionship-services exemption, the Court explicitly contemplated that the full range of potential outcomes lay within the agency's discretion."  *Weil*, 799 F.3d at 1092 (citing *Coke*, 551 U.S. at 167–68).  The Court questioned:

> Should the FLSA cover *all* companionship workers paid by third parties? Or should the FLSA cover *some* such companionship workers, perhaps those working for some (say, large but not small) private agencies, or those hired by a son or daughter to help an aged or infirm mother living in a distant city? Should it cover *none*? How should one weigh the need for a simple, uniform application of the exemption against the fact that some (but not all) third-party employees were previously covered?[4]

*Coke*, 551 U.S. at 167-68 (Court's emphases).  The Court held that it is "consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions."  *Id*. at 168.  And the Court explicitly recognized the agency's discretion to determine that "*none*" of the domestic service workers paid by third parties are exempt from the FLSA's protections.  *Id*.  Accordingly, pursuant to *Loper Bright*, the Home Care Rule must be upheld so long as the Department acted within "the outer statutory boundaries" of those express statutory delegations and consistent with the APA.

---

[4] As explained in the Home Care Rule, prior to 1974, domestic service employees who worked for a covered third party, but who were assigned to work in someone's private home, were covered by the FLSA. *Application of the Fair Labor Standards Act to Domestic Service*, 78 FR 60454, 60481-82 (Oct. 1, 2013). However, the Department's 1975 regulations, by allowing those covered enterprises to claim the newly instituted domestic service exemptions, denied those employees the Act's minimum wage and overtime protections. *Id.*

*See Loper Bright*, 144 S. Ct. at 2268; *see also Mayfield*, 2024 WL 4142760, *4 (explaining that where there is a clear delegation of authority, "the question is whether the Rule is within the outer boundaries of that delegation").

The Home Care Rule is well within the bounds of the Department's discretionary authority. In 2013, after comprehensive notice and comment rulemaking, the Department amended its 1975 regulations in view of the transformation of the home care industry that had occurred over the ensuing decades.  Under the Home Care Rule, the exemptions for companionship services and live-in domestic service employees can be claimed by an individual (or family member) who hires a worker directly, but not by third-party employers such as home care agencies that assign members of their workforce to particular homes.  *See* 78 FR at 60557; 29 C.F.R. § 552.109(a), (c). In other words, the Home Care Rule expressly adopted one of the potential options identified by the Supreme Court in *Coke*.  551 U.S. at 167-68.  The Department explained that the exclusion of home care workers employed by third parties was "an inequity that has increased over time" as the industry grew tremendously between 1975 and 2013.  78 FR 60482.  The Department's determinations had ample support in the administrative record, including data from the 15 states that already provided minimum wage and overtime protections to all or most home care workers employed by third parties, as well as comments from consumer representatives such as the AARP and disability rights advocates.  Moreover, the rule included a comprehensive analysis of the economic impact of the regulatory changes on a wide array of constituencies, including consumers, workers, employers, and the public programs (such as Medicare and Medicaid) that pay for most home care services.  *See* 78 Fed. Reg. 60454.  Based on that analysis, the Department rejected industry claims that the amended regulations would harm consumers by denying them access to home care services or the reducing the quality of their care.  To the contrary, the Department found

that FLSA coverage would benefit not only the affected workers, "but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a higher quality of care." *Id*. at 60459-60.

The D.C. Circuit unanimously upheld the Home Care Rule, concluding that it was a proper exercise of the Department's delegated authority. See *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1087 (D.C. Cir. 2015), *cert. denied*, 579 U.S. 927 (2016). In *Weil*, the D.C. Circuit underscored that the "[Supreme] Court invoked the precise terms of § 29(b)'s general grant of implementation authority—the authority 'to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act'—in the portion of its opinion holding that the third-party-employment question had been delegated to the Secretary." *Weil*, 799 F.3d at 1092 (citing *Coke*, 551 U.S. at 165). The D.C. Circuit further explained that that the 2013 regulation was consistent with Congress's intent to include within the FLSA's protections all employees whose vocation is domestic service, *see id.* at 1094, and that there was "ample support" in the administrative record for the Secretary's determination that the recipients of home care "would be benefitted, not harmed, by the new regulations," *id.* at 1095.

