UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEPARTMENT OF LABOR,

          Plaintiff,

    v.

AMERICARE HEALTHCARE
SERVICES, LLC, *et al.*,

          Defendants.

**Case No. 2:21-cv-5076**
**Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on several motions. The Court previously ordered the Parties to re-file their Motion and Partial Motion for Summary Judgment after the Supreme Court's holding in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). (ECF No. 108.) Plaintiff the United States Department of Labor ("DOL") has since renewed its Motion for Summary Judgment on its claims that Defendants Americare Healthcare Services, LLC, and Dilli Adhikari violated the Fair Labor Standards Act ("FLSA"). (DOL's Mot., ECF No. 112-1.) Defendants also renewed their Partial Motion for Summary Judgment asking the Court to vacate and set aside a regulation issued by DOL requiring third-party employers to pay home care workers overtime compensation. (Defs.' Mot., ECF No. 113-2.)

Both Motions are ripe for the Court's review. For the reasons below, the Court **DENIES** Defendants' Partial Motion (ECF No. 113) and **GRANTS** DOL's Motion for Summary Judgment (ECF No. 112). DOL also moves to admit the deposition testimony of John Linkosky. (ECF No. 101.) Since the Court awards DOL summary judgment, that Motion is **DENIED as MOOT**.

# BACKGROUND

DOL brings this enforcement action against Americare, a third-party home care agency, and its owner Mr. Adhikari, for alleged violations of the FLSA's overtime and recordkeeping rules. DOL insists that Defendants must pay their home care aides back pay and liquidated damages for unpaid overtime hours worked, but Defendants argue they need not pay the aides overtime when the aides provide in-home companionship and live-in assistance.

## I. Factual Background

Mr. Adhikari bought Americare in November 2016, after founding his own home care agency, Intra-National Home Care, LLC. (Americare Dep., ECF No. 64-1, 45:14–24; *see also* ECF No. 113-3,[1] PageID 48602.) While Intra-National provides services in Michigan and Pennsylvania, Americare has offices in Columbus, Cleveland, Cincinnati, and Akron. (Bharati Dep.,[2] ECF No. 66-1, 10:25–11:09.) Each office has an Area Director or Office Manager responsible for hiring and supervising the aides. (*Id.*) The aides provide several services for Americare's mainly elderly clients, including hygiene, personal care, nutrition, and mobility assistance. (*Id.* 60:17–61:23.)

To ensure the aides provide proper care to Americare clients, Americare uses an Electronic Visit Verification platform. (*Id.* 36:05–21; 38:12–20.) The aides sign in and out when they perform work for a particular client and then the client confirms the work performed by the aide. (*Id.* 37:01–

---

[1] Defendants attach as an Exhibit to their Motion a "Concise Statement of Undisputed Material Facts." (ECF No. 113-3.) The statement is seven pages long and disputed by DOL. (*See* ECF No. 114-1.) The Court had instructed Defendants to review this Court's Local Rules before filing its renewed motion with an attached statement of facts. (ECF No. 108, PageID 26776.) The Court emphasized that facts should be discussed in the primary memorandum and that the Court does not permit additional memoranda beyond those enumerated in the Local Rules. (*Id.* citing S.D. Ohio Civ. Rule 7.2 (a) and (d).) If Defendants file additional memoranda in this Court, they are ordered to comply with the Local Rules.

[2] Rup Bharati is the Office Manager for Americare's Columbus Office. (Bharati Dep., 7:21–8:04.)

16.) The Electronic Visit Verification platform, including the GPS-location data, is monitored daily to ensure all clients received their required services. (*Id.* 38:02–14.)

### A. Americare's Payment Structure

From October 2018 to September 2019, Defendants did not pay overtime at the premium rate of time and a half when the aides worked more than 40 hours in a workweek. (Defs.' Opp., ECF No. 115, PageID 48856; *see also* Defs.' Resp. to Pls.' Req. for Admis., ECF No. 64-3, PageID 917–18; Adhikari Dep., ECF No. 69-1, 38:06–10.) Mr. Adhikari explained that he thought the aides were exempt from the overtime requirements because to his knowledge, no other agency paid overtime. (Americare Dep., ECF No. 64-1, 48:08–21.)

He alleges that he consulted an attorney in 2016 or 2017, whose name Mr. Adhikari could not remember, about exemptions to the overtime requirements under the FLSA. (*Id.* 51:19–52:13.) According to Mr. Adhikari, that attorney advised him that some personal care services were exempted from the FLSA's overtime requirements. (*Id.*)[3] Explaining that he was still confused, Mr. Adhikari testified that he consulted a different attorney from Pittsburg who told him that the aides were not owed overtime. (*Id.* 55:05–56:22; 62:3–9.)

Soon after a class action lawsuit and a Pennsylvania Department of Labor investigation were initiated against Mr. Adhikari and Intra-National, prompting Mr. Adhikari to seek the advice of a third attorney named John Linkosky. (*Id.* 62:19–63:14; 64:20–65:6; 275:3–12.) According to Mr. Adhikari, Mr. Linkosky suggested that homecare agencies may lack sufficient control over the aides to be considered "employees" and subject to the FLSA. Mr. Linkosky disputes Mr. Adhikari's characterization of his advice. (Linkosky Decl., ECF No. 72-1, ¶¶ 8, 10 (explaining

---

[3] The attorney-client privilege does not apply to communications between Mr. Adhikari and his attorneys because Mr. Adhikari expressly waived the privilege under Rule 502(a) of the Federal Rules of Evidence.

that he "never advised [Mr.] Adhikari, Americare, or any Americare manager or officer that Americare's direct care workers were exempt from the minimum wage or overtime provisions of the FLSA due to the companionship services, live-in caregiver, or domestic service exemption.").) Mr. Adhikari also concedes that Mr. Linkosky advised him to pay the aides overtime compensation in "early 2018." (Adhikari Dep. 2022,[4] ECF No. 69-2, 123:10–24.) In July 2018, Mr. Adhikari began paying home care aides employed by Intra-National overtime compensation, but Defendants did not start paying Americare aides overtime until September 2019. (Adhikari Dep., ECF No. 69-1, 38:06–18.)

Starting in September 2019, Defendants reduced the aides' hourly rate based on the number of hours the aides worked and paid overtime on the lower regular rate for overtime hours worked. (Defs.' Resp. to Pls.' Interrog., ECF No. 64-3, PageID 898.) Deepesh Pradhan, Americare's payroll coordinator, explained that under the new payment practice, the aides' regular rate varied based on the number of hours worked. (Pradhan Dep., ECF No. 70-1, 23:03–26:25; Americare and Adhikari Cont. Dep., ECF No. 65-1, 68:16–25.) The more hours the aide worked, the lower the rate. (*Id.*) Mr. Adhikari candidly explained that Americare could not afford to pay overtime compensation without a rate adjustment. (Americare Dep., 232:11–13 ("we don't have enough money to pay [the aides]."); *see also* Americare and Adhikari Cont. Dep., 68:06–12.)

Mr. Adhikari acknowledges that Mr. Linkosky advised him that he could set a regular, lower rate of pay, and then pay overtime on the lower rate, but that he could not fluctuate the regular rate of pay based on the number of hours worked. (*Id.* 70:15–71:6.) Mr. Linkosky also

---

[4] DOL submits a copy of Mr. Adhikari's deposition transcript from a similar enforcement action brought by DOL in the Western District of Pennsylvania. *See Walsh v. Intra-Nat'l Home Care, LLC, et al.*, Case No. 2:21-cv-1391 (W.D. Pa.) The Court will refer to this deposition transcript as "Adhikari Dep. 2022." (*See* ECF No. 69-2.)

counseled Mr. Adhikari to make any changes to the regular rate by agreement with the aides. (Americare and Adhikari Cont. Dep., ECF No. 65-1, 9:25–13:22.) Yet Defendants produced only 81 written rate change agreements (*id.*), even though DOL alleges that 1,700 aides were subject to Defendants' improper pay practices. (DOL's Reply, ECF No. 118, PageID 48949.)

In 2020, Defendants learned that DOL was investigating them for potential overtime violations. (*See* Alloway Decl., ECF No. 111-1.) Stephen Alloway, an investigator with the Wage and Hour Division of DOL, participated in that investigation. (*Id.*) After obtaining self-audited reports from Defendants through discovery, and subpoenaing Defendants' payroll services provider, Mr. Alloway calculated the amount of overtime Defendants failed to pay the aides. (*Id.* ¶¶ 4–6, 8; *see also* ECF No. 111-3 (detailed spreadsheet of back wages owed). In total, DOL argues Defendants owe $7,478,820.79 in back wages. (*Id.* ¶ 30; ECF No. 111-3.)