Even though the analyses in *Coke* and *Weil* did not have the benefit of the Court's instructions in *Loper Bright* regarding delegations of discretion, there should be no question that references in *Coke* and *Weil* to deference principles that *Loper Bright* overruled do not detract from the precedential value of those cases. The Supreme Court explicitly stated in *Loper Bright* that it was "not call[ing] into question prior cases that relied on the *Chevron* framework," and that such prior cases "are still subject to statutory *stare decisis* despite our change in interpretive methodology." 2024 WL 3208360, at *21; *see also Tennessee v. Becerra*, No. 24-5220, 2024 WL 3934560, at *7 (6th Cir. Aug. 26, 2024) (explaining that *Loper Bright* "forecloses new challenges

34

based on specific agency actions that were already resolved via *Chevron* deference analysis");

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (recognizing that *stare decisis* principles "demand respect for precedent whether judicial methods of interpretation change or stay the same"). The Supreme Court's admonition that courts should adhere to the principle of statutory *stare decisis* has particular force here, as both the Supreme Court and the D.C. Circuit Court of Appeals reasoned that the Department had authority to promulgate the current third-party regulation.[5]

### G. Defendants Violated the FLSA's Overtime Provisions and Owe Back Wages Totaling $7,478,820.79

> 1. *From October 19, 2018 to August 11, 2019, Defendants Violated the Act by Paying Straight Time for Overtime and, as a Result, Owe $555,905.40 in Back Wages.*

Defendants failed to comply with the overtime requirements of the FLSA. Under the FLSA, employers must pay employees at least one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek. 29 U.S.C. § 207(a)(1). Here, it is undisputed that from October 19, 2018 through August 11, 2019, Defendants paid Aides their normal hourly rate for all hours worked, including hours worked over 40 in a workweek. Indeed, Defendants have admitted under oath that during this period they paid straight time pay to Aides when they worked more than 40 hours in a workweek. (UMF, ¶ 45). Moreover, Defendants' own payroll and time records

---

[5] Even when Congress does not delegate to an agency the discretionary authority to issue substantive regulations, *Loper Bright* reaffirms that courts may "seek aid from the interpretations of those responsible for implementing particular statutes," under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Thus, even had Congress not expressly delegated discretion to the Department to make the choices reflected in the Home Care Rule, under *Skidmore*, deference would be warranted to that Rule based on both the "validity" of the Department's "reasoning" and the "thoroughness" of its "consideration." 323 U.S. at 140. The Department issued its Home Care Rule through the notice-and-comment rulemaking procedures of the Administrative Procedure Act. As explained above, the Department's preamble to the rule detailed the dramatic changes in the home care industry as well as conducted an in-depth analysis of the legislative history and responded to the substantive issues raised by thousands of comments, and as such, thoroughly considered the relevant issues.

prove Defendants paid Aides at straight time for overtime hours during this period. (*Id.*). As such, Plaintiff is entitled to judgment as a matter of law with respect to this violation.

When an employer pays straight time for overtime hours worked, back wages are calculated by dividing employees' regular rate (all compensation paid in a workweek, divided by hours worked in a workweek) by two, and then multiplying that half-time rate by the number of overtime hours worked. *Monroe v. FTS USA, LLC*, 860 F.3d 389, 415 (6th Cir. 2017); *see also Acosta v. Min & Kim, Inc.*, 919 F.3d 361, 364 (6th Cir. 2019) (explaining how overtime pay must be calculated). Plaintiff used this exact method when calculating the $555,905.40 in back wages owed to Aides adversely affected by Defendants' unlawful pay practices between October 19, 2018 and August 11, 2019. (UMF, ¶ 49). Notably, nothing in the record contradicts Plaintiff's computations of back wages owed for this violation.

Based on the above undisputed facts, Plaintiff is entitled to summary judgment on this claim and an award of $555,905.40 in back wages for straight time for overtime from October 19, 2018 to August 11, 2019.

> 2. *From August 12, 2019 Through April 14, 2024, Defendants Violated the Act by Artificially Lowering Employee's Regular Rate When Calculating Overtime Owed, Resulting in Back Wages Totaling $6,922,915.39.*

As discussed above, employers must pay employees at least one and one-half times their regular rate of pay for all hours worked in excess of 40 in a workweek. 29 U.S.C. § 207(a)(1). A regular rate cannot be a lower, artificial rate designated by the employer; instead, it must be the hourly rate actually paid to the employee. *See* 29 C.F.R. § 778.108; *see also Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 40 (1944). Indeed, an employer cannot avoid its overtime obligations by artificially lowering an employee's regular hourly rate. *See Reich v. Midwest Body Corp.*, 843 F.