### B. Cases Between DOL and Defendants in Federal Courts in Pennsylvania

Once learning that Defendants, along with their affiliated entity Intra-National, were under investigation, Intra-National and Mr. Adhikari brought a lawsuit in the Western District of Pennsylvania under the Administrative Procedure Act ("APA") seeking a declaratory judgment that DOL's rule prohibiting third party employers from claiming an exemption to the overtime requirements be set aside as arbitrary and capricious. *Intra-Nat'l Home Care, LLC v. United States Dep. of Lab.*, Case No. 2:22-cv-1545 (W.D. Pa.).[5] One year later, DOL filed an enforcement action against Intra-National Home Care, LLC, and Mr. Adhikari in the Western District of Pennsylvania. *Walsh v. Intra- Nat'l Home Care, LLC, et al.*, Case No. 2:21-cv-1391 (W.D. Pa.). Both cases

---

[5] The district court dismissed Intra-National's claims as untimely under the statute of limitations applicable to the APA, 28 U.S.C. § 2401(a), but the Third Circuit vacated the district court's decision and remanded the case for further proceedings. *Intra-Nat'l Home Care, LLC v. United States Dep't of Lab.*, No. 22-2628, 2024 U.S. App. LEXIS 22675, at *2 (3d Cir. Sep. 6, 2024).

remain pending and neither case has reached the merits on the enforceability of the challenged regulation or Defendants' alleged FLSA violations.

## II.    Procedural Background

In October 2021, DOL filed this lawsuit seeking to enjoin Americare and Mr. Adhikari from violating provisions of the FLSA by failing to pay the home care aides overtime compensation. (*See* Compl., ECF No. 1; *see also* Am. Compl., ECF No. 8.) DOL moved for summary judgment seeking back wages, liquidated damages, and injunctive relief for Defendants' alleged willful violations of the FLSA from October 2018 to April 2024. (DOL's Mot., PageID 48515.) Defendants opposed that Motion. (Defs.' Opp., ECF No. 115.)

One day after the deadline to reply in support of its Motion passed, DOL moved for leave to file its reply instanter. (ECF No. 117.) The Court **GRANTS** DOL's Motion and will consider its Reply (DOL's Reply, ECF No. 118).

Defendants separately moved for partial summary judgment. (Defs.' Mot., ECF No. 113.) DOL opposed that Motion (DOL's Opp., ECF No. 114), and Defendants replied in support of their Motion (Defs.' Reply, ECF No. 116).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary

6

judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (awarding summary judgment when the evidence could not lead a jury to find for the nonmoving party).

The legal standard remains the same when evaluating cross-motions for summary judgment. To the extent that the cross-motions overlap, the Court addresses the legal arguments together, but otherwise considers each Motion separately. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## ANALYSIS

DOL asserts that Defendants violated the FLSA in two ways. First, by failing to pay their employees overtime compensation at one and one-half times their regular rate of pay for all hours worked over 40 hours per workweek. Second, by failing to maintain accurate records. The Court addresses each alleged violation in turn.

### I.       Defendants are Liable for Overtime Violations

The FLSA dictates that covered employees who work more than 40 hours per workweek shall be paid overtime compensation at a rate not less than one and one-half times their regular pay. 29 U.S.C. § 207(a)(1). Employers who violate this requirement may be liable in the amount of the employee's unpaid overtime compensation and an equal amount of liquidated damages. 29 U.S.C. § 216(b).

To prevail on an unpaid overtime claim, a plaintiff must first prove that an employer-employee relationship existed. 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . ."). Next, the plaintiff must show that the employer or its employees are engaged in interstate commerce. *Id.*; *see also Bey v. WalkerHealthCareIT, LLC*, No. 2:16-cv-1167, 2018 U.S. Dist. LEXIS 72819, at \*10 (S.D. Ohio May 1, 2018) (Smith, J.). Finally, the employees must show that they worked more than 40 hours per workweek and were not paid overtime. *Stansbury v. Faulkner*, 443 F. Supp. 3d 918, 925 (W.D. Tenn. 2020) (describing this as a four factor test).

The FLSA creates exemptions to an employer's duty to pay covered employees overtime compensation. *See* 29 U.S.C. § 213(a)(1)–(19). Once a plaintiff establishes the elements above, the burden shifts to the employer to show by a preponderance of the evidence that one of the exemptions applies to the employment relationship in question. *Kowalski v. Kowalski Heat Transfer Co.*, 920 F. Supp. 799, 806 (N.D. Ohio 1996) (explaining employer has burden of proof to establish an exemption); *Corning Glass Works v. Brennan*, 417 U.S. 188, 197 (1974) (describing an exemption as an affirmative defense on which the employer has the burden of proof).

Defendants assert that two exemptions apply to relieve them from their obligation to pay the home care aides overtime compensation. (Defs.' Mot.; *see also* Defs.' Opp., PageID 48851–52.) DOL moves for summary judgment arguing that third-party agencies are not entitled to claim either exemption, thus Defendants were required to pay their employees overtime compensation. (DOL's Mot., PageID 48541–50.) But Defendants counter that the administrative regulation prohibiting third-party agencies from claiming either exemption is unlawful and should be vacated. (Defs.' Mot., PageID 48582–600.) The Court begins by addressing whether an employment relationship existed.

### A. The Americare Aides are Employees under FLSA

DOL asks this Court to find that the Americare aides are employees under the FLSA. (DOL's Mot., PageID 48539.) The FLSA broadly defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To give effect to Congress's broad definition, courts look to whether workers are "as a matter of 'economic reality,' an employee." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (citation omitted).

The economic reality test applies six factors: (1) the permanency of the relationship; (2) the degree of skill required; (3) the worker's investment in equipment or materials; (4) the worker's opportunity for profit or loss; (5) the degree of the alleged employer's right to control the work; and (6) whether the service rendered is essential to the employer's business. *Id.* at 807 (citations omitted). Whether a relationship is an employment relationship is a question of law based on the totality of the circumstances. *See Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994). Only if the factors are in "equipoise" should the question be put to the trier of fact. *Imars v. Contractors Mfg. Servs.*, No. 97-3543, 1998 U.S. App. LEXIS 21073, at *19 (6th Cir. Aug. 24, 1998).

Defendants argue that DOL cannot establish that Americare's aides were employees under the FLSA. Defendants dispute factors (1) and (5) of the economic reality test, but admit that factors (2), (3), (4) and (6) favor a finding of an employment relationship. (Defs.' Opp., PageID 48853–54.) The Court focuses its analysis on the disputed factors.

### i. The Permanence of the Relationship

This factor looks to the "length and regularity of the working relationship between the parties." *Keller*, 781 F.3d at 807 (citation omitted). This Court has held that the length and regularity of the working relationship between a third-party agency and a home care aide supports a finding of an employment relationship. *Julie A. Su v. HALO Homecare Servs.*, LLC, No. 1:20-

cv-744, 2023 U.S. Dist. LEXIS 114605, at *16 (S.D. Ohio June 30, 2023) (McFarland, J.) (explaining that home care workers are employed at-will, rather than for a fixed employment period). Independent contractors, in comparison, have more "variable or impermanent working relationships" and "transfer from place to place as particular work is offered to them." *Keller*, 781 F.3d at 807. Even "short, exclusive relationships between the worker and the company may [nonetheless] be indicative of an employee-employer relationship." *Id.* (citing *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)).

Defendants argue that the relationship between Americare and its aides is temporary because when a client switches agencies, the aide will often change agencies as well to stay with the client. (Defs.' Opp., PageID 48853–54.) Defendants offer no evidence to support their proposition. (*Id.*)

DOL acknowledges that the home health care industry is somewhat transient, but attributes the "lack of permanence" to the "operational characteristics of the industry" instead of "the workers' own business initiative." (DOL's Reply, PageID 48936–37 (citing *Crouch v. Guardian Angel Nursing, Inc.*, No. 3:07-cv-00541, 2009 U.S. Dist. LEXIS 103832, at *43 (M.D. Tenn. Nov. 4, 2009).) And although there may be high turnover in the industry, DOL argues that a majority (71.9%) of the aides stayed with Americare for over a year. (*See* Alloway Decl., ECF No. 118-1, ¶ 4.) Thus, the relationship between Americare and the aides, even if short, is indicative of an employment relationship.

### ii.    Defendants' Degree of Control

Defendants also argue that the fifth factor—the employer's right to control the aides' work—weighs against finding an employment relationship. (Defs.' Opp., PageID 48854–55.) Under the fifth factor, the Court evaluates the level of control that an employer has over its workers

and "ask[s] whether the company 'retains the right to dictate the manner' of the worker's performance." *Acosta v. Off Duty Police Servs.*, 915 F.3d 1050, 1060 (6th Cir. 2019) (citing *Donovan v. Brandel*, 736 F.2d 1114, 1119 (6th Cir. 1984)). "The absence of need to control should not be confused with the absence of the right to control, and the actual exercise of control requires only such supervision as the nature of the work requires." *Id.* at 1061 (cleaned up) (citing *Peno Trucking, Inc. v. Comm'r of Internal Revenue*, 296 F. App'x 449, 456 (6th Cir. 2008)). Control may be exhibited by an employer's control over scheduling, the workers' ability to take on other contracts, the employer's ability to discipline, and overall supervision of the worker's work product. *Scalia v. G.E.M. Interiors, Inc.*, No. 1:17-cv-203, 2021 U.S. Dist. LEXIS 185082, at *40 (S.D. Ohio Sep. 28, 2021) (Barrett, J.) (citations omitted).