36

Supp. 1249, 1251 (N.D. Ill. 1994); *Helmerich & Payne*, 323 U.S. at 40; *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 208, *modified*, 331 U.S. 795 (1947); *see also United States Dep't of Lab. v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 281–82 (4th Cir. 2019) (discussing similar application of "blended rate" that, in actuality, was a straight time payment for overtime).

Nearly 80 years ago, the Supreme Court in *Helmerich* rejected the exact rate manipulation Defendants have employed here, holding that a regular rate of pay may not be derived in "a wholly unrealistic and artificial manner" and that employers may not use "mathematical manipulations" to generate "a fictitious regular rate consisting of a figure somewhat lower than the rate actually received." *Helmerich & Payne*, 323 U.S. at 41-42. DOL regulations describe a variety of pay schemes that violate Section 207 of the FLSA. *See, e.g.*, 29 C.F.R. §§ 778.316, 778.500. As illustrated by WHD's interpretive regulation:

> [T]he hourly rate paid for the identical work during the hours in excess of the applicable maximum hours standard cannot be lower than the rate paid for the non-overtime hours nor can the hourly rate vary from week to week inversely with the length of the workweek.

29 C.F.R. § 778.500(b). Additionally, Section 778.316 states in pertinent part:

> [W]here a rate has been agreed upon as applicable to a particular type of work the parties cannot lawfully agree that the rate for that work shall be lower merely because the work is performed during the statutory overtime hours, or during a week in which statutory overtime is worked.

29 C.F.R. § 778.316 ("agreements or practices in conflict with statutory requirements are ineffective"). Section 778.327 provides an example of an unlawful pay scheme that is identical to that of Defendants:

> If the [employer] set the rate at $6 per hour for all workweeks in which the employee worked 40 hours or less, approximately $5.93 per hour for workweeks of 41 hours, approximately $5.86 for workweeks of 42 hours, approximately $5.45 for workweeks of 50 hours, and so on, the employee would always receive (for straight

time and overtime at these "rates") $6 an hour regardless of the number of overtime hours worked. This is an obvious bookkeeping device designed to avoid the payment of overtime compensation and is not in accord with the law. *See Walling* v. *Green Head Bit & Supply Co.,* 138 F.2d 453 [10th Cir. 1943]. The regular rate of pay of this employee for overtime purposes is, obviously, the rate he earns in the normal nonovertime week—in this case, $6 per hour.

29 C.F.R. § 778.327.

The example cited in the federal regulations is derived from the holding of *Walling v. Green Head Bit & Supply Co*., where the Tenth Circuit reasoned, "the contract, in substance, was an agreement to pay a stipulated rate per hour for all hours worked and no extra pay for overtime, and that the agreement to so reduce the regular rate, dependent on the number of overtime hours worked, so as to obtain that result, was a *device to avoid the provisions of the Act*." *Walling*, 138 F.2d 453 (emphasis added); *see also Marshall v. Murray*, No. 76-167, 1979 WL 1986, at *5 (M.D. Pa. Sept. 14, 1979) ("It seems clear that where different rates are paid from week to week for the same work and where the difference is justified by no factor other than the number of hours worked by the individual employee–the longer he works the lower the rate–the device is evasive and the rate actually paid in the shorter or nonovertime week is his regular rate for overtime purposes in all weeks.").

Here, the records show – and Defendants admit – that Defendants altered employees' regular rate in their bookkeeping system depending on the number of hours worked. (UMF, ¶¶ 46-50; 54-55). Moreover, Defendants provided a clear reason for those fluctuations: they alleged they underpaid Aides because they determined the company could not afford to pay overtime wages. (UMF, ¶ 51).[6] As there is no dispute that Defendants artificially lowered the Aides' regular rates

---

[6] It also should be mentioned that, periodically, Defendants continued to employ the same overt straight time for overtime scheme that they used between October 19, 2018 to August 11, 2019, during the period of August 12, 2019 through April 14, 2024.  (UMF, ¶ 53).

to avoid paying overtime with the goal of maintaining their high profit margin, the Court must grant Plaintiff's motion for summary judgment with respect to this FLSA violation.