Defendants reason that the aides control their own work schedule and work with the clients directly to determine when and how to provide services. (Defs.' Opp., PageID 48854.) DOL counters that the aides' work is pre-determined by company policy. (DOL Reply, PageID 48943.) While the Ohio Area Agency on Aging creates a client's care plan, Americare ensures the aides execute each client's care plan. (Americare Dep., 139:23–25.) To ensure the aides provide the services required by the client's care plan, Defendants utilize an Electronic Visit Verification platform to track the aides using both client verification and location data. (Bharati Dep., 36:05–21; 38:12–20.) The platform requires the aide to sign in and out when they perform services for a particular client to document the number of hours and the services or tasks performed for each client. (*Id.* 37:01–16.) The visit verification data is monitored daily to ensure all clients received their required services. (*Id.* 38:02–14.)

The aides' conduct is further controlled by Americare's Employee Handbook which outlines attendance, confidentiality, and non-solicitation policies, as well as rules governing how

11

aides must conduct themselves in the client's home and when they may utilize their personal cell phone. (*See* Employee Handbook, ECF No. 64-2, PageID 701–82.) When aides violate the policies in the Employee Handbook, or Americare receives client complaints, Americare "educates" and disciplines the aides. (Archarya Dep.[6], ECF No. 67-1, 25:24–26:11; 27:08–15.)

Thus, while the aides had some control over their schedule, Defendants exercised control over their work. The aides' ability to set their own hours "is not sufficient to negate control." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992). This is especially so when Defendants track the aides' hours and whereabouts through a GPS-enabled electronic verification platform. *HALO Homecare*, 2023 U.S. Dist. LEXIS 114605, at *18 (concluding that the third-party home care agency exercised control over its employees by tracking their hours through a GPS-enabled smartphone application). The exclusive relationship between Americare and the aides, Defendants' close supervision via the Electronic Visit Verification platform, and Defendants' power to discipline the aides, collectively support finding that an employment relationship exists.

Defendants concede that Mr. Adhikari may be held individually liable under the FLSA. (ECF No. 86, PageID 2634 (explaining that he is the "sole beneficial owner of Americare and is actively involved in both overall policymaking and day-to-day operations"); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991 (finding that the "top man" at a corporation that functions for his profit is enough to impose FLSA liability). Thus, the Court finds that Americare and Mr. Adhikari are employers and that Mr. Adhikari may be held individually liable.

After balancing the six factors of the economic reality test, including the undisputed factors, the Court finds that the aides are employees and Americare and Mr. Adhikari are employers under the FLSA. Defendants failed to raise a genuine dispute of material fact about

---

[6] Keshab Archarya is Americare's Human Resource Director. (Archarya Dep., 8:08–22.)

whether an employment relationship existed. DOL's Motion for Summary Judgment on this question is **GRANTED**.

### B.  Defendants are Employers Covered by the FLSA

Not all employees are protected by the FLSA's overtime provisions—only those who are engaged in interstate commerce as defined by 29 U.S.C. §§ 206(a) and 207(a) are covered. *Bey*, 2018 U.S. Dist. LEXIS 72819, at *10. An employee can be covered in two ways: enterprise coverage or individual coverage. *Id.* (citing 29 U.S.C. §§ 203(r) and (s)(1)). A plaintiff need establish only one or the other. Defendants do not dispute that Americare is a covered enterprise under the FLSA. (ECF No. 86, PageID 26341 ("Defendants have stipulated that they are subject to 'enterprise' coverage under 29 U.S.C. § 203(s)(1)(A)."); ECF No. 64-2, PageID 694, ¶ 3.) Americare is therefore a covered enterprise.

### C.  Defendants Cannot Claim an Exemption to the FLSA's Overtime Requirements

Once a plaintiff has established the elements of an unpaid overtime claim, an employer may show by a preponderance of the evidence that one of the exemptions afforded by § 213 of the FLSA applies to this employment. *See Kowalski*, 920 F. Supp. at 806; 29 U.S.C. § 213(a)(1)–(19). In other words, if an employer proves it is entitled to an exemption, the employer need not pay its employees overtime compensation.

Two such exemptions are at issue. First, the "live-in exemption" provides that domestic service workers who reside in their employer's home are exempt from the overtime requirements of the FLSA. 29 U.S.C. § 213(b)(21). Second, the "companionship exemption" exempts "any employee in domestic service employment [who] provide[s] companionship services for individuals who (because of age or infirmity) are unable to care for themselves." *Id.* § 213(a)(15).

The regulations accompanying the FLSA promulgated by DOL preclude third-party employers like Defendants from claiming the companionship or live-in exemptions. *See* 29 C.F.R. § 552.109(a) and (c). DOL promulgated this rule in 2013 and it became effective in 2015. *See* Application of the Fair Labor Standard Act to Domestic Service; Final Rule, 78 Fed. Reg. 60454, 60557 (Oct. 1, 2013) (codified at 29 C.F.R. § 552.109(a), (c)) ("2013 Rule"). The 2013 Rule also amended and narrowed the definition of what services are considered "companionship services" under 29 U.S.C. § 213(a)(15). *Id.* (codified at 29 C.F.R. § 552.6(b)).

Defendants' Partial Motion for Summary Judgment challenges the 2013 Rule and its subsequent codified regulations (29 C.F.R. §§ 552.109, 552.6), as arbitrary and capricious, unreasonable, and in violation of the text of the FLSA, the APA, and the major questions doctrine. (Defs.' Mot., PageID 48566.) Defendants ask the Court to vacate and set aside the 2013 Rule and find that Defendants may claim the live-in and companionship exemption. (*Id.*) Because the Court finds that the 2013 Rule was a valid exercise of regulatory authority, the Court **DENIES** Defendants' Partial Motion for Summary Judgment and finds as a matter of law that Defendants are not entitled to claim either exemption to the FLSA's overtime requirements.

i.    *Loper Bright* **Does Not Impact the Validity of the 2013 Rule.**

In 1974, Congress amended the FLSA to extend its protections to domestic service employees. *See* Fair Labor Standards Act Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 ("1974 Amendments"); 29 U.S.C. §§ 206(a), 207(l). That same amendment also created the companionship and live-in exemptions. *Id.*

But in amending the FLSA, Congress did not define several terms like "companionship services," or "domestic service employment" and instead empowered DOL to do so. 1974 Amendments, § 29(b), 88 Stat. 76 (authorizing DOL to "prescribe necessary rules, regulations,

and orders with regard to the amendments made by this Act."). Congress also authorized DOL to "define[] and delimit[] by regulation[]" the scope of the workers exempted under the companionship exemption. 29 U.S.C. § 213(a)(15).

DOL did so by issuing implementing regulations. At first, these regulations allowed third-party agencies to claim the live-in and companionship exemptions to the FLSA's requirements. 29 C.F.R. § 552.109(a), (c) (before Jan. 1, 2015). Consequently, until 2015, third-party agencies did not have to pay their home care workers overtime compensation. The regulation promulgated in 1975, defined "companionship services" as "those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs." 29 C.F.R. § 552.6 (before Jan. 1, 2015). It included household work such as "meal preparation, bed making, washing of clothes, and other similar services." *Id.*

In 2007, the Supreme Court heard a challenge to the regulation allowing third-party agencies to avoid the overtime requirements of the FLSA. *See Long Island Home Care at Home, Ltd. v. Coke*, 551 U.S. 158, 164 (2007). An employee of a home care agency argued that she should be entitled to the protections of the FLSA. *Id.* The Supreme Court disagreed and explained that Congress did not expressly answer the third-party employment question in the text of FLSA. *Id.* at 168, 171. Instead, Congress granted the authority to DOL to resolve the issue and DOL's answer at that time was to allow third-party agencies to claim an exemption. *Id.*

But DOL changed course in 2013. Under a new regulation, third-party employers of companionship and live-in workers could no longer "avail themselves" of the statutory exemptions. 2013 Rule, 78 Fed. Reg. 60454, at 60455. Third-party employers under the 2013 Rule were required to pay employees providing companionship services and live-in employees overtime compensation. 29 C.F.R. § 552.109(a), (c). The 2013 Rule also narrowed what services qualified

15

as "companionship services." *Id.* § 552.6(b). "[M]eal preparation, driving, light housework, managing finances, assistance with the physical taking of medication, and arranging medical care" qualified as companionship services—only if it did not exceed 20% of the total hours worked. *Id.*

Before the 2013 Rule went into effect in 2015, a group of trade associations representing third-party employers challenged the 2013 Rule under the APA. *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1089 (D.C. Cir. 2015), *cert. denied*, 597 U.S. 927 (2016). The district court declared the revised third-party regulation invalid under *Chevron* step one, but the D.C. Circuit by a unanimous panel reversed the district court's vacatur. *Id.* at 1090, 1097 (reversing *Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138, 139 (D.D.C. 2014)).

Applying the *Chevron* framework, the D.C. Circuit first decided that "Congress delegated the authority to [DOL] to determine whether employees of third-party agencies should fall within the scope of the companionship-services and live-in worker exemptions." *Id.* at 1093.[7] Congress amended the FLSA in 1974 to expand the FLSA's protections to more workers. *Id.* at 1093–94. Thus, DOL's narrow construction of the exemptions helped achieve congressional intent and was reasonable. *Id.* Because the court found the regulation was a reasonable exercise of rulemaking authority, and was neither arbitrary nor capricious, the court held that the regulation was valid and enforceable. *Id.* at 1094–95.