As Defendants' rate manipulation scheme resulted in straight time for overtime, Plaintiff calculated back wages owed for the violations taking place between August 12, 2019 and April 14, 2024 by dividing employees' regular rate (all compensation paid in a workweek, divided by hours worked in a workweek) by two, and then multiplying that half-time rate by the number of overtime hours worked. *FTS USA*, 860 F.3d at 415; *Min & Kim*, 919 F.3d at 364. Based on the records and the methodology as explained above – all of which are undisputed – Plaintiff is entitled to an award of $6,922.915.39 in back wages between August 12, 2019 and April 14, 2024.

> 3. *Plaintiff Is Entitled to Back Wages for Defendants' Overtime Violations that Have Continued Since April 14, 2024.*

There is no indication in the record that Defendants have come into compliance with the FLSA since April 14, 2024. Notably, Plaintiff's Complaint clearly seeks back wages and liquidated damages for violations continuing through to the present. (ECF 8, Stipulated Amended Complaint). As such, the Court should order Defendants to produce payroll and time records for the period of April 15, 2024 through the present. Should those records confirm continuing violations of the same nature at issue here, the Court should award back wages and liquidated damages owed as a result of Defendants' post-April 14, 2024 violations.

**H. Defendants Are Liable for $7,478,820.79 in Liquidated Damages.**

"An employer who violates the FLSA's overtime provisions is liable to the employee in the amount of the unpaid overtime compensation 'and in an additional equal amount as liquidated damages.'" *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004) (*quoting* 29 U.S.C. § 216(b)). "[L]iquidated damages are the norm and have even been referred to as 'mandatory.'" *Id.* (*quoting Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991)).

Defendants can only avoid a liquidated damages award if they prove they violated the FLSA in good faith, as set forth in 29 U.S.C. § 260. "This burden on the employer is substantial, and if the employer fails to carry it, the court may not limit or deny liquidated damages." *Indiana Michigan Power*, 381 F.3d at 584 (*quoting Elwell v. U. Hosps. Home Care Services*, 276 F.3d 832, 840 (6th Cir. 2002)) (internal quotations and alterations omitted). Defendants' burden is a high one. Indeed, "[t]o prove that it acted in good faith, an employer must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Timberline S., LLC*, 925 F.3d at 856 (internal quotations omitted). In addition, an employer must demonstrate there were also reasonable grounds for believing it was in compliance with the Act. *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982). "[D]emonstrating good faith requires more than the absence of intent or knowledge." *Solis v. Min Fang Yang*, 345 Fed. Appx. 35, 39 (6th Cir. 2009); *Chao v. First Nat. Lending Corp.*, 516 F. Supp. 2d 895, 902 (N.D. Ohio 2006), *aff'd*, 249 Fed. Appx. 441 (6th Cir. 2007) ("A showing of good faith includes a duty to investigate potential liability under the FLSA.").

Here, Defendants cannot meet their "substantial" burden of establishing they violated the FLSA in "good faith." *Brunner*, 668 F.2d at 753. The record evidence shows that, during the Relevant Period, Defendants were aware that they were required under the FLSA to pay Aides overtime compensation. First and foremost, undisputed record evidence – in the form of a sworn admission from Adhikari – proves Defendants knew as early as July 2018 (two months before the start of the Relevant Period) that Aides were entitled to overtime under the FLSA. (UMF, ¶ 62). Additionally, Adhikari understood third-party agencies of home care aides are precluded from claiming the companionship exemption to the FLSA. (*Id.* at ¶ 74). Moreover, Defendants employed a scheme that gave the false appearance they were paying Aides in compliance with the

Act when, in fact, they were paying straight time for overtime. *Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1265 (D. Or. 2014) (awarding liquidated damages where employer "purposefully intended to evade the law's requirements" by manipulating employee work hours to evade compliance). Additionally, Adhikari knew based on investigations conducted by the Department of Labor that home health aides were entitled to overtime compensation under the FLSA. (UMF, ¶¶ 64, 73). Record evidence shows Defendants knew of their overtime obligations for the entirety of the Relevant Period and, despite that knowledge, still made the decision to underpay their employees. In short, the record is devoid of any evidence Defendants had a reasonable belief they were in compliance with the Act. This failure, alone, warrants the rejection of Defendants' good faith affirmative defense.