Recently, the Supreme Court overruled the *Chevron* deference framework relied upon by the D.C. Circuit in *Home Care*. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

---

[7] While *Coke* addressed a challenge only to the companionship exemption, *Home Care* determined that the *Coke* Court's holding applied equally to DOL's authority under the FLSA's live-in exemption. *Home Care*, 799 F.3d at 1091 (describing the parallel construction of § 213(a)(15) and § 213(b)(21)).

Defendants argue that after *Loper Bright*, the D.C. Circuit's decision no longer offers persuasive guidance. (Defs.' Mot., PageID 48590.)

The Court acknowledges that *Loper Bright* changes the framework for interpreting some agency regulations but finds that it has no such impact here. *Chevron* instructed courts to defer to "permissible agency interpretations of the statutes those agencies administer." *Loper Bright*, 144 S. Ct. at 2254 (discussing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). Now, under *Loper Bright*, courts "need not . . . and may not" defer to agency interpretations of *ambiguous* statutes. *Id.* at 2273 (emphasis added). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," but "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.*

In this case, both the 1974 Amendments and § 213(a)(15) of the FLSA unambiguously delegate authority to DOL to prescribe the rules and regulations to shape the parameters of the exemptions to the FLSA. *See* 1974 Amendments, § 29(b), 88 Stat. 76 and 29 U.S.C. § 213(a)(15). In fact, the Supreme Court in *Loper Bright* recognized § 213(a)(15) as an example of a statute that "expressly delegates to an agency the authority to give meaning to a particular statutory term." *Loper Bright*, 144 S. Ct. 2263 n.5 (cleaned up).

Since the delegation of statutory authority to DOL is clear and unambiguous, the *Loper Bright* decision does not impact the outcome here. *See Su v. WiCare Home Care Agency, LLC*, No. 1:22-cv-00224, 2024 U.S. Dist. LEXIS 135200, at *42 n.12 (M.D. Pa. July 31, 2024) (concluding on cross motions for summary judgment that *Loper Bright* did not impact the validity of the companionship exemption); *Barnes v. Res. for Hum. Dev., Inc.*, No. 24-757, 2024 U.S. Dist.

LEXIS 193273, at *5 (E.D. Pa. Oct. 24, 2024) (same).[8] DOL's authority to promulgate regulations was within the bounds of its statutory authority, as contemplated by Congress.

Further, the mere fact that the D.C. Circuit relied on *Chevron* does not cast doubt on that court's holding in *Home Care*. *See Loper Bright*, 144 S. Ct. 2272. The Supreme Court made clear that cases that relied on *Chevron* "are still subject to statutory stare decisis despite our change in interpretative methodology." *Id.* Thus, Defendants' argument that the 2013 Rule is invalid under *Loper Bright* is unpersuasive.

### ii.     The 2013 Rule Excluding Third Parties from the Live-In Exemption is Valid and Enforceable.

Defendants argue that the regulation preventing third-party agencies from claiming the live-in exemption is unlawful and should be set aside. (Defs.' Mot., PageID 48582, citing 2013 Rule, 78 Fed. Reg. 60454, codified at 29 C.F.R. § 552.109.) Because most aides are family members of Americare's clients, and live in the client's home, Defendants argue they have a right to claim this exemption. (*See* Americare Dep., 27:11–12.) First, Defendants reason that the live-in exemption is met if the employee resides where they work, no matter who their employer is. (*Id.* PageID 48582–87.) Second, Defendants maintain that the Supreme Court's holding in *Coke* does not apply to the live-in exemption. (*Id.* PageID 48587–90.)

As for Defendants' first argument, the live-in exemption states that the FLSA's overtime requirements "shall not apply" to "any employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21). Since the statute does not

---

[8] The unambiguous delegation of statutory authority here also distinguishes this case from the Sixth Circuit's recent decision in *FCC v. FCC (In re MCP)*, No. 24-7000, 2025 U.S. App. LEXIS 11, at *14 (6th Cir. Jan. 2, 2025). In that case, the court applied the *Loper Bright* framework and held that the Federal Communications Commission exceeded its implicit statutory authority by imposing net-neutrality policies under the "telecommunications service" provision of the Communications Act. *Id.*

mention the type of employer who may claim the exemption, Defendants argue that DOL did not have the authority to exclude certain employers. (Defs.' Mot., PageID 48583.) Limiting the employers that may claim the exemption is not the "best reading" of the statute and amounts to rewriting clear statutory terms. (*Id.* PageID 48584; citing *Loper Bright*, 144 S. Ct. at 2264.)

But the Supreme Court explained that the 1974 Amendments to the FLSA gave DOL the "power to fill [] gaps through rules and regulations," and "instruct[ed] [DOL] to work out the details of [its] broad definitions." *Coke*, 551 U.S. at 168. "[W]hether to include workers paid by third parties within the scope of the definitions is one of those details." *Id.* DOL's authority to define which employers may claim the exemption was conclusively resolved by the Supreme Court in *Coke*, and *Loper Bright* has not changed that. *See Loper Bright*, 144 S. Ct. at 2272 (protecting statutes that "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme" or "expressly delegate[]" to an agency). DOL's decision to exclude third-party employers from the employers who could claim this exemption was within its statutory authority under the 1974 Amendments and amounts to "fair reading" of the exemption. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018) (holding that exemptions must be given a fair reading).

Defendants counter that the Supreme Court's holding in *Coke* is limited to the companionship exemption. (Defs.' Mot., PageID 48587.) Defendants reason that *Coke* should not apply to the live-in exemption because the companionship exemption at issue in *Coke* provides a unique statutory authorization to "define[] and delimit[]" its terms, but the live-in exemption contains no such parallel authorization. (*Id.* PageID 48589–90.)

While Defendants are correct that the plaintiff in *Coke* challenged only the companionship exemption, as the D.C. Circuit in *Home Care* explained, the exemptions were phrased similarly and the court found no reason to treat the exemptions differently. 799 F.3d at 1091 (citing *Coke*,

19

551 U.S. at 167–68 and the 1974 Amendments.) The companionship exemption excludes from the FLSA's requirements "*any employee employed in domestic service employment* to provide companionship services for individuals who . . . are unable to care for themselves." 29 U.S.C. § 213(a)(15) (emphasis added). Similarly, the live-in exemption applies to "*any employee who is employed in domestic service* in a household and who resides in such household." 29 U.S.C. § 213(b)(21) (emphasis added). Both left details or gaps to be filled in, and the D.C. Circuit determined that Congress authorized DOL to fill in those details. *Home Care,* 799 F.3d at 1091.

Further, the Supreme Court's holding *Coke* was based on Congress's broad grant of authority "to prescribe necessary rules, regulations, and orders with regard to the" exemptions created therein. *See* 1974 Amendments, Pub. L. No. 93-259, § 29(b), 88 Stat. at 76. DOL's power to fill in the details of both exemptions, in other words, did not come from the unique "define[] and delimit[]" language in § 213(a)(15), but from Congress's general grant of authority in 1974 Amendments. Because Congress gave DOL broad authority to enforce all provisions of the 1974 Amendments, the *Coke* Court's holding applies equally to DOL's authority under the FLSA's live-in exemption. Defendants' arguments to the contrary are unpersuasive. Thus, the 2013 Rule excluding third-party employers from claiming the live-in exemption is valid.

### iii. The 2013 Rule Excluding Third Parties from the Companionship Exemption is Valid and Enforceable.

Defendants raise different challenges to the application of the third-party rule to the companionship exemption. Defendants argue that precluding third-party employers from claiming the companionship exemption conflicts with the major questions doctrine. (Defs.' Mot., PageID 48591–92.) Next, Defendants argue that DOL failed to identify ambiguity in the companionship exemption to warrant deference to DOL's regulation before or after *Loper Bright*. (*Id.* PageID 48592–95.) Defendants also reason that the 2013 Rule creates an unfair paradox because an

20

individual or family member who jointly employs a home care worker with a third-party agency may claim the exemption, but the third-party agency cannot. (*Id.* PageID 48595–96.)

The major questions doctrine requires agencies to have "clear congressional authorization" before making major policy decisions. *West Virginia v. EPA,* 597 U.S. 697, 724 (2022). Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (quotations omitted). This doctrine applies only "in extraordinary cases in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 767, n. 3 (6th Cir. 2023) (cleaned up). Thus, the question is whether DOL's 2013 Rule implicates the major questions doctrine by exercising powers of vast economic and political significance, and if so, whether DOL had clear congressional authorization to do so.

Courts generally consider an agency action to be of vast economic significance if it requires "billions of dollars in spending." *King v. Burwell*, 576 U.S. 473, 485 (2015); *see also West Virginia*, 597 U.S. at 715 (projecting that the Clean Power Plan would have a trillion-dollar impact); *Ala. Ass'n of Realtors*, 594 U.S. at 764 (concluding that an economic impact of $50 billion was of vast economic significance); *Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023) (finding that the student loan program would impact 43 million Americans and $430 billion in federal debt so the program implicated the major questions doctrine).