Defendants also cannot satisfy their burden of proving they took active steps to learn the dictates of the Act and moved to comply with them. *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) ("'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them.") Although Defendants allege they met with three separate attorneys regarding their FLSA obligations, they have failed to produce any reliable evidence supporting their affirmative defense. Even information as basic as the full names of the attorneys from whom Defendants sought advice has been left a mystery. Defendants have only provided the name of two of the three lawyers at issue. With respect to the nameless attorney, Defendants have failed to offer any details regarding the nature of the advice provided or the facts on which said advice was based. Defendants have failed to even state how the advice was imparted onto them. Defendants have not produced any documents supporting their allegations concerning the nameless attorneys, offering only self-

serving testimony from a named defendant in support of an affirmative defense that requires significantly more from an employer seeking to avoid a liquidated damages award. The same failings that prevent Defendants from relying on the alleged advice from the unnamed attorney in pursuing a good faith affirmative defense also apply to the alleged advice provided by Attorney "Castelli." Indeed, nothing in the record supports Adhikaris's self-serving testimony regarding "Castelli."

As to the third attorney, Linkosky, his testimony ravages what remains of Defendants' paltry defense. Adhikari stated under oath that Attorney Linkosky advised him to pay Aides overtime mere months before the start of the Relevant Period, in July 2018. (UMF, ¶ 69). Consistent with this advice, Adhikari also testified Attorney Linkosky advised that Adhikari had to set a rate and could not fluctuate an Aide's rate of pay "every time." (*Id.* at ¶ 70). Despite this advice, Defendants continued to manipulate rates and underpay employees. In doing so, Defendants destroyed any chance of successfully arguing they took active steps to determine the dictates of the Act and then moved to comply with them.

Additionally, throughout most of this period, Defendants continued to violate their recordkeeping obligations, making it more difficult to detect their noncompliance. Such conduct is antithetical to any claim of "good faith" or "reasonable belief" of compliance by Defendants. Accordingly, the Acting Secretary is entitled to judgment as a matter of law and an award of liquidated damages in an amount equal to the back wages owed by Defendants.

## I.  Defendants' Violation of the FLSA's Overtime Provision Was Willful.

If a plaintiff can show that defendants acted willfully, the statute of limitations for FLSA violations increases from two to three years. *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988); 29 U.S.C. § 255(a). To establish willfulness, a plaintiff has the burden of showing

defendants "either knew or showed reckless disregard for the matter of whether [its] conduct was prohibited." *Herman v. Palo Group Foster Home, Inc*., 183 F.3d 468, 474 (6th Cir. 1999). An employer acts recklessly when it was "aware of a substantial risk that its activities violated the FLSA, and acted in conscious disregard of that risk." *Elwell*, 276 F.3d at 844. A finding of willfulness does not require prior violations or litigation. *Reich v. Montfort, Inc.,* 144 F.3d 1329, 1334-35 (10th Cir. 1998).

The record establishes Defendants acted with – at a minimum – reckless disregard, which is sufficient to establish the overtime violations were willful as a matter of law. It is undisputed Defendants knew of the FLSA's overtime requirements yet actively disregarded their obligations under the Act. Significantly, in this matter, the record establishes Defendants' actions were even more egregious than reckless disregard as they actively concealed their FLSA violations by manipulating their payroll records. *See e.g., Elwell*, 276 F.3d 832 (6th Cir. 2002) (evidence an employer took steps to actively conceal FLSA violations "would make it more likely that the employer was aware of a substantial risk that its activities violated the FLSA, and acted in conscious disregard of that risk.")

Adhikari admits knowing before the start of the Relevant Period that the 2013 Home Care Rule prohibited third-party home care agencies such as Americare from claiming an exemption to overtime requirements. (UMF, ¶ 64). Indeed, Adhikari understood that third-party agencies of home care workers are precluded from claiming the companionship exemption to the FLSA. (*Id*. at ¶ 75). Defendants admit they knew Aides were entitled to overtime pay as of July 2018. (*Id*. at ¶ 69). Indeed, Adhikari testified he was advised in July 2018 by Attorney Linkosky that he should be paying Aides overtime wages at one and one-half times their regular rate of pay. (*Id*.). This same attorney advised Adhikari that he had to set a regular rate of pay and not fluctuate Aides'

regular rate of pay to remain compliant with the FLSA. (*Id.* at ¶ 70). Again, Attorney Linkosky provided this advice to Defendants months prior to the start of the Relevant Period, but Defendants continued to violate the FLSA despite this legal advice.