Defendants contend that the 2013 Rule was an exercise of economic significance because it impacted a $66 billion-dollar industry. (*Defs.' Mot., PageID 48591, citing 2013 Rule, 78 Fed. Reg. at 60554, n.225.) But as DOL points out, that figure represents the total expenditures for the

21

entire industry, not the economic impact of the 2013 Rule. 2013 Rule, 78 Fed. Reg. at 60554, n.225. DOL counters that the 2013 Rule was projected to increase state Medicaid budgets by 0.03% per year and have a $20.7 million effect on employers in the first year, with additional transfers of up to $210.2 million depending on how employers managed overtime hours. *Id.* at 60555, n.229. But while the numbers are large, the economic impact of the 2013 Rule is distinguishable from the cases implicating the major questions doctrine. *See e.g.*, *Mayfield v. United States DOL*, 117 F.4th 611, 616 (5th Cir. 2024) (concluding that because the economic impact of an FLSA exemption was in the hundreds of millions, rather than billions, the major questions doctrine did not apply).

Turning to the political significance of the 2013 Rule. Defendants argue that whether third-party employers can claim the companionship exemption is a matter of political significance. (Defs.' Mot., PageID 48591.) To demonstrate political significance, Defendants point out that Congress repeatedly rejected efforts to amend the companionship exemption before DOL promulgated the 2013 Rule. (*Id.*) But Congress (and the President through the Secretary of Labor) has left the 2013 Rule in place for over ten years. (DOL's Opp., PageID 48800.) Though important to the domestic service employees, the issue of which employees are exempt from the FLSA is not analogous to the types of issues considered politically significant enough to trigger the application of the major questions doctrine. *See Mayfield*, 117 F.4th at 617 (concluding FLSA exemptions are not "politically contentious" enough to trigger the doctrine).

Nor is this an instance in which DOL "discover[ed] in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Mayfield*, 117 F.4th at 617 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). DOL has promulgated regulations regarding third-party employers since 1975 based on the statutory authority provided by the 1974 Amendments. *See* 29 C.F.R. § 552.109(a), (c) (before Jan. 1, 2015). So, the 2013 Rule

is not the sort of "extraordinary case" to which the major questions doctrine applies. Therefore, Defendants' major questions doctrine argument fails as a matter of law.

Next, Defendants argue again that *Coke* cannot survive *Loper Bright* and continue to protect the companionship exemption. (Defs. Mot., PageID 48592–48595.) After *Loper Bright*, Defendants posit that there are only two ways to read the Supreme Court's decision in *Coke*. (*Id.*) Either the Supreme Court inferred a "gap" in the term domestic service employment—a term only found in the companionship exemption, not in the live-in exemption. (*Id.* PageID 48592–93.) Or it relied on an implied delegation from statutory "silence" which now defies *Loper Bright*. (*Id.*)

Not so. As the Court discussed *supra*, Congress broadly delegated authority to DOL to "prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act." 1974 Amendments, § 29(b), 88 Stat. 76. That authority was not limited to defining domestic service employment and thus applied broadly to the companionship and live-in exemptions. This Court refuses to read *Coke* so narrowly. The second interpretation is also incorrect because DOL's rulemaking authority is not grounded in statutory silence, but an express delegation under the 1974 Amendments. *Id.* The 2013 Rule is within the outer bounds of that delegation. *Id.*

Finally, Defendants take issue with the fact that an individual or family member who jointly employees a home care worker with a third-party agency may still assert the companionship exemption, but the third-party agency may not. *See* 29 C.F.R. 552.109(a). Defendants contend that the regulation creates an unreasonable paradox because an employee could be both exempt and not exempt at the same time. (Defs.' Mot., PageID 48595–96.) But there is nothing in the text of § 213(a)(15) that precludes this result. As DOL explains, Congress created other circumstances where joint employers of the same employee have different obligations under the FLSA depending on the nature of the employer. (DOL's Opp., PageID 48795.)

23

Congress intended for DOL to resolve complex questions of whether or how to include workers paid by third parties within the scope of the exemptions under the 1974 Amendments. *Coke*, 551 U.S. at 167–68. This Court sees no reason to break with the Supreme Court's precedent in *Coke* and finds as a matter of law that excluding third-party employers from claiming the companionship exemption is a valid exercise of DOL's rulemaking authority.

### iv.     The Third-Party Rule is Neither Arbitrary Nor Capricious.

Finally, Defendants challenge the third-party rule as arbitrary and capricious in violation of the APA. (Defs.' Mot., PageID 48598–600.) The APA requires that courts "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). But courts do not vacate a rule for being arbitrary and capricious unless the agency "entirely failed to consider an important aspect of a problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted). The regulatory decision need not be "the best one possible or even . . . better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Courts should uphold an agency regulation "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action." *Id.* (cleaned up). No greater scrutiny is applied to agency actions that change or reverse a prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

DOL's explanation for its 2013 Rule meets those standards. When reversing its policy, DOL explained that the home care industry transformed since 1975. 2013 Rule, 78 Fed. Reg. at 60481. Originally, most people received care in an institutional setting, rather than in their homes, and home care workers were employed directly by a member of the household. *Id.* at 60455; *see*

24

*also Home Care*, 799 F.3d at 1095 (citations omitted). But over time, people preferred to receive

care in their homes. *Id.* Third party agencies grew to meet the increased demand and by the time

the Supreme Court decided *Coke*, most home care workers were employed by third-party agencies.

*Id.* Thus, most of the workers in this growing industry were not protected by the FLSA.

Defendants assert that DOL ignored the fact that the regulation would increase the cost of

home care and exceed the Medicaid reimbursement rate, making home care less accessible. (Defs.'

Mot., PageID 48599.) Forcing third-party employers to pay their home care employees overtime

compensation would raise costs and compel employers to cut employees' hours to reduce overtime

costs. (*Id.*) Cutting employees hours would not achieve DOL's desired outcome of increasing

earnings for home care workers. (*Id.* PageID 48600.) Defendants spill much ink over a 2020

Government Accountability Office report to show that employers reduced home care workers'

hours in response to the 2013 Rule, and the Rule did not improve earnings. (Defs.' Mot., PageID

48599; citing GAO-21-72, https://www.gao.gov/products/gao-21-72.)

DOL considered the potential costs increases when promulgating the final rule. The agency

acknowledged that direct care workers may receive fewer hours but balanced that against the

potential to improve the quality of home care services. 2013 Rule, 78 Fed. Reg. at 60483.

Increasing the protections for home care workers would attract and retain better qualified workers,

reduce turnover, and result in a higher quality of care. *Id.* at 60548, 60459–60; *see also Home

Care*, 799 F.3d at 1096 (deciding that DOL's conclusions were reasonable).

Further, as DOL points out, judicial review under the APA is limited to the administrative

record before the agency at the time the agency's decision was made. *See Citizens to Pres. Overton

Park, Inc. v. Volpe*, 401 U.S. 402, 404, 420 (1971); *Dep't of Homeland Sec. v. Regents of the Univ.

of Cal.*, 591 U.S. 1, 21 (2020) (refusing to rescind agency regulations based on impermissible "post

hoc rationalization"). The Government Accountability Office report, issued in 2020, was not in the administrative record at the time DOL promulgated the 2013 Rule.

DOL did not "entirely fail[] to consider an important aspect of a problem," *Defs. of Wildlife*, 551 U.S. at 658, and instead "examined the relevant considerations and articulated a satisfactory explanation for its action." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292. DOL's regulatory decision need not be "the best one possible or even . . . better than the alternatives," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292, but it is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. of Wildlife*, 551 U.S. at 658. Accordingly, the third-party employer regulation was neither arbitrary nor capricious and Defendants are not entitled to summary judgment on this issue.

### v.      Defendants Lack Standing to Challenge 29 C.F.R. § 552.6(b).

Apart from challenging the third-party regulation under 29 C.F.R. § 552.109, Defendants also challenge 29 C.F.R. § 552.6(b), as amended by the 2013 Rule. (Defs.' Mot., PageID 48596–98.) That regulation defines the services included in "companionship services." 29 C.F.R. § 552.6 (2014). The 2013 Rule amended that definition to expand the type of tasks that fell outside the companionship exemption if performed more than 20% of the time. 29 C.F.R. § 552.6(b) (2015). If more than 20% of an employee's time is spent providing care related to "daily living" tasks like feeding, dressing, meal preparation, or assistance with medication, then the companionship exemption does not apply. *WiCare*, 2024 U.S. Dist. LEXIS 135200, at *41 (describing this test as the "duties test"). Effectively, the narrowed definition operates as an exception to the companionship exemption. *Faulkner*, 443 F. Supp. 3d at 929 (citations omitted).

Under this framework, an employer bears the initial burden of proving that it is entitled to the companionship exemption under 29 U.S.C. § 213(a)(15). *Id.* "If satisfied, the burden shifts to

the employee to prove that [they are] entitled to the care exception (i.e., submit proof that [they] performed care-related work more than 20% of the time)." *Id.*

Defendants cannot meet their initial burden to claim the companionship exemption because they are a third-party employer. The Court concluded *supra* that the rule prohibiting third-party employers from claiming exemptions was valid and enforceable. Since the 2013 Rule is valid, and Defendants are third-party employers, no genuine dispute of material fact exists as to whether Defendants can claim the companionship exemption—they cannot.