Moreover, Defendants knew at all relevant times that they were taking a position that was contrary to the position of the Department of Labor with respect to payment of overtime to Aides. Indeed, Adhikari testified he learned in 2018 that other similar home care agencies were being investigated by the Department of Labor, were advised by the Department of Labor that they needed to pay their home health aides overtime compensation and were starting to pay overtime to their home health aides. (*Id.* at ¶ 74). These facts are sufficient to establish willfulness on summary judgment. *See Su v. Nursing Home Care Management Inc*., Civil Action No. 21-cv-02583, 2023 WL 3440237, *11 (E.D. Pa. May 12, 2023) (relying on Defendants' knowledge that their position was contrary to the Department of Labor's interpretation of the law as supporting a finding of willfulness in granting summary judgment for the Department of Labor).

Knowledge Adhikari gained from previous investigations and litigation further demonstrates Defendants' FLSA violations were willful. *Palo Grp. Foster Home, Inc*., 183 F.3d at 474 (held FLSA violations by an adult foster care facility were willful based on previous DOL investigations of a different facility owned by the same individual). The Pennsylvania state labor department initiated an investigation in early 2018 against Adhikari's home care company in Pennsylvania (Intra-National Home Care, LLC), and at least one class action was filed against the company in 2017 for unpaid overtime compensation. (UMF, ¶ 67). Clearly Defendants knew of their obligations under the FLSA. This knowledge, coupled with Defendants' continued efforts to violate the Act while masking their unlawful activities, warrants a finding that Defendants willfully violated the FLSA.

Defendants' ongoing recordkeeping violations, discussed *infra*, provide further support for the willful nature of the violations at issue. *See Elwell*, 276 F.3d at 844 ("[A]n employer's recordkeeping practices may nonetheless corroborate an employee's claims that the employer acted willfully in failing to compensate for overtime.") (internal citation omitted). In *Walsh v. KDE Equine, Inc.*, 56 F.4th 409 (6th Cir. 2022), the employer modified its time records to give the appearance that the employees were being paid by the hour by calculating the employees' salary and dividing it by $8.00, the rate the owner believed to be the minimum wage. The Sixth Circuit found that a reasonable jury could infer the employer knowingly modified its records to conceal its failure to pay overtime or to eliminate evidence that might be used against it later, either of which would suggest the employer knew its practices were prohibited by the FLSA. *Id.* at 19 (citing *Elwell*, 276 F.3d at 844).

Just like the *KDE Equine* defendants, Defendants took active steps to hide their FLSA violations which further evidences the willful nature of their violations. *Id*. Defendants' refusal to even take this small step towards compliance shows their contempt for the FLSA, and this Court should deem their violations willful.

### J.  Defendants Violated the FLSA's Recordkeeping Provisions.

Defendants failed to maintain records in accordance with Section 211(c) of the FLSA, which requires employers subject to the provisions of the Act to make, keep, and preserve records of their employees' wages, hours, and other conditions and practices of employment, as prescribed by the Acting Secretary's regulations. 29 U.S.C. § 211(c), 29 C.F.R. § 516.2(a). The FLSA requires employers to maintain accurate records of hours worked each workday and total hours each workweek. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(7). Of particular note in this case, the FLSA requires employers to record each employee's regular hourly rate for any workweek in which

overtime was owed, total weekly straight-time earnings, and total weekly overtime premium pay. 29 C.F.R. §§ 516.2(a)(6), 516.2(a)(8), 516.2(a)(9).

Defendants did not maintain records of weekly hours worked by each Aide, as Defendants failed to produce documents reflecting weekly hours worked. (UMF, ¶ 83). Defendants also failed to maintain records of the regular hourly rate worked, as they listed an artificial hourly rate that decreased the more hours the employee worked, rather than the Aide's actual regular rate (*i.e.*, the hourly rate earned by the Aide during non-overtime workweeks). (*Id*. at ¶ 84). Further, Defendants failed to maintain records of total weekly overtime premium pay, as Defendants often recorded overtime premium pay being paid to Aides when, in reality, Defendants only paid straight time for hours worked. (*Id*. at ¶ 85).