Facing a similar situation in *Home Care*, the D.C. Circuit held that "because third-party employers were not allowed to avail themselves of the exemption under any definition of companionship services," the third-party employers did not suffer an injury in fact for standing from the narrowed definition. *Home Care*, 799 F.3d at 1097. Without a direct injury from the 2013 Rule, the D.C. Circuit concluded that it lacked jurisdiction to consider the merits of the challenge to 29 C.F.R. § 552.6(b) under the APA. *Id.*

The Court agrees with the D.C. Circuit's reasoning. Defendants cannot avail themselves of the FLSA's companionship exemption as a third-party employer, and thus cannot show that the revised definition of companionship services caused them an injury in fact. Accordingly, the Court lacks jurisdiction to consider the merits of Defendants' challenge.

The Court has dispensed of all arguments raised by Defendants in their Partial Motion for Summary Judgment. The Court concludes that the 2013 Rule, and its accompanying codified regulation (29 C.F.R. § 552.109) was a valid exercise of DOL's rulemaking authority under the text of the FLSA and did not violate either the major questions doctrine or the APA. Having found that the Rule prohibiting third-party employers from claiming exemptions to the FLSA was valid, no genuine issue of material fact exists as to whether Defendants may claim either the

companionship or live-in exemption. Thus, Defendants' Motion for Partial Summary Judgment (ECF No. 113) is **DENIED**. DOL is entitled to judgment as a matter of law on this question. The Court now addresses the specific overtime violations alleged by DOL.

### D. Defendants Failed to Pay the Aides Overtime Compensation

DOL alleges that Defendants violated the overtime requirements of the FLSA in three ways. First, DOL argues that Defendants did not pay overtime to the Americare aides when they worked over 40 hours in a week from October 2018 to September 2019. (DOL's Mot., PageID 48550–51.) DOL contends that Defendants changed their pay structure in September 2019 to lower the regular hourly rate when the aides worked overtime, and then paid them one and one-half times the lowered regular rate. (*Id.* PageID 48551–54.) Finally, DOL argues that Defendants offer no evidence of compliance with the FLSA to date and have likely not paid overtime since April 2024. (*Id.* PageID 48554.)

### i. Defendants willfully violated the FLSA from October 2018 to September 2019.

DOL moves for summary judgment on its claims that Defendants paid the Americare aides straight time for all hours worked from October 2018 to September 2019. (DOL's Mot., PageID 48550.) Defendants do not dispute that they paid the aides straight time for all hours worked, including for overtime hours during this period. (Defs.' Opp., PageID 48856; *see also* Defs.' Resp. to Pls.' Req. for Admis., ECF No. 64-3, PageID 917–18; Adhikari Dep., ECF No. 69-1, 38:06–10.) But Defendants argue that they may only be held liable if the Court finds that the violations were willful. (Defs.' Opp., PageID 48856.)

The FLSA has a two-year statute of limitations for actions to recover unpaid overtime, but it extends the limitations to three years if the violations are willful. 29 U.S.C. § 255(a). Since DOL

filed its Complaint on October 19, 2021, unless the three-year limitations period applies, DOL's claims for violations from October 2018 to September 2019 would be time barred.

An FLSA violation is willful if the defendant "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988). But an employer who merely acts negligently could not have acted willfully. *Elwell v. Univ. Hospitals Home Care Services*, 276 F.3d 832, 841 n.5 (6th Cir. 2002). When the evidence shows that the employer knew that its conduct violated the FLSA, either because of a prior DOL investigation, a complaint from an employee, or similar lawsuit, courts within this Circuit have found that an employer acted willfully. *See, e.g.*, *Crowell v. M St. Ent., LLC*, 670 F. Supp. 3d 563, 600 (M.D. Tenn. 2023) ("[T]he Sixth Circuit has found an employer to have acted knowingly or recklessly when it had 'actual notice of the requirements of the FLSA by virtue of earlier violations, [an] agreement to pay overtime wages, and [its] assurance of future compliance.'") (quoting *Walsh v. KDE Equine, LLC*, 56 F. 4th 409, 414–15 (6th Cir. 2022)).

Mr. Adhikari's testimony about whether he knew that Americare was required to compensate the aides at a premium rate for overtime worked is contradictory. When he started Intra-National and took over Americare, he testified that he thought that aides were exempt from overtime requirements because no other agency paid overtime. (Americare Dep., ECF No. 64-1, 48:08–21.) But he also testified that he knew that DOL amended the rules in 2013 to exclude home care agencies from the overtime exemptions. (*Id.* 51:12–18.)

Mr. Adhikari attributes this contradiction to allegedly conflicting advice he received from attorneys. An attorney allegedly told him in 2016 that personal care services were exempt from the overtime requirements. (*Id.* 51:19–22.) But Mr. Adhikari could not remember the name of this attorney. (*Id.*) Mr. Adhikari testified that he also consulted another attorney from Pittsburg. (*Id.*

55:05–16; 62:3–9.) Mr. Adhikari alleges that this attorney told him that home care workers were not owed overtime, but offers not documentation to support his allegations. (*Id.* 55:24–56:22.) Mr. Adhikari consulted a third attorney named John Linkosky. (Americare Dep., 62:19–63:14; 64:20–65:6.) Defendants concede that Mr. Linkosky advised Mr. Adhikari to pay home care aides overtime compensation. (Defs.' Opp., PageID 48857.) But Mr. Adhikari also testifies that Mr. Linkosky told him that homecare agencies may lack sufficient control over the aides to be considered employers and covered by the FLSA.[9] (Americare Dep., 65:10–66:23.)

Mr. Adhikari may have received confusing or contradictory advice from various attorneys. But even viewing the facts in the light most favorable to Defendants, the Court can conclude that Defendants knew or should have known that they were violating the FLSA by 2018. Defendants concede that in "early 2018," Mr. Linkosky advised Mr. Adhikari to pay the aides overtime compensation. (*See* Adhikari Dep. 2022, ECF No. 69-2, 123:10–24.) In July 2018, Mr. Adhikari began paying home care aides employed by Intra-National overtime compensation but did not pay Americare aides overtime until September 2019. (Adhikari Dep., ECF No. 69-1, 38:06–18.) Even before that, Mr. Adhikari acknowledged that DOL had changed the regulations such that home care agencies as third-party employers were no longer exempt from overtime requirements. (Americare Dep., 51:12–18.)

The investigation by the Pennsylvania Department of Labor and the class action lawsuit for unpaid overtime also put Defendants on notice of their obligations under the FLSA.

---

[9] Mr. Linkosky disputes Mr. Adhikari's characterization of his advice. He says he "never advised [Mr.] Adhikari, [or] Americare, . . . that Americare's direct care workers were exempt from the minimum wage or overtime provisions of the FLSA due to the companionship services, live-in caregiver, or domestic service exemption. Likewise, I did not advise [them], that Americare's direct care workers were exempt from the minimum wage or overtime provisions of the FLSA due to any other exemption." (Linkosky Decl., ECF No. 72-1, ¶¶ 8, 10.)

Additionally, "[s]everal courts have held that allegations of recordkeeping violations may bolster a plaintiff's allegation of willfulness." *Bey*, 2018 U.S. Dist. LEXIS 72819, at *15 (collecting cases within the Sixth Circuit). As discussed below, the Court finds that Defendants also failed to maintain accurate records and violated § 211(c) of the FLSA. (*See infra*, Section II; *see also* Defs.' Opp., PageID 48861 (conceding some recordkeeping violations, but contesting others).)

Accordingly, a reasonable jury could conclude that Defendants acted willfully in failing to pay Americare aides overtime compensation from October 2018 to September 2019 such that the three-year statute of limitations under 29 U.S.C. § 255(a) applies. Because Defendants do not dispute that they paid straight time for all overtime hours worked, the Court finds that no genuine issue of material fact exists and DOL is entitled to summary judgment for these FLSA violations.

### ii. Defendants failed to properly compensate the aides for overtime hours worked from 2019 to 2024.

DOL next contends that it is entitled to an award of summary judgment for Defendants' violations of the overtime provisions of the FLSA from September 2019 to April 2024. (DOL's Mot., PageID 48551–54.) When Defendants started paying the aides overtime in September 2019, Defendants lowered the aides' regular rate of pay when they worked overtime hours (more than 80 hours in a two-week period), so that the aides were paid one and one-half times the lowered rate for overtime hours worked. (*Id.*; *see also* Alloway Decl., ECF No. 111-1, ¶¶ 22–27.)

Defendants do not contest that they reduced the aides' hourly rates and then paid time and one-half for overtime hours worked. (Defs.' Resp. to Pls.' Interrog., ECF No. 64-3, PageID 898.) Mr. Adhikari candidly explained that Americare could not afford to pay overtime compensation without a rate adjustment. (Americare Dep., ECF No. 64-1, 232:11–13 ("we don't have enough money to pay [the aides]."); *see also* Americare and Adhikari Cont. Dep., ECF No. 65-1, 68:06–12.) Since "the employer and employee are free to establish [the] regular rate at any point and in

31

any manner they see fit," Defendants contend that their pay practice did not violate the FLSA. *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945).