Moreover, Defendants did not compute overtime on a workweek basis; instead, they computed it on a two-week, pay period basis, which is, in itself, a violation of the FLSA's overtime and recordkeeping requirements. 29 C.F.R. § 516.2(a)(7) ("Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or both sections 6 and 7(a) of the Act apply … total hours worked each workweek.").

There are no material facts in dispute as to Defendants' violations of Section 211 of the Act, and Plaintiff is entitled to judgment as a matter of law.

**K.  The Acting Secretary is Entitled to Injunctive Relief.**

The FLSA authorizes district courts to issue injunctive relief "restrain[ing] violations" of Sections 206 and 207 upon a showing of cause. 29 U.S.C. § 217. Whether to issue injunctive relief is a decision within the sound discretion of the Court. *See Martin v. Funtime, Inc.*, 963 F.2d 110, 113 (6th Cir. 1992). In determining whether to issue a prospective injunction under the FLSA,

courts consider (1) the employer's previous conduct, (2) its current compliance (or noncompliance), and (3) the dependability of any assurances that it will comply with the FLSA in the future. *Id.* at 114; *see also, Reich v.Petroleum Sales Inc.*, 30 F.3d 654, 657 (6th Cir. 1994)(imposition of an injunction is not punitive and does not impose a hardship on the employer because it requires the employer to comply with the FLSA, which is already required). "[A]n employer's pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective injunction." *Funtime*, 963 F.2d at 114 (internal quotations omitted).

Here, all three factors favor granting injunctive relief. Defendants have a history of violating the FLSA. Despite being investigated by the United States Department of Labor, the Pennsylvania state department of labor, being sued for overtime violations, ignoring legal advice, and taking active steps to conceal their unlawful overtime practices, Defendants continued to violate the FLSA by failing to pay Defendants' Aides proper overtime wages. In fact, Americare filed a declaratory judgment action acknowledging its lack of compliance with the FLSA and asked a court to relieve it from its obligation to comply with the FLSA and to have the Department of Labor cease its enforcement of the FLSA.

Further, the Acting Secretary's review of Defendants' records from October 18, 2019 through April 14, 2024 (*i.e.*, the period following the Department of Labor's investigation of Defendants), more than four and a half years, reveal that the FLSA violations are still ongoing. The overtime violations are so blatant that Defendants slip in and out of paying straight time for overtime and manipulating the Aide's rates in the records to give the appearance of paying overtime compensation. Indeed, there are many examples of pure straight time for overtime on the records in 2023 and 2024. Defendants' continued FLSA violations make it unlikely that they will comply with the FLSA at any point in the future absent an injunction. Defendants' disregard for

47

the law is evidenced by Americare's declaratory judgment action in which they have asked the federal courts to declare the law as it stands today invalid.

Finally, given Defendants' clear contempt for the FLSA, and their failure to come into compliance despite multiple investigations and enforcement actions, any claim by Defendants that they will come into compliance (which, to date, has not been made) would be wholly unreliable.

Thus, injunctive relief against Defendants is justified and necessary.

## III.   CONCLUSION

For the foregoing reasons, the Acting Secretary is entitled to judgment as a matter of law on all claims. Accordingly, Plaintiff respectfully requests the Court enter a judgment awarding full back wages and liquidated damages totaling $14,957,641.60, in addition to as yet unknown back wages and liquidated for the overtime violations that took place during the period of April 15, 2024 to present. Plaintiff also requests the Court award injunctive relief requiring Defendants future compliance with the FLSA.

Date: October 1, 2024

Respectfully submitted,

OF COUNSEL:

SEEMA NANDA
Solicitor of Labor

CHRISTINE Z. HERI
Regional Solicitor

LEAH A. WILLIAMS
Associate Regional Solicitor

*/s/ Rina R. Russo*
RINA R. RUSSO (0087761)
Counsel for Wage & Hour and Civil Rights
STEPHEN M. PINCUS
HALEY R. JENKINS
Trial Attorneys
U.S. Department of Labor
881 Federal Office Building
1240 East Ninth Street
Cleveland, Ohio 44199
(216) 522-2447
(216) 522-3877
(216) 522-7172 (fax)
Russo.Rina.R@dol.gov
Pincus.Stephen.M@dol.gov
Jenkins.Haley.R@dol.gov

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2024, the foregoing document was filed electronically with the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

<u>/s/ Rina R. Russo</u>
RINA R. RUSSO