But the freedom to contract and set the regular rate of pay "does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes." *Walling v. Helmerich & Payne*, 323 U.S. 37, 42 (1944). The FLSA was not intended to reduce employees' regular rate of pay, but "to compensate employees for the burden of overtime workweeks." *Brennan v. Elmer's Disposal Serv., Inc.*, 510 F.2d 84, 87 (9th Cir. 1975) (citing *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948)). An employer cannot implement a compensation system designed to avoid paying the minimum wage and overtime requirements. *Youngerman-Reynolds Hardwood Co.*, 325 U.S. at 424.

29 C.F.R. § 778.316 describes practices at odds with the FLSA and states that "the parties cannot lawfully agree that the rate for that work shall be lower merely because the work is performed during the statutory overtime hours, or during a week in which statutory overtime is worked." The hourly rate cannot "vary from week to week inversely with the length of the workweek." 29 C.F.R. § 778.500(b). The regulations also illustrate an example of an unlawful pay practice that is analogous to the pay practice utilized by Defendants:

> It is obvious that as a matter of simple arithmetic an employer might adopt a series of different rates for the same work, varying inversely with the number of overtime hours worked in such a way that the employee would earn no more than his straight time rate no matter how many hours he worked. If [the employer] set the rate at $ 6 per hour for all workweeks in which the employee worked 40 hours or less, approximately $ 5.93 per hour for workweeks of 41 hours, approximately $ 5.86 for workweeks of 42 hours, approximately $ 5.45 for workweeks of 50 hours, and so on, the employee would always receive (for straight time and overtime at these "rates") $ 6 an hour regardless of the number of overtime hours worked. This is an obvious bookkeeping device designed to avoid the payment of overtime compensation and is not in accord with the law. *See Walling v. Green Head Bit & Supply Co.*, 138 F. 2d 453 [(10th Cir. 1943)]. The regular rate of pay of this employee for overtime purposes is, obviously, the rate he earns in the normal nonovertime week — in this case, $ 6 per hour.

29 C.F.R. § 778.327(a).

The difference between a permissible reduction to an employee's regular rate of pay, and an impermissible one, hinges on "whether the rate change is 'justified by no factor other than the number of hours' an employee worked." *Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1310 (11th Cir. 2023) (quoting 29 C.F.R. § 778.327); *see also Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 797 (9th Cir. 2010) (explaining that an employee's average rate can be reduced "so long as the rate reduction was not designed to circumvent" the FLSA). When the regular rate reduction is "justified by the length of the workweek, 'the device is evasive and the rate actually paid in the shorter or non[-]overtime week is [the employee's] regular rate for overtime purposes in all weeks." *Thompson*, 67 F.4th at 1310; *see also Walsh v. Kynd Hearts Home Healthcare, LLC*, Civil Action No. 2:20CV630 (RCY), 2022 U.S. Dist. LEXIS 63694, at *9 (E.D. Va. Apr. 5, 2022) (holding that the plaintiff adequately stated a claim for an FLSA violation where the employer paid employees one rate of pay during normal, non-overtime weeks, and a different lower rate of pay during the weeks where the employees worked overtime); *Marshall v. Murray*, No. 76-167, 1979 U.S. Dist. LEXIS 9811, at *15 (M.D. Pa. Sep. 14, 1979) (finding that the employer's system was in fact the type of system designed to avoid the overtime requirements).

Intent, rather than "the mere fact of a reduction in the regular rate is the true indicator of whether a rate reduction is permissible under the FLSA." *Wofford v. Seba Abode, Inc.*, No. 2:20-cv-00084-RJC, 2024 U.S. Dist. LEXIS 170753, at *52 (W.D. Pa. Sep. 23, 2024). Defendants' intent is clear from the testimony of Mr. Adhikari and Americare's payroll coordinator, Deepesh Pradhan. (Americare and Adhikari Cont. Dep., ECF No. 65-1, 68:16–25 (explaining that the regular rate depended on the number of hours worked); Pradhan Dep., ECF No. 70-1, 23:03–26:25

(same).) The purpose of the variable rate policy was to save money by reducing the regular rate when an employee worked overtime. (Americare Dep., 232:11–13.)

The reduction to the aides' regular rate depended on the number of hours an employee worked. For example, Sujata Dahal worked 77 hours in a two-week pay period at a rate of $12.50 per hour. (ECF No. 64-1, 209:01–210:03.) But when Mr. Dahal worked 96 hours (16 overtime hours), his hourly rate was reduced to $11.45 per hour, and then to $10.75 per hour when he worked 119 hours in a pay period. (*Id.*) Similarly Durga Chhetri was paid $12.70 per hour when she worked 84 hours, but $11.44 when she worked 110 hours. (Chhetri Records, ECF No. 111-18.)

This method was designed to ensure that the aides would effectively earn their original regular rate for all hours worked, including overtime. Defendants make no effort to conceal the fact that they enacted a scheme nearly identical to the plan described in 29 C.F.R. § 778.327. Defendants' pay practice offends the core policy goals of the FLSA. *See Thompson*, 67 F.4th at 1309–10 ("Without that prohibition, the FLSA would neither (1) place financial pressure on employers to hire additional workers instead of scheduling their existing employees to work overtime, nor (2) ensure that employees receive additional compensation for the burden of a workweek in excess of the hours."). Defendants were not without other options to avoid paying overtime rates. They could have hired more aides, or not offered the opportunity to work overtime, or even simply justified a company-wide rate reduction for reasons other than the number of hours the employees worked. *Wofford*, 2024 U.S. Dist. LEXIS 170753, at *59. But Defendants instead utilized a rate reduction practice to avoid paying the proper premium overtime rate. Defendants cite no cases that support their pay practice and thus fail to raise a genuine issue of material fact to avoid summary judgment. The Court enters summary judgment for DOL on this issue.

### iii. Defendants have not shown compliance with the FLSA to date.

DOL also argues that Defendants have made no representation that they have come into compliance with the FLSA since April 14, 2024. (DOL's Mot., PageID 48554.) Since DOL's Complaint (Am. Compl., ECF No. 8) requests liquidated damages for violations continuing through the present, DOL urges the Court to award more back wages and liquidated damages because of Defendants continued violations. (DOL's Mot., PageID 48554.) Defendants do not address DOL's arguments nor do they respond with evidence of compliance. (*See* Defs.' Opp.) Accordingly, Defendants fail to raise a genuine issue of material fact that they complied with the FLSA's overtime requirements from April 2024 to the date of this Order.

The Court awards DOL summary judgment as to liability on this issue. To determine the appropriate amount of damages, the Court also **ORDERS** Defendants to produce payroll and time records for April 15, 2024 to the date of this Court's order within **14 DAYS**. If the records confirm continuing violations, DOL is **ORDERED** to file Notice and a Proposed Order detailing the amount of damages within **21 DAYS** of receiving the records.

## II.    Defendants are Liable for Record Keeping Violations

Section 11(c) of the FLSA requires an employer to "make, keep, and preserve" records of the persons they employ, as well as "the wages, hours, and other conditions and practices of employment" for a period set forth in the regulations. 29 U.S.C. § 211(c). These records must be accurate and include (1) the employee's regular hourly rate of pay per week under 29 C.F.R. § 516.2(a)(6); and (2) an employee's total weekly hours of work under 29 C.F.R. § 516.2(a)(7). *See, e.g.*, *Acosta v. Min & Kim, Inc.*, 919 F.3d 361, 365 (6th Cir. 2019).

Defendants concede that they maintained only bi-weekly payroll records and thus failed to compute overtime on a workweek basis as required by 29 C.F.R. § 516.2(a)(7). (Defs.' Opp.,

PageID 48861.) But Defendants argue that they did not fail to maintain records of the aides' regular hourly rate worked because that "assumes DOL established the alleged overtime violations." (*Id.*)

As discussed above, Defendants varied the aides' regular rate based on the number of hours the aides worked each bi-weekly pay period. (*See supra*, Section I(D)(ii).) The Court concluded that the regular rate changed based on the number of overtime hours worked. (*Id.*) Thus, the regular rate listed in Defendants' payroll records was incorrect, and so Defendants failed to maintain accurate records. As a result, DOL is entitled to summary judgment for Defendants' violations of the FLSA's recordkeeping requirements. DOL's Motion is **GRANTED** on this issue.

### III. Defendants are Liable for Back Wages as Calculated by DOL

DOL asserts that it is entitled to summary judgment for back wages from Defendants' failure to pay overtime. First, DOL seeks $555,905.40 for the overtime hours when Defendants did not pay any over time from 2018 to 2019. (DOL's Mot., PageID 48551; Alloway Decl., ECF No. 111-1, ¶ 27.) DOL argues that it is also entitled to an additional amount of $6,922,915.39 for back wages after Defendants lowered the regular rate of pay, and effectively paid the aides straight time for all overtime hours worked. (DOL's Mot., PageID 48554; Alloway Decl., ¶ 29.) In total, DOL requests an award of $7,478,820.79. (Alloway Decl., ¶ 30; *see* ECF No. 111-3.)

In support of this calculation, DOL submitted the declaration of Stephen Alloway, an investigator in the Wage and Hour Division of DOL. (Alloway Decl.) According to Mr. Alloway, DOL calculated back wages by taking each employees' gross pay and dividing it by the number of bi-weekly hours worked, to reach a regular rate of pay. (ECF No. 111-2 (Mr. Alloway's Narrative Report of his investigation into Americare and Mr. Adhikari).) Then Mr. Alloway multiplied the regular rate of each aide by 1.5, to reach a premium overtime rate, and multiplied that premium rate by the number of overtime hours worked. (*Id.*) Mr. Alloway relied on Defendants' self-audited reports and payroll records subpoenaed from Automatic Data Processing,

Inc. ("ADP"), which provided payroll services to Defendants, to reach the damages figure. (Alloway Decl., ¶¶ 4–6, 8.) He also provided a detailed spreadsheet of all back wages owed to each aide for overtime violations. (*Id.* ¶ 7; *see* ECF No. 111-3.)

Defendants do not point to any errors in DOL's calculations, nor have they provided their own damages calculations. (*See* Defs.' Opp.) Without evidence to the contrary, Defendants' evidence cannot establish a dispute of material fact on damages. The Court **GRANTS** DOL's Motion for Summary Judgment and awards back wages in the amount of $7,478,820.79.

## IV. Defendants are Liable for Liquidated Damages

Next, DOL contends that it is entitled to summary judgment regarding Defendants' liability for liquidated damages. (DOL's Mot., PageID 48554–57.) Defendants counter that their good faith defense precludes summary judgment. (Defs.' Opp., PageID 48859.)

Liquidated damages are the default for FLSA violations, unless an employer can prove that it acted in good faith and had reasonable grounds to believe that its act or omission complied with the FLSA. 29 U.S.C. § 216(b) ("An employer who violates the provisions of section . . . 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid . . . overtime compensation . . . and in an additional equal amount as liquidated damages."); 29 U.S.C. § 260 (explaining good faith defense to liquidated damages); *Miller v. SBK Delivery, LLC*, No. 2:21-cv-4744, 2024 U.S. Dist. LEXIS 35204, at *10 (S.D. Ohio Feb. 29, 2024) (Watson, J.). Liquidated damages are considered "compensation, not a penalty or punishment," and compensate employees for the delay in payment of wages. *Elwell*, 276 F.3d at 840 (citations omitted).

The burden is on the employer to prove it acted in good faith and had reasonable grounds to believe that it complied with the FLSA, and the burden is "substantial." *Id.* To show that it acted in good faith, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Sec'y of Labor v. Timberline S., LLC*, 925

37

F.3d 838, 856 (6th Cir. 2019) (quoting *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574 (6th Cir. 2004) (citations omitted)). "[D]emonstrating good faith requires more than the absence of intent or knowledge." *Solis v. Min Fang Yang*, 345 F. App'x 35, 39 (6th Cir. 2009).

Defendants argue that Mr. Adhikari had an honest intention to learn the requirements under FLSA, and to comply with the Act. (Defs.' Opp., PageID 48859.) To support this proposition, Mr. Adhikari testified that he sought the advice of several attorneys to understand Americare's obligations. (*Id.*; *see also* Americare Dep., ECF No. 64-1, 51:19–22; 55:05–16; 62:3–9.) He claims he received contradictory and confusing advice, that led him to consult Attorney Linkosky. (*Id.*) According to Mr. Adhikari, Mr. Linkosky told him that he could lower the employee's regular rate of pay, by agreement with employee, and then pay overtime at that lowered rate. (Americare Dep., 70:15–71:6.) Based on this advice, Mr. Adhikari implemented the post-September 2019 pay practices. (*Id.*) Mr. Adhikari reasons that his reliance on the advice of his counsel gave him reasonable grounds to believe he complied with the FLSA. (Defs.' Opp., PageID 48860.)

Here, Defendants have not met their burden to establish that liquidated damages are inappropriate. As the Court noted *supra*, even if Mr. Adhikari received conflicting legal advice, he also admitted that Mr. Linkosky advised him to start paying overtime to the aides. (*Supra*, Section I(D)(i); Defs.' Opp., PageID 48857; Americare Dep., ECF No. 64-1, 282:25–283:10; 285:23–24.) He also testified that he knew DOL amended the rules in 2013 to exclude home care agencies from overtime exemptions. (Americare Dep., 51:12–18.) By July 2018, Mr. Adhikari paid the Intra-National home care aides overtime compensation, but he waited until September 2019 to pay Americare aides overtime. (Adhikari Dep., ECF No. 69-1, 38:06–18.)

Mr. Adhikari also admits that Mr. Linkosky advised him to set a regular pay rate, by agreement with aides, and that the regular rate of pay could not fluctuate. (Americare Dep., 70:15–

71:6.) Yet the aides' rate of pay from September 2019 to April 2024 fluctuated depending on the number of hours worked. (*See supra*, Section I(D)(ii).) And despite acknowledging that any changes to the regular rate should be done by agreement with the employees, Defendants produced only 81 written rate change agreements. (Americare and Adhikari Cont. Dep., ECF No. 65-1, 9:25–13:22.) DOL has put forth evidence that over 1,700 aides were subject to Defendants' improper pay practice. (DOL's Reply, PageID 48949.)

Defendants cannot meet their substantial burden by shifting the blame to others to keep them apprised of the law. *Walsh v. Indep. Home Care of Mich., LLC*, No. 20-10170, 2022 U.S. Dist. LEXIS 88634, at *15 (E.D. Mich. May 17, 2022). Ignorance of the law does not demonstrate good faith. *Solis*, 345 F. App'x at 39 (concluding that good faith requires more than "the absence of intent or knowledge"). Defendants did not take sufficient affirmative steps to comply with the FLSA. The Court's conclusion on Defendants' good faith defense is consistent with the Court's finding that Defendants acted willfully. *See E.E.O.C. v. City of Detroit Health Dept., Herman Kiefer Complex*, 920 F.2d 355, 358 (6th Cir. 1990) (explaining that where the jury found a willful violation of the FLSA, the district court could not find the defendant acted in good faith). DOL is thus entitled to an equal amount of liquidated damages and its Motion is **GRANTED**.

## V.     DOL is Entitled to Injunctive Relief

DOL also requests injunctive relief against Defendants to prevent future violations. (DOL's Mot., PageID 48561.) Under 29 U.S.C. § 217, "[t]he district courts . . . shall have jurisdiction, for cause shown, to restrain violations" of the FLSA. "The purpose of issuing an injunction against future violations is to effectuate general compliance with the Congressional policy of abolishing substandard labor conditions by preventing recurring future violations." *Reich v. Petroleum Sales*,

30 F.3d 654, 656 (6th Cir. 1994) (quoting *Martin v. Funtime, Inc*., 963 F.2d 110, 113–14 (6th Cir. 1992) and describing the remedial, rather than punitive purpose of an injunction)

Issuing an injunction is left to the reasonable discretion of the trial judge. *Id.* (citation omitted). But courts should consider: (1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance." *Id.* at 657. "The most important factor is the likelihood that the employer will comply with the [FLSA] in the future." *Id.* DOL bears the burden of proving an injunction is warranted.

Applying the considerations above, the Court finds injunctive relief prohibiting Defendants from violating FLSA overtime and recordkeeping provisions appropriate. Incorporating much of the earlier damages analysis, the record shows that Defendants continuously disregarded obligations under the FLSA and demonstrated a past and persistent history of violating the FLSA's overtime requirements. (*See supra*, Section IV); *Sec'y of United States DOL v. Am. Made Bags, LLC*, No. 5:19CV863, 2022 U.S. Dist. LEXIS 27352, at *28 (N.D. Ohio Feb. 15, 2022) (awarding injunctive relief where defendants had a "past and persistent history" of violating the FLSA); *Funtime, Inc.*, 963 F.2d at 114 (granting injunctive relief because defendant "exercised less than good faith in attempting to comply with the FLSA"). Defendants have presented no evidence of compliance with the FLSA's requirements. Nor have Defendants shown a likelihood, or given any assurance, that they would obey the FLSA. *See Reich*, 30 F.3d at 657. Accordingly, the Court **GRANTS** DOL's Motion for Summary Judgment.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Department of Labor's Motion for Leave to File Reply in Support of Motion for Summary Judgment Instanter (ECF No. 117).

The Court **DENIES** Defendants' Partial Motion for Summary Judgment (ECF No. 113) and **GRANTS** the Department of Labor's Motion for Summary Judgment (ECF No. 112).

Defendants are **ORDERED** to pay back wages in the amount of $7,478,820.79 for the period between October 2019 and April 2024 when Defendants failed to pay overtime to their employees. To determine the appropriate amount of damages from April 2024 to present, the Court **ORDERS** Defendants to produce payroll and time records dating back to April 15, 2024 to DOL within **14 DAYS**. If the records confirm continuing overtime violations, DOL is **ORDERED** to file Notice and a Proposed Order detailing the amount of damages owed within **14 DAYS** of receiving the records. Defendants may respond within **14 DAYS** of DOL's Notice. Defendants are **ORDERED** to pay an equal amount of liquidated damages.

DOL's Motion for an Order to Admit Deposition of John Linkosky (ECF No. 101) is **DENIED as MOOT**. The Settlement Conference scheduled for January 14, 2025 is **VACATED** (ECF No. 100). This case remains open.

**IT IS SO ORDERED.**

<u>1/9/2025</u>                                              <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                                **EDMUND A. SARGUS, JR. UNITED STATES DISTRICT JUDGE